## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PUBLIC UTILITY DISTRICT NO. 1
OF SNOHOMISH COUNTY,
WASHINGTON,

Appellant,

v.

ENRON POWER MARKETING, INC.,

Appellee.

No. 07 Civ. 218 (LAP),
07 Civ. 3078 (LAP)

## BRIEF FOR APPELLANT
## PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY

Alan E. Gamza (AG 2014)
Philippe Zimmerman (PZ 7744)
Alan Kolod (AK 3108)
MOSES & SINGER LLP
405 Lexington Avenue
New York, NY  10174
(212) 554-7800

Michael A. Goldfarb
LAW OFFICES OF
   MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, WA  98121
(206) 374-7090

Michael J. Gianunzio
   General Counsel
Eric L. Christensen
   Assistant General Counsel
PUBLIC UTILITY DISTRICT NO. 1
   OF SNOHOMISH COUNTY
2320 California Street
Everett, WA  98206
(425) 783-8649

Douglas F. Curtis (DC 2076)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

Craig Goldblatt
Joel Millar
Danielle Spinelli
D. Hien Tran
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

Lisa Lynch
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

JURISDICTIONAL STATEMENT .........................................................................................4

STATEMENT OF ISSUES ......................................................................................................5

STATEMENT OF THE CASE..................................................................................................6

STATEMENT OF FACTS ........................................................................................................8

    A.    Statutory and Regulatory Background......................................................8

    B.    Factual and Procedural Background ........................................................11

STANDARD OF REVIEW .....................................................................................................21

ARGUMENT ...........................................................................................................................21

I.    FERC'S JUNE 28, 2006 ORDER DENYING ENRON'S TERMINATION-
PAYMENT CLAIM DID NOT VIOLATE THE BANKRUPTCY CODE'S
AUTOMATIC STAY AND THEREFORE IS NOT VOID AB INITIO.........................21

    A.    Snohomish Did Not Violate The Automatic Stay When It Sought To
Defend Itself, In Response To Enron's Claim Against It, By Petitioning
FERC To Declare The Termination Payment Unlawful.......................................21

    B.    FERC'S June 28, 2006 Order Was Entered Pursuant To FERC's Police
And Regulatory Power And Therefore Falls Within Section 362(b)(4)'s
Exception To The Automatic Stay For Regulatory Proceedings.........................26

II.    FERC'S JUNE 28 ORDER DENYING ENRON'S TERMINATION-PAYMENT
CLAIM MUST BE ACCORDED PRECLUSIVE EFFECT.............................................34

    A.    FERC's June 28 Order Actually Decided The Same Issue Before The
Bankruptcy Court, And The Decision Was Necessary To Its Judgment...............35

    B.    FERC Acted In A Judicial Capacity In Resolving The Termination-
Payment Issue, Which Was Properly Before It, And The Parties Had A
Full And Fair Opportunity To Litigate The Issue...................................................36

    C.    The June 28 FERC Order Is Final For Purposes Of Issue Preclusion. .................39

III.    IN THE ALTERNATIVE, THE DOCTRINE OF PRIMARY JURISDICTION
REQUIRES DEFERRAL OF ENRON'S TERMINATION-PAYMENT SUIT
UNTIL FERC DETERMINES WHETHER THE TERMINATION PAYMENT
IS AN UNJUST PROFIT THAT CANNOT BE COLLECTED.....................................41

CONCLUSION.........................................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Advance United Expressways, Inc. v. Eastman Kodak Co.*, 965 F.2d 1347 (5th Cir. 1992),
   *modified on other grounds on rehearing*, 990 F.2d 184 (5th Cir. 1993) .......................... 49

*Alberta Gas Chemicals Ltd. v. Celanese Corp.*, 650 F.2d 9 (2d Cir. 1981) ................................. 46

*Anderson v. Bungee International Manufacturing Corp.*, 44 F. Supp. 2d 534
   (S.D.N.Y. 1999) ........................................................................................................ 35

*Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981) ..................................................... 40, 48

*Ashley v. Boehringer Ingelheim Pharmaceuticals*, 7 F.3d 20 (2d Cir. 1993) ............................... 20

*Astoria Federal Savings & Loan Association v. Solimino*, 501 U.S. 104 (1991) .......................... 34

*Atlantis Express, Inc. v. Standard Transportation Services*, 955 F.2d 529 (8th Cir. 1992) ......... 49

*Board of Governors of the Federal Reserve System v. MCorp Finance, Inc.*,
   502 U.S. 32 (1991) .............................................................................................. 27, 32, 33

*Borough of Lansdale v. PP & L, Inc.*, 426 F. Supp. 2d 264 (E.D. Pa. 2006),
   *reconsidered in part on other grounds*, 2007 WL 1461807
   (E.D. Pa. May 16, 2007) ..................................................................................... 35, 38, 39

*Boston Edison Co. v. Federal Energy Regulatory Commission*, 856 F.2d 361
   (1st Cir. 1988) ........................................................................................................ 10

*CFTC v. Incomco, Inc.*, 649 F.2d 128 (2d Cir. 1981) ................................................................. 27

*California ex rel. Lockyer v. Federal Energy Regulatory Commission*, 383 F.3d 1006
   (9th Cir. 2004) ........................................................................................................ 10

*Chauffeur's Training School, Inc. v. Spellings*, 478 F.3d 117 (2d Cir. 2007) ....................... 34, 38

*Checkers Drive-in Restaurants, Inc. v. Commissioner of Patents & Trademarks*,
   51 F.3d 1078 (D.C. Cir. 1995) .................................................................................... 23

*Christo v. Padgett*, 223 F.3d 1324 (11th Cir. 2000) ................................................................. 39

*Cities Service Gas Producing Co. v. Federal Power Commission*, 233 F.2d 726
   (10th Cir. 1956) ....................................................................................................... 11

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) .............................................. 27

*Corso v. Dewitt*, 180 B.R. 589 (C.D. Cal. 1994) .......................................................................25

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) ...........................................................35

*Delta Traffic Service, Inc. v. Appco Paper & Plastics Corp.*, 893 F.2d 472 (2d Cir.),
    *vacated on other grounds*, 498 U.S. 964 (1990)..................................................................49

*Delta Traffic Service v. Georgia-Pacific Corp.*, 936 F.2d 64 (2d Cir. 1991) ...............................50

*Delta Traffic Service v. Transtop, Inc.*, 902 F.2d 101 (1st Cir. 1990)..........................................49

*Disher v. Information Resources, Inc.*, 873 F.2d 136 (7th Cir. 1989) ..........................................21

*EDP Medical Computer System, Inc. v. United States*, 480 F.3d 621 (2d Cir. 2007) ..................41

*Ellis v. Tribune Television Co.*, 443 F.3d 71 (2d Cir. 2006)..............................................21, 42, 44

*Forney v. Apfel*, 524 U.S. 266 (1998) .........................................................................................20

*Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38 (2d Cir. 1986) .................................................35

*Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51 (2d Cir. 1994) ...................46, 50

*Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F. Supp. 2d 192 (D. Conn. 2006) ........35, 37

*Hirschfeld v. Spanakos*, 104 F.3d 16 (2d Cir. 1997)....................................................................38

*Hoblock v. Albany County Board of Elections*, 422 F.3d 77 (2d Cir. 2005) ................................21

*Holland America Insurance Co. v. Roy*, 777 F.2d 992 (5th Cir. 1985) ........................................26

*In re Berry Estates, Inc.*, 812 F.2d 67 (2d Cir. 1987) .............................................................23, 27

*In re Bridgestone/Firestone, Inc., Tire Products Liability Litigation*, 333 F.3d 763
    (7th Cir. 2003)......................................................................................................................39

*In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992) ..............................................................28

*In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440
    (1st Cir. 1986) ......................................................................................................................29

*In re Crysen/Montenay Energy Co.*, 902 F.2d 1098 (2d Cir. 1990) .............................................22

*In re Federal Communications Commission*, 217 F.3d 125 (2d Cir. 2000) ...........................27, 33

*In re Finance News Network Inc.*, 158 B.R. 570 (S.D.N.Y. 1993)................................................23

*In re First Alliance Mortgage Co.*, 263 B.R. 99 (B.A.P. 9th Cir. 2001) ......................................29

*In re MTBE Products Liability Litigation*, Nos. 04-5974, 04-6056, 2007 WL 1500338
    (2d Cir. May 24, 2007) ..........................................................................................30

*In re Merrick*, 175 B.R. 333 (B.A.P. 9th Cir. 1994).....................................................23

*In re Stockbridge Funding Corp.*, 158 B.R. 914 (S.D.N.Y. 1993) ...............................21

*In re Transportation Systems International, Inc. v. Honeywell, Inc.*,
    110 B.R. 888 (D. Minn. 1990), *affirmed on other grounds*,
    930 F.2d 625 (8th Cir. 1991) ...............................................................24, 25, 26

*In re University Medical Center*, 973 F.2d 1065 (3d Cir. 1992) ...................................29

*Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922) ........................48

*Kremer v. Chemical Construction Corp.*, 456 U.S. 461 (1982) ....................................38

*Lockyer v. Mirant Corp.*, 398 F.3d 1098 (9th Cir. 2005) ...................................28, 29, 30

*Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94 (1915) ..........................48

*Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80 (2d Cir. 1961) .............39

*Maislin Industrial U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990).............47, 48

*Martin-Trigona v. Champion Federal Savings & Loan Association*, 892 F.2d 575
    (7th Cir. 1989)..................................................................................................22, 23

*McMullen v. Sevigny (In re McMullen)*, 386 F.3d 320 (1st Cir. 2004) ...................28, 29

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992)..........................................34, 39

*Midlantic National Bank v. New Jersey  Department of Environmental Protection*,
    474 U.S. 494 (1986)................................................................................................27

*Milne Truck Lines v. Makita U.S.A.*, 970 F.2d 564 (9th Cir. 1992)...............................49

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988).......................9

*Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951) ..........48

*NLRB v. 15th Avenue Iron Works, Inc.*, 964 F.2d 1336 (2d Cir. 1992)........................27

*NLRB v. E.D.P. Medical Computer System*, 6 F.3d 951 (2d Cir. 1993)........................27

*Nader v. Allegheny Airlines*, 426 U.S. 290 (1976) ........................................................48

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986) ...............................8

*National Fuel Gas Supply Corp. v. Federal Energy Regulatory Commission*,
    811 F.2d 1563 (D.C. Cir. 1987) ...............................................................................10

*New York Electric & Gas Corp. v. New York Independent System Operator, Inc.*,
    168 F. Supp. 2d 23 (N.D.N.Y. 2001) ........................................................................45

*New York State Electric & Gas Corp. v. Federal Energy Regulatory Commission*,
    875 F.2d 43 (3d Cir. 1989) .......................................................................................10

*Niagara Mohawk Power Corp. v. Federal Power Commission*, 379 F.2d 153
    (D.C. Cir. 1967) ..........................................................................................................9

*Niagara Mohawk Power Corp. v. Megan Racine Associates, Inc.*, 180 B.R. 375
    (Bankr. N.D.N.Y. 1995) .............................................................................................46

*PBGC v. LTV Corp.*, 875 F.2d 1008 (2d Cir. 1989), *reversed on other grounds*,
    496 U.S. 633 (1990) ...................................................................................................27

*Panhandle Eastern Pipe Line Co. v. Utilicorp United Inc.*, 928 F. Supp. 466
    (D. Del. 1996) ............................................................................................................40

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) ...................................................34

*Pennsylvania Water & Power Co. v. Federal Power Commission*, 343 U.S. 414 (1952).........8, 30

*Perez v. Volvo Car Corp.*, 247 F.3d 303 (1st Cir. 2001) ..............................................41

*Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.*, 170 F.3d 1373
    (Fed. Cir. 1999) .........................................................................................................41

*Price & Pierce International, Inc. v. Spicers International Paper Sales, Inc.*, 50 B.R. 25
    (S.D.N.Y. 1985) .........................................................................................................26

*Public Utility Commission v. Federal Energy Regulatory Commission*, 462 F.3d 1027
    (9th Cir. 2006) ...........................................................................................................10

*Public Utility District No. 1 of Snohomish County v. Federal Energy Regulatory
    Commission*, 471 F.3d 1053 (9th Cir. 2006), *petition for certiorari filed*,
    No. 06-1457 (May 3, 2007) .................................................................................9, 12, 47

*Reiter v. Cooper*, 507 U.S. 258 (1993) ....................................................................42, 48, 49, 50

*Reliant Energy Services v. Enron Canada Corp.*, 349 F.3d 816 (5th Cir. 2003) .........................21

*Safir v. Gibson*, 432 F.2d 137 (2d Cir. 1970) ............................................................35

*Saftey-Kleen, Inc. v. Wyche*, 274 F.3d 846 (4th Cir. 2001) ....................................28

*St. Paul Fire & Marine Insurance Co. v. Pepsico, Inc.*, 884 F.2d 688 (2d Cir. 1989)................22

*Sam Rayburn Dam Electric Cooperative v. Federal Power Commission*, 515 F.2d 998 (D.C. Cir. 1975) ....................................................................11

*Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999) ....................................36

*Securities & Exchange Commission v. Brennan*, 230 F.3d 65 (2d Cir. 2000)......................27, 28

*Sierra Club v. U.S. Nuclear Regulatory Commission*, 862 F.2d 222 (9th Cir. 1988)..................41

*Southwestern Bell Telegraph v. Allnet Communications Services*, 789 F. Supp. 302 (E.D. Mo. 1992) ...............................................................49

*T.L. James & Co.*, 36 F.P.C. 463 (1966)......................................................11

*Tennessee Gas Pipeline Co. v. 104 Acres of Land More or Less*, 749 F. Supp. 427 (D.R.I. 1990) ......................................................40

*Texas Eastern Transmission Corp. v. Federal Power Commission*, 306 F.2d 345 (5th Cir. 1962).....................................................11

*Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263 (1960)................................11

*Town of Norwood v. Federal Energy Regulatory Commission*, 217 F.3d 24 (1st Cir. 2000) .....................................................10, 31

*Tripati v. G.L. Henman*, 857 F.2d 1366 (9th Cir. 1988).....................................41

*United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2d Cir. 1993) ....................................39

*United States v. Inslaw*, 932 F.2d 1467 (D.C. Cir. 1991) ....................................22, 23

*United States v. McGann*, 951 F. Supp. 372 (E.D.N.Y. 1997) ....................................39

*United States v. Utah Construction & Mining Co.*, 384 U.S. 394 (1966) ....................................34

*United States v. Western Pacific Railroad Co.*, 352 U.S. 59 (1956) .........................10, 42, 46, 50

*Vreeland v. Federal Power Commission*, 528 F.2d 1343 (5th Cir. 1976) ....................................11

*Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199 (5th Cir. 1988)........................................45

*Wegoland Ltd. v. Nynex Corp.*, 27 F.3d 17 (2d Cir. 1994) ...........................................48

*Wickham Contracting Co. v. Board of Education*, 715 F.2d 21 (2d Cir. 1983) .....................36, 38

*Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491 (10th Cir. 1996) ...........................45

*Wolstein v. Docteroff*, 133 F.3d 210 (3d Cir. 1997) .......................................39

*Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005) ...................................................34

*Zdanok v. Glidden Co.*, 327 F.2d 944 (2d Cir. 1964) .................................39

## FERC DECISIONS

*American Electric Power Service Corp.*, 103 F.E.R.C. ¶ 61,345 (2003) ...............................12, 14

*Arkansas Louisiana Gas Co. v. Hall*, 7 F.E.R.C. ¶ 61,175 (1979) ................................11

*Boston Edison Co. v. Town of Concord*, 49 F.E.R.C. ¶ 61,213 (1989) .........................32

*Citizens Power & Light Corp.*, 48 F.E.R.C. ¶ 61,210 (1989) ..........................................9

*El Paso Electric Co.*, 108 F.E.R.C. ¶ 61,071 (2004) ...................................10, 15, 42, 43

*El Paso Electric Co.*, 110 F.E.R.C ¶ 61,280 (2005) .........................................15, 16, 17

*Enron Power Marketing, Inc.*, 65 F.E.R.C. ¶ 61,305 (1993) ...................................11, 42

*Enron Power Marketing, Inc.*, 103 F.E.R.C. ¶ 61,343 (2003), *rehearing denied*, 106 F.E.R.C. ¶ 61,024 (2004), *petition for review filed*, No. 04-1040 (D.C. Cir. Feb. 4, 2004) ......................................12, 42, 43, 44, 47

*Enron Power Marketing, Inc.*, 103 F.E.R.C. ¶ 61,346 (2003), *rehearing denied*, 106 F.E.R.C. ¶ 61,020 (2004) ....................................................................14

*Enron Power Marketing, Inc.*, 106 F.E.R.C. ¶ 61,024 (2004), *petition for review filed*, No. 04-1040 (D.C. Cir. Feb. 4, 2004) ...................................................1, 12, 44

*Florida Power & Light*, 60 F.E.R.C. ¶ 61,001 (1992) .................................................11

*Golden Spread Electric Cooperative, Inc.*, 40 F.E.R.C. ¶ 61,348 (1987) .....................11

*Idaho Power Co.*, 39 F.E.R.C. ¶ 61,032 (1987) ...............................................................10

*Nevada Power Co. v. Enron Power Marketing, Inc.*, 103 F.E.R.C. ¶ 61,353, *rehearing denied*, 105 F.E.R.C. ¶ 61,185 (2003) ............................................................47

*Phelps Dodge Corp. v. El Paso Natural Gas Co.*, 84 F.E.R.C. ¶ 61,043 (1998) ........................11

*Public Service Co. v. New Hampshire Electric Cooperative, Inc.*,
55 F.E.R.C. ¶ 61,028 (1991) ............................................................................11, 32

*Public Utility District No. 1 of Snohomish County*, 115 F.E.R.C. ¶ 61,375 (2006) .......................3

*San Diego Gas & Electric Co.*, 93 F.E.R.C. ¶ 61,294 (2000) ......................................................12

*Seminole Electric Cooperative, Inc. v. Florida Power & Light Co.*,
53 F.E.R.C. ¶ 61,026 (1990) ........................................................................................11

*Southern Co. Services*, 37 F.E.R.C. ¶ 61,256 (1986).................................................................11

## STATUTES AND REGULATIONS

11 U.S.C. § 362(a)(3).................................................................3, 5, 7, 18, 21, 22, 24, 25, 26

11 U.S.C. § 362(b) ................................................................................................................26

11 U.S.C. § 362(b)(4) ...............................................................3, 4, 5, 18, 26, 27, 29

11 U.S.C. § 541(a)(1)...........................................................................................................22

Federal Power Act
     16 U.S.C. § 824(a) .............................................................................................8, 30
     16 U.S.C. § 824(b)(1) ................................................................................................8
     6 U.S.C. § 824d(a) .....................................................................................8, 30, 42
     16 U.S.C. § 824d(b) ....................................................................................................8
     16 U.S.C. § 824d(c) ............................................................................8, 30, 42, 44
     16 U.S.C. § 824d(e) ...........................................................................................10, 30
     6 U.S.C. § 824e(a).............................................................................9, 30, 42
     6 U.S.C. § 824e(b)....................................................................................................10
     16 U.S.C. § 825h ......................................................................................................10
     16 U.S.C. § 825l.......................................................................................................40
     16 U.S.C. § 825l(a) ............................................................................................17, 40
     6 U.S.C. § 825l(c) ....................................................................................................40

28 U.S.C. § 158(a)(1)...........................................................................................................4

28 U.S.C. § 1292(b) ..............................................................................................................7

28 U.S.C. § 1452....................................................................................................................30

Section 1290 of Energy Policy Act of 2005,
  Pub. L. No. 109-58, 119 Stat. 594 ..........................................................................1, 5, 6, 16

18 C.F.R. § 35.1(e)..........................................................................................................30, 42, 44

## OTHER AUTHORITIES

Restatement (Second) of Judgments § 13 cmt. f (1982)...................................................41

Restatement (Second) of Judgments § 83 (1982) ..........................................................35

Restatement (Second) of Judgments § 83(2) (1982) ....................................................36

18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and
  Procedure* § 4416 (2d ed. 2002) .......................................................................34

# PRELIMINARY STATEMENT

This case stems from the Western power crisis of 2000 and 2001, in which certain wholesale power sellers, including appellee Enron Power Marketing, Inc. ("Enron"), engaged in unprecedented fraud and manipulation of the market for electrical power. As the Federal Energy Regulatory Commission ("FERC") later concluded, Enron's "abuse, overreaching, and gouging" resulted in "unjust and unreasonable rates" for electrical power, requiring the revocation of Enron's authority to sell electrical power at market-based rates.[1]

At the apogee of the Western power crisis, when prices in the spot market for electricity had soared to previously unseen heights, appellant Public Utility District No. 1 of Snohomish County ("Snohomish") entered into a long-term contract to purchase electrical power from Enron, relying on Enron's false representations that it was solvent and had investment-grade credit. Upon Enron's financial collapse, Snohomish terminated the contract. Shortly thereafter, Enron filed for bankruptcy, and it subsequently brought suit against Snohomish in bankruptcy court seeking a "termination payment" under the contract.

All such contracts for the sale of electrical power, and all rates and charges collected by sellers under such contracts, are subject to comprehensive regulation and oversight by FERC pursuant to the Federal Power Act ("FPA"). FERC has the exclusive power to craft remedies for violations of the FPA or of a seller's market-based rate authority. In addition, as part of its regulatory authority, FERC has jurisdiction, concurrent with state and federal courts, to resolve state contract-law issues that arise with respect to FERC-regulated energy contracts. Yet the bankruptcy court repeatedly erred by failing to respect FERC's broad regulatory authority over the contract between Enron and Snohomish.

---

[1] *Enron Power Mktg., Inc.*, 106 F.E.R.C. ¶ 61,024, 61,093-94 (2004), *pet. for rev. filed*, No. 04-1040 (D.C. Cir. Feb. 4, 2004).

Snohomish now appeals from two orders of the bankruptcy court, each of which embodies that fundamental error. In an October 30, 2006 order, the bankruptcy court wrongly held that a June 2006 FERC order—in which FERC determined that Enron had fraudulently induced Snohomish to enter the parties' contract and thus could not collect a termination payment—violated the automatic stay provisions of the Bankruptcy Code and thus was void and unenforceable. (Order, Docket No. 73 ("Oct. 30 Order"), attached as Exhibit 1.)[2] Subsequently, in a March 9, 2007 opinion and March 19, 2007 order, the bankruptcy court refused to defer further proceedings on Enron's termination-payment claim, even though FERC is now exercising its exclusive jurisdiction under the FPA to determine whether the termination payment is an unjust profit that Enron should be barred from collecting. (Op., Docket No. 111 ("March 9 Op."), attached as Exhibit 2; Order, Docket No. 115 ("March 19 Order"), attached as Exhibit 3.) Although the bankruptcy court ultimately dismissed Enron's adversary proceeding without prejudice in order to permit Enron to bring its claim in arbitration, it did so only because it rejected Snohomish's contention that, in light of the FERC proceedings, Enron's claim should not have gone forward at all.

In fact, the two separate FERC proceedings each should have precluded Enron from pursuing its termination-payment claim against Snohomish. *First*, in June 2006, FERC issued an order pursuant to Section 1290 of the Energy Policy Act of 2005, which, with respect to the contract at issue here, grants FERC "exclusive jurisdiction . . . to determine whether a requirement to make termination payments . . . is not permitted under a . . . contract . . . or is otherwise unlawful on the grounds that the contract is unjust and unreasonable or contrary to the public interest." Pub. L. No. 109-58, 119 Stat. 594, 984. In that order, FERC addressed Enron's

---

[2] "Docket No." references refer to the docket in the bankruptcy court adversary proceeding, No. 03-2064, unless otherwise specifically indicated.

claim for a termination payment against Snohomish and, applying New York law, held that Enron's fraudulent representations rendered its contract with Snohomish voidable and precluded it from recovering a termination payment. *Public Utility Dist. No. 1 of Snohomish County*, 115 F.E.R.C. ¶ 61,375 (2006) ("June 28 Order"), attached as Exhibit 4. This Court subsequently held that Section 1290 does not give FERC exclusive jurisdiction to determine whether a termination-payment claim is permitted under a FERC-regulated contract if doing so involves addressing questions of state law, and Snohomish does not contest that conclusion for purposes of this appeal. This Court also recognized, however, that FERC possesses concurrent jurisdiction over such state-law questions, which are "'inextricably intertwined' with FERC's regulatory function." Op. & Order, *Enron Power Mktg., Inc. v. Public Utility Dist. No. 1 of Snohomish County*, No. 05-10129 (S.D.N.Y. Aug. 31, 2006) ("Aug. 31 Op."), at 35. FERC therefore had the power to decide Snohomish's fraudulent inducement defense, and, once it did so, its decision was binding on the parties.

The bankruptcy court wrongly held that FERC's June 2006 order, and any attempt to enforce that order, violated the automatic stay provisions of the Bankruptcy Code and hence were void *ab initio*. The provision on which the bankruptcy court relied bars only acts "to obtain possession of property of the estate . . . or to exercise control over property of the estate," 11 U.S.C. § 362(a)(3), not actions taken to defend against a claim by the debtor. Because Snohomish brought the FERC proceeding in order to *defend* against Enron's termination-payment claim—not to obtain or control estate property—the proceeding did not implicate the automatic stay at all. In addition, even if the FERC proceeding fell within Section 362(a)(3), it would be exempt from the automatic stay under Section 362(b)(4), which excludes from the stay any proceeding by FERC to enforce its "police and regulatory power." Because, in issuing its order, FERC was not acting as, or on behalf of, a creditor to protect its pecuniary interests, but

pursuant to its authority to protect the public interest by overseeing contracts for the sale of electricity, its action was exempt from the automatic stay under Section 362(b)(4).

Because FERC's order did not violate the automatic stay and thus was not void, it should have been accorded preclusive effect. FERC's order decided precisely the same dispositive issue before the bankruptcy court: whether Enron fraudulently induced Snohomish to enter the parties' contract, rendering the contract voidable and the termination-payment provision unenforceable. The parties had a full and fair opportunity to litigate that issue in an adjudicative proceeding before FERC; FERC's ruling on that issue was necessary to its judgment; and FERC's decision—which has not been stayed and is enforceable under the FPA—is sufficiently final to warrant issue-preclusive effect. Rather than giving Enron a second bite at the apple, the bankruptcy court should have recognized that FERC's decision is valid and binding.

*Second*, even leaving aside FERC's June 2006 order, the bankruptcy court should have dismissed or stayed Enron's adversary proceeding under the doctrine of primary jurisdiction. FERC is currently conducting proceedings to determine the proper remedy for Enron's market manipulation and violation of the terms of its market-based rate authority; FERC is considering in those proceedings whether the termination payment Enron seeks from Snohomish constitutes unjust profits that Enron should not be permitted to collect. Because that question involves important policy considerations within FERC's exclusive jurisdiction, implicates FERC's regulatory authority to craft a remedy for Enron's misconduct, and is already under consideration by FERC, the bankruptcy court should have deferred any further action on Enron's termination-payment claim until FERC has resolved Enron's entitlement to a termination payment.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 158(a)(1) over: (1) the bankruptcy court's order entered on October 30, 2006, enforcing the automatic stay, from which Snohomish timely

appealed on November 3, 2006; and (2) the bankruptcy court's order entered on March 19, 2007, dismissing Enron's adversary proceeding without prejudice in favor of arbitration, from which Snohomish timely appealed on March 26, 2007.

## STATEMENT OF ISSUES

Snohomish raises the following issues on appeal:

1.    Whether the Bankruptcy Code's automatic stay of acts to "obtain possession of" or "exercise control over" property of the debtor's bankruptcy estate under 11 U.S.C. § 362(a)(3) barred Snohomish from defending itself, in response to Enron's suit to collect a disputed termination payment from Snohomish, by filing a petition with FERC seeking a ruling that the termination payment was unlawful under the FPA and state law.

2.    Whether the Bankruptcy Court erred in ruling that the determination of state contract-law issues regarding contracts within FERC's regulatory jurisdiction is outside FERC's regulatory police power and thus not within the exception to the automatic stay set out in 11 U.S.C. § 362(b)(4).

3.    Whether FERC's June 28, 2006 order holding that Enron could not collect a termination payment because it had fraudulently induced Snohomish to enter the contract in question is preclusive and bars further litigation of Enron's termination-payment claim.

4.    Whether the Bankruptcy Court erred by refusing to dismiss or stay Enron's adversary proceeding seeking a termination payment, under the doctrine of primary jurisdiction, until FERC determines in related pending administrative proceedings whether the termination payment constitutes an unlawful profit made in violation of the FPA.

In addition, Snohomish preserves its arguments that Section 1290 of the Energy Policy Act of 2005 constitutionally grants exclusive jurisdiction to FERC to determine whether Enron may lawfully collect a termination payment under the contract in question, and that FERC's

determination of the scope of its own jurisdiction may be set aside only by the Court of Appeals charged with reviewing FERC orders under the FPA.  In light of this Court's August 31, 2006 order, Snohomish will not reargue those points here, but reserves its right to raise those arguments on further appeal.

## STATEMENT OF THE CASE

This appeal arises out of an adversary proceeding brought in 2003 by Enron against Snohomish in the U.S. Bankruptcy Court for the Southern District of New York (Gonzalez, J.), seeking a termination payment under Enron's contract with Snohomish for the sale of electrical power.  In 2005, Congress enacted Section 1290 of the Energy Policy Act of 2005, which provides that with respect to that contract, among others, FERC shall have "exclusive jurisdiction under the Federal Power Act . . . to determine whether a requirement to make termination payments . . . is not permitted under a rate schedule (or contract under such a schedule) . . . or is otherwise unlawful on the grounds that the contract is unjust and unreasonable or contrary to the public interest."  Pub. L. No. 109-58, 119 Stat. 594, 984.  Snohomish filed a petition with FERC pursuant to Section 1290 seeking a ruling that Enron was not entitled to collect the termination payment it sought.  On June 28, 2006, FERC held that Enron had fraudulently induced Snohomish to enter the contract by falsely representing that it was solvent and possessed investment-grade credit; that, under New York law, the contract was therefore voidable; and that Enron could not collect a termination payment.  June 28 Order.

While Snohomish's petition before FERC was pending, this Court withdrew the reference of Enron's adversary proceedings against Snohomish and other similarly situated parties, at Enron's request, to consider the jurisdictional issues presented by Section 1290.  On August 31, 2006, this Court issued an opinion and order holding that Section 1290 did not grant FERC exclusive jurisdiction to determine the lawfulness of the termination payment to the extent doing

so involved deciding questions of state law.  Aug. 31 Op. at 38.  The Court certified that order

for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  On October 4, 2006, Snohomish and

the United States filed petitions for permission to appeal the August 31, 2006 order to the Court

of Appeals for the Second Circuit.  The Second Circuit granted those petitions on March 22,

2007, and the appeal is now being briefed.

 In the interim, on October 5, 2006, Enron moved for summary judgment in its adversary

proceeding against Snohomish.  Snohomish then filed a petition for interim relief at FERC,

seeking, *inter alia*, a declaration that Enron's attempts to pursue a termination payment in

bankruptcy court contravened FERC's June 28, 2006 order.  (Decl. Israel Dahan, Docket No. 67,

Ex. E.)  Enron moved the bankruptcy court to enjoin Snohomish from pursuing such relief, and

on October 30, 2006, the court granted Enron's motion in part, holding that FERC's June 28,

2006 order, and any attempt to enforce that order, violated the automatic stay under Section

362(a)(3) of the Bankruptcy Code, and were thus "void *ab initio*."  (Oct. 30 Order.)  Snohomish

appealed that order to this Court on November 3, 2006.

 Snohomish asked both the bankruptcy court and this Court to hold Enron's adversary

proceeding in abeyance during the pendency of its petition for permission to appeal this Court's

August 31, 2006 order on the dispositive jurisdictional issue; both courts declined to do so.  (Bk.

Ct. Order, Docket No. 64; Order, No. 05-10129 (S.D.N.Y. Dec. 13, 2006).)  Snohomish

therefore responded to Enron's summary judgment motion by filing a cross-motion asking the

bankruptcy court either to dismiss Enron's adversary proceeding in light of the arbitration clause

in the parties' contract or to dismiss or stay the proceeding while FERC decided whether, under

the FPA, any termination payment would constitute unjust profits that Enron should not be

permitted to collect; in the alternative, Snohomish sought summary judgment in its favor.

(Cross-Mot. To Dismiss, Stay or Defer, or in the Alternative, for Summ. J., Docket No. 80.)

In a March 9, 2007 opinion and March 19, 2007 order, the bankruptcy court ruled on the parties' cross-motions. The court refused to dismiss or stay the adversary proceeding against Snohomish in deference to the ongoing FERC proceedings, and instead dismissed the proceeding without prejudice to permit Enron to pursue its termination-payment claim through arbitration, retaining jurisdiction over any action to confirm an arbitration award. On March 26, 2007, Snohomish appealed the March 19, 2007 order to this Court. On April 30, 2007, this Court entered an order consolidating Snohomish's appeals from the bankruptcy court's October 30, 2006 and March 19, 2007 orders and setting a briefing schedule for the consolidated appeal.

## STATEMENT OF FACTS

### A.    Statutory and Regulatory Background

In 1935, recognizing that federal regulation of the interstate sale and transmission of electricity "is necessary in the public interest," 16 U.S.C. § 824(a), Congress enacted the FPA. The FPA's primary purpose is "to protect power consumers against excessive prices." *Pennsylvania Water & Power Co. v. FPC*, 343 U.S. 414, 418 (1952). To that end, the FPA grants FERC the exclusive authority to regulate and oversee all rates, charges, and contracts for "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 956, 966-67 (1986).

*1. FERC's Exclusive Jurisdiction To Determine Just And Reasonable Rates And Its Remedial Powers.* Sections 205 and 206 of the FPA lie at the core of FERC's regulatory authority. Section 205 requires utilities to file schedules with FERC showing all wholesale rates and charges for electric energy, "together with all contracts which in any manner affect or relate to such rates [and] charges," 16 U.S.C. § 824d(c), requires all such rates and charges to be "just and reasonable" and not unduly discriminatory or preferential, and declares any rates that are not just and reasonable to be "unlawful," *id.* § 824d(a)-(b). Section 206, in turn, provides that

whenever FERC finds that "any rate, charge, . . . or contract affecting such rate [or] charge" is "unjust, unreasonable, unduly discriminatory or preferential," it must "determine the just and reasonable rate, charge . . . or contract." *Id.* § 824e(a). Together, Sections 205 and 206 vest FERC with "exclusive authority" to ensure that filed rates, charges, and contracts satisfy the statutory standard. *See Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988).

In the 1990s, FERC began to shift from its traditional regulatory regime—in which sellers filed tariffs with FERC specifying the rates they intended to charge, and FERC approved those rates if they were "just and reasonable" under a cost-based standard—to a new, market-based regime. *See Public Util. Dist. No. 1 of Snohomish County v. FERC*, 471 F.3d 1053, 1058, 1063-64 (9th Cir. 2006), *pet. for cert. filed*, No. 06-1457 (May 3, 2007). Under this approach, a seller is not required to specify the precise rates to be charged in tariffs, but may be allowed to charge market-based rates if it can demonstrate that it lacks "market power," that is, the ability to "significantly influence price in the market by withholding service and excluding competitors for a significant period of time." *Citizens Power & Light Corp.*, 48 F.E.R.C. ¶ 61,210, 61,777 (1989); *see also Snohomish*, 471 F.3d at 1064-65. Nonetheless, FERC retains the obligation, and the exclusive authority, to ensure that rates, charges, and contracts comply with the FPA— including the obligation to ensure that charges are collected pursuant only to contracts "formed free from the influence of improper factors, such as market manipulation, the leverage of market power, or an otherwise dysfunctional market." *Id.* at 1085-86.

The FPA grants FERC broad authority to take remedial action in response to violations of the FPA; indeed, FERC's administrative discretion is at its "zenith" when fashioning remedies. *See Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967). Sections 205 and 206 authorize FERC to order sellers to refund specified charges that exceed a just and

reasonable rate.  16 U.S.C. §§ 824d(e), 824e(b).  Section 309 of the FPA, in turn, gives FERC

the power "to perform any and all acts, and to prescribe . . . such orders . . . as it may find

necessary or appropriate to carry out the provisions of [the FPA]."  *Id.* § 825h.  This provision

grants FERC broad "remedial authority to require that entities violating the [FPA] pay restitution

for profits gained as a result of a statutory or tariff violation."  *Public Util. Comm'n v. FERC*,

462 F.3d 1027, 1048 (9th Cir. 2006).  As such, FERC can order a seller to disgorge profits made

while it was in violation of its market-based rate authorization.  *See California ex rel. Lockyer v.*

*FERC*, 383 F.3d 1006, 1015 (9th Cir. 2004), *pets. for cert. filed*, No. 06-888 (Dec. 28, 2006), No.

06-1100 (Feb. 5, 2007); *El Paso Elec. Co.*, 108 F.E.R.C. ¶ 61,071, 61,375 & n.51 (2004).

  *2.  FERC's Concurrent Jurisdiction Over State-Law Contract Questions Arising Under*

*FERC-Regulated Contracts.*  In addition to its exclusive jurisdiction to determine the

reasonableness of wholesale power rates, charges, and contracts, FERC has for decades

exercised jurisdiction under the FPA to decide questions of state contract law regarding the

construction and validity of the contracts that are filed with it and that it regulates.  *See*, *e.g.*,

*Idaho Power Co.*, 39 F.E.R.C. ¶ 61,032, 61,092 (1987); *Town of Norwood v. FERC*, 217 F.3d 24,

27, 30 (1st Cir. 2000); *New York State Elec. & Gas Corp. v. FERC*, 875 F.2d 43, 45-46 (3d Cir.

1989); *Boston Edison Co. v. FERC*, 856 F.2d 361, 365-67 (1st Cir. 1988); *National Fuel Gas*

*Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987).

  In certain circumstances, moreover, FERC has primary authority over state contract-law

questions under the primary jurisdiction doctrine.  *See United States v. Western Pac. R.R. Co.*,

352 U.S. 59, 64 (1956) (courts defer to primary jurisdiction of agency when enforcement of a

claim "originally cognizable in the courts . . . requires the resolution of issues which, under a

regulatory scheme, have been placed within the special competence of an administrative body,"

and holding that court was required to defer to agency on question whether carriers could

lawfully collect shipping charges).  In *Arkansas Louisiana Gas Co. v. Hall* ("*Arkla*"), 7 F.E.R.C.

¶ 61,175 (1979), FERC set out the factors it considers to determine when it should assert primary

jurisdiction, to the exclusion of courts, over state-law questions of contract interpretation:

> (1) whether the Commission possesses some expertise which makes the case
> peculiarly appropriate for Commission decision; (2) whether there is a need for
> uniformity of interpretation of the type of question raised by the dispute; and, (3)
> whether the case is important in relation to the regulatory responsibilities of the
> Commission.

*Id*. at 61,322.  Weighing these factors, FERC has frequently decided to exercise jurisdiction over

state-law questions arising out of FERC-regulated contracts.[3]  As FERC has made clear,

however, the *Arkla* test does not define the boundaries of its jurisdiction, but merely guides it in

determining how to exercise its "considerable discretion" to assert jurisdiction over such matters.

*Public Serv. Co. v. New Hampshire Elec. Coop., Inc*., 55 F.E.R.C. ¶ 61,028, 61,978 (1991).

## B.    Factual and Procedural Background

*1.  The Western Power Crisis, Enron's Market Manipulation And Fraud, And Its*

*Contract With Snohomish.*  In December 1993, FERC granted Enron authority to enter contracts

for the sale of wholesale electrical power at market-based rates.  *See Enron Power Mktg., Inc.*,

65 F.E.R.C. ¶ 61,305 (1993).  As FERC's investigation later revealed, Enron seriously abused

that authority, engaging in a massive scheme to manipulate prices for electricity in the Western

---

[3] *See, e.g.*, *Phelps Dodge Corp. v. El Paso Natural Gas Co*., 84 F.E.R.C. ¶ 61,043
(1998); *Florida Power & Light*, 60 F.E.R.C. ¶ 61,001 (1992); *Seminole Elec. Coop., Inc. v. Fla.
Power & Light Co*., 53 F.E.R.C. ¶ 61,026 (1990); *Golden Spread Elec. Coop., Inc.*, 40 F.E.R.C.
¶ 61,348 (1987); *Southern Co. Servs*., 37 F.E.R.C. ¶ 61,256 (1986).  FERC's practice is rooted in
decades of precedent established by its predecessor, the Federal Power Commission, which
regularly considered questions of contract law arising from filed contracts.  *See, e.g.*, *Texas Gas
Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 267-69 (1960); *Vreeland v. FPC*, 528 F.2d
1343, 1343-44 (5th Cir. 1976); *Sam Rayburn Dam Elec. Coop. v. FPC*, 515 F.2d 998, 1009-10
(D.C. Cir. 1975); *Texas Eastern Transmission Corp. v. FPC*, 306 F.2d 345, 346-47 (5th Cir.
1962); *Cities Serv. Gas Producing Co. v. FPC*, 233 F.2d 726, 728 (10th Cir. 1956); *T.L. James &
Co.*, 36 F.P.C. 463, 465 (1966).

power market.  Enron's traders employed now infamous schemes with names like "Fat Boy," "Death Star," and "Ricochet," with devastating effects.[4]  As the Final Report of FERC Staff summarized its findings:  "Enron and its affiliates intentionally engaged in a variety of market manipulation schemes that had profound adverse impacts on market outcomes."[5]

During the ensuing power crisis of 2000 and 2001, spot prices for wholesale electricity in the Western states soared, reaching unprecedented levels.  In the Pacific Northwest, short-term power prices, which historically averaged about $24/MWh, shot up to as much as $500/MWh during the summer and fall of 2000, and reached an astonishing peak of $3,300/MWh in December 2000.  *Snohomish*, 471 F.3d at 1069.  That month, in light of the dysfunctional state of the spot market, FERC issued an order urging utilities to move to long-term contracts of two years or more.  *San Diego Gas & Elec. Co.*, 93 F.E.R.C. ¶ 61,294, 61,994-95 (2000).

On December 22, 2000, Snohomish determined that it was no longer practicable to rely on the spot markets, and issued a request for proposals ("RFP") to wholesale power suppliers, seeking bids for long-term contracts.  Snohomish's RFP specified that bidders must possess an investment-grade credit rating.  In January 2001, Snohomish entered into a nine-year, fixed-price contract to purchase electrical power from Enron at $109/MWh (the "Contract").  The Contract provided that Enron's insolvency or failure to maintain investment-grade credit would constitute default and entitle Snohomish to terminate the Contract.[6]

---

[4] *See Enron Power Mktg., Inc.*, 103 F.E.R.C. ¶ 61,343, 62,301 & n.32 (2003), *reh'g denied*, 106 F.E.R.C. ¶ 61,024 (2004), *pet. for rev. filed* (D.C. Cir. Feb. 4, 2004) (No. 04-1040); *American Elec. Power Serv. Corp.*, 103 F.E.R.C. ¶ 61,345, 63,335-37 (2003).

[5] *See Final Staff Report on Price Manipulation in Western Markets* (March 2003), at VI-1, *available at* http://www.ferc.gov ("Addressing the 2000-2001 Western Energy Crisis" link).

[6] *See* Decl. Eric Lee Christensen, Docket No. 86 ("Christensen Decl."), ¶¶ 7, 16-17; Decl. Philippe Zimmerman ("Zimmerman Decl."), Docket No. 91, Ex. 1 (Master Power Purchase & Sale Agreement between Enron and Snohomish, dated Jan. 26, 2001), §§ 5.1-5.2.

In negotiating to obtain the Contract, Enron repeatedly represented that it was solvent and a creditworthy counterparty, specifically representing on six separate occasions that it had investment-grade credit. (Christensen Decl. ¶¶ 19-25.) Those representations were false. As Enron now concedes, it was already insolvent when it entered its Contract with Snohomish.[7] It was later revealed that Enron Corporation had used a series of complex partnerships to keep hundreds of millions of dollars of debt off its books and disguise its serious financial problems. In a six-week downward spiral starting in October 2001, the company disclosed a $638 million third-quarter loss, the SEC opened an investigation into the off-balance-sheet transactions, and the company's principal rival backed out of an $8.4 billion merger. On November 28, 2001, market analysts downgraded Enron Corporation's credit rating to below investment-grade. The same day, Snohomish terminated its Contract with Enron. (Christensen Decl. ¶ 9.)

2. *Enron's Bankruptcy And Its Adversary Proceeding Against Snohomish.* A few days later, on December 2, 2001, Enron Corporation and Enron filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York. In early 2003, Enron filed an adversary proceeding in the bankruptcy court seeking to recover a "termination payment" from Snohomish under the Contract. (Compl., Docket No. 1.) The Contract provided that in the event of termination, the party experiencing a net "gain" would owe the other party a termination payment based on the amount of the gain, regardless of which party had defaulted. (Contract §§ 5.2, 5.3.) Because prices for electrical power—artificially inflated when Snohomish entered into the Contract at the height of the Western power crisis—had fallen after FERC's efforts to

---

[7] *See, e.g.*, Zimmerman Decl., Ex. 17 (Debtors' Objection to Claim of Public Utility District No. 1 of Snohomish County, at 7 n.1, *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. May 6, 2005)); *id.* Ex. 19 (Reorganized Debtors' Fourth Am. Compl. For Avoidance and Return of Preferential Payments, ¶ 703, *Enron Corp. v. Citigroup, Inc.*, Adv. Pro. No. 03-9266 (Bankr. S.D.N.Y. Jan. 10, 2005)).

address the crisis, Enron contended that Snohomish had experienced a "gain" upon termination

of the Contract, and thus owed Enron a termination payment of approximately $116.8 million,

plus interest.

3. *The Gaming And Partnership Proceedings Before FERC.*  In June 2003, following the

issuance of the FERC Staff's Final Report on Enron's market manipulation practices, FERC

revoked Enron's authority to sell power at market-based rates, concluding that its "fraud,

deception [and] misrepresentation" had "undermine[d] the functioning of the wholesale power

market and our reliance on that market to ensure that rates are just and reasonable." *Enron*

*Power Mktg., Inc.*, 103 F.E.R.C. at 62,297, 62,301-02.  It further concluded that Enron had

violated the conditions of its market-based rate authority by failing to inform FERC of "changes

in [its] market share that resulted from [its] gaining influence/control over [competitors']

facilities," thereby denying FERC "the ability to assure that [Enron's] market share[] warranted

[its] continued authorization to charge market-based rates." *Id.*  In its order denying rehearing,

FERC reaffirmed its conclusion that Enron's practices had resulted in "unjust and unreasonable

rates," and amounted to "abuse, overreaching, and gouging." *Enron Power Mktg., Inc.*, 106

F.E.R.C. at 61,090, 61,094.

FERC accordingly initiated proceedings pursuant to Sections 206 and 309 of the FPA

against Enron and other sellers in the Western markets—collectively referred to as the "Gaming

and Partnership Proceedings"—to determine the extent to which they should disgorge unjust

profits earned from their market manipulation activities.[8]  In July 2004, FERC consolidated the

Gaming and Partnership Proceedings with other enforcement proceedings against Enron, in

---

[8] *American Elec. Power Serv. Corp.*, 103 F.E.R.C. ¶ 61,345 (2003) ("Gaming"
proceeding); *Enron Power Mktg., Inc.*, 103 F.E.R.C. ¶ 61,346 (2003) ("Partnership" proceeding).

which FERC had found that Enron had been in violation of its market-based rate authorization since at least 1997.[9]  FERC ordered the Administrative Law Judge overseeing the Gaming and Partnership Proceedings to review "all evidence of violations of tariffs on file or orders of the Commission in all pending dockets involving Enron's role in the Western power crisis" to determine "the total amount of profits that Enron should be required to disgorge," noting that "based on the evidence" before it, "Enron potentially could be required to disgorge profits for *all* of its wholesale power sales in the Western Interconnect for the period January 16, 1997 to June 25, 2003."[10]

Snohomish subsequently sought clarification from FERC that the unjust profits to be considered in the Gaming and Partnership Proceedings would include not only profits already extracted by Enron, but also profits still being sought by Enron in the form of termination payments.  Granting such clarification, FERC ordered the ALJ to examine "terminated wholesale power contracts between Enron and various utilities . . . pursuant to which Enron continues to demand termination payments," including Enron's Contract with Snohomish, because "termination payments are based on profits Enron projected to receive under its long-term, wholesale power contracts executed during the period when Enron was in violation of conditions of its market-based rate authority," and hence are subject to forfeiture under the FPA.[11]

*4.  FERC's June 28, 2006 Order Holding Enron Cannot Collect A Termination Payment.* When Congress enacted Section 1290 of the Energy Policy Act of 2005, both Snohomish and a defendant in another termination-payment suit, Luzenac America, Inc., filed petitions asking

---

[9] *See El Paso Elec. Co.*, 108 F.E.R.C. ¶ 61,071, 61,371-72, 61,374-75 (2004).

[10] *See id.* at 61,369, 61,374-76 & n.50.

[11] *See El Paso Elec. Co.*, 110 F.E.R.C ¶ 61,280, 62,089-91 & n.4 (2005).

FERC to decide whether the termination payment Enron sought was lawful.[12]  Enron moved the

bankruptcy court to enjoin Luzenac, under the automatic stay provision of the Bankruptcy Code,

from seeking such relief from FERC.  The bankruptcy court denied the injunction, holding that

Section 1290 "provides exclusive jurisdiction to FERC, which includes all state-law disputes

regarding the requirement to make termination payments, as part of their regulatory

responsibility in matters of public policy."[13]

On June 28, 2006, FERC issued an order holding that Enron could not lawfully collect a

termination payment from Snohomish.  June 28 Order.  Although FERC suggested that it "would

not typically rule on the contract issues raised by Enron's termination payment claim," because

those issues "require, for their resolution, the application of state law and do not otherwise

require uniform interpretation with respect to the policies we are required to administer," it

concluded that in light of Section 1290, "it is both necessary and appropriate to consider the

parties' respective state law claims and defenses on the merits."  *Id.* at 62,469.  Moreover, FERC

stated that before it could address Snohomish's claim that the termination payment was not just

and reasonable, as the FPA required, it "must first determine whether the [Contract] is a valid

and binding contract."  *Id.* at 62,476.

---

[12] Petition, *Public Utility Dist. No. 1 of Snohomish County v. Enron Power Mktg., Inc.*, Docket No. EL05-139 (F.E.R.C. Aug. 5, 2005), *available at* http://www.ferc.gov, at "Documents & Filing," "eLibrary" and "Docket Search" links (subdocket 000, Accession No. 20050805-0110).  Snohomish subsequently amended its petition to assert defenses under both the FPA and state law, including that Enron fraudulently induced Snohomish to enter into the Contract.  Amendment to Supplement Petition, *Public Utility Dist. No. 1 of Snohomish County v. Enron Power Mktg., Inc.*, Docket No. EL05-139 (F.E.R.C. Dec. 7, 2005), *available at* http://www.ferc.gov, "Documents & Filing," "eLibrary" and "Docket Search" links (subdocket 001, Accession No. 20051214-0207).

[13] Order, *Enron Power Mktg., Inc. v. Luzenac America, Inc.*, Adv. Pro. No. 03-2096, Docket No. 32, Ex. A, at 5-6 (Bankr. S.D.N.Y. Nov. 16, 2005).

Turning to that threshold issue, FERC ruled that, based on the "clear and convincing evidence" of "Enron's admitted financial fraud" and "the detailed factual record" before it, Enron had fraudulently induced Snohomish to enter the Contract by misrepresenting its solvency. *Id.* at 62,469, 62,482-86. Based on this record, including the "sworn statements of [Enron's] former executives and Enron's own position in litigations filed . . . against its former bankers and executives," FERC found that "Enron was insolvent at the time of the parties' negotiations, knew it was insolvent, yet nonetheless made numerous representations to Snohomish as to its solvency" with the "purpose and intent of inducing Snohomish to enter the agreement." *Id.* at 62,484. FERC further found that Snohomish would not have entered into the Contract "had Enron disclosed its true financial status," and that Snohomish had suffered damages and legal injury as a result. *Id.* at 62,484-85. Concluding that Snohomish had proven all elements of the affirmative defense of fraudulent inducement under New York law, FERC held that Enron could not collect a termination payment under the Contract. *Id.* at 62,482, 62,485.[14]

     *5. This Court's August 31, 2006 Order Regarding Section 1290 And Snohomish's Appeal To The Second Circuit.* While Snohomish's petition before FERC was pending, this Court withdrew the reference of the bankruptcy adversary proceeding, at Enron's behest, to address the jurisdictional issues presented by Section 1290. On August 31, 2006, this Court held that Section 1290 did not grant FERC exclusive jurisdiction to determine the legality of Enron's termination-payment claim, but rather clarified the pre-existing regime, in which FERC exercises

---

[14] Both Enron and Snohomish filed petitions seeking partial rehearing of FERC's order pursuant to 16 U.S.C. § 825*l*(a), which remain pending. In addition, Enron has filed a complaint in this Court seeking review of FERC's June 28, 2006 order, which is stayed pending resolution of Snohomish's appeal from this Court's August 31, 2006 order.

concurrent jurisdiction over state contract-law issues with respect to FERC-regulated contracts. Aug. 31 Op.  This Court certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and on October 4, 2006, Snohomish and the United States filed petitions for permission to appeal the order, which the Second Circuit granted on March 22, 2007.  That appeal is now being briefed.

    6. *The Bankruptcy Court's Automatic Stay Ruling.*  While Snohomish's petition for permission to appeal was pending, Enron moved for summary judgment in its adversary proceeding against Snohomish.  (Mot. Partial Summ. J., Docket No. 57.)  Snohomish then filed a petition for interim relief at FERC, seeking, *inter alia*, a declaration that Enron's attempts to pursue a termination payment in bankruptcy court contravened FERC's June 28, 2006 order. (Decl. Israel Dahan, Docket No. 67, Ex. E.)  Enron moved the bankruptcy court to enjoin Snohomish from pursuing such relief at FERC, and in an order dated October 30, 2006, the bankruptcy court did so.  (Mot. Order Enforcing Automatic Stay, Docket No. 65; Oct. 30 Order.)

    The bankruptcy court reasoned that any proceedings by FERC to address state contract-law questions relating to the lawfulness of the termination payment would violate the automatic stay provisions of the Bankruptcy Code, which bar, *inter alia*, acts to "obtain possession of" or "exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  The court further opined that the "determination of state-law contractual issues [is] not within FERC's regulatory police power," and thus not exempted from the automatic stay under the exception for proceedings to enforce a governmental agency's police or regulatory powers, *see id.* § 362(b)(4).  Accordingly, it held that FERC's June 28, 2006 order, and any attempts to enforce that order, violated the automatic stay, and thus were "void *ab initio*."  (Oct. 30 Order, Ex. A, at 3-5.)

    7. *The Bankruptcy Court's Order Dismissing The Adversary Proceeding Without Prejudice In Favor Of Arbitration.*  Snohomish asked both the bankruptcy court and this Court to

18

hold the adversary proceeding in abeyance until the Second Circuit had ruled on its petition for permission to appeal the dispositive jurisdictional issues resolved in this Court's August 31, 2006 order; both courts declined to do so.  (Bk. Ct. Order, Docket No. 64; Order, No. 05-10129 (S.D.N.Y. Dec. 13, 2006).)   Accordingly, Snohomish responded to Enron's motion for summary judgment by filing a cross-motion asking the bankruptcy court either to dismiss Enron's adversary proceeding in light of the mandatory arbitration clause in the parties' Contract or to dismiss or stay the proceeding, under the doctrine of primary jurisdiction, pending the resolution of related proceedings at FERC, including the Gaming and Partnership Proceedings; in the alternative, Snohomish sought summary judgment in its favor.  (Cross-Mot. to Dismiss, Stay or Defer, or in the Alternative, for Summ. J., Docket No. 80.)  In light of this Court's August 31, 2006 order and the bankruptcy court's October 30, 2006 order stating that FERC's June 28, 2006 order was void as in violation of the automatic stay, Snohomish preserved but did not reargue its position that FERC had exclusive jurisdiction to decide the legality of the termination-payment claim and that its June 28, 2006 order was entitled to preclusive effect.  (Mem. Law Opp. Plff.'s Mot. Partial Summ. J., Docket No. 88, at 5 n.2, 30 n.12, 53 n.18.)

On March 9, 2007, the bankruptcy court issued an opinion on the parties' cross-motions. The bankruptcy court first addressed the "threshold" issue of whether it should dismiss or stay the adversary proceeding in deference to the pending proceedings at FERC that could determine Enron's entitlement to a termination payment, noting that "it is only if the Court has determined that it will not defer the matter pending a ruling by FERC that it is required to reach the issue of arbitration."  (March 9 Op. at 3, 19.)  The court reasoned that the doctrine of primary jurisdiction did not require it to defer to the FERC proceedings because it was competent to decide the state-law issues presented by Enron's contract claim, and because the filed-rate doctrine required it to enforce the Contract until FERC sets it aside.  (*Id.* at 3, 27-29.)  Turning to the arbitration issue,

the court concluded that to the extent the termination-payment issues fell outside FERC's regulatory jurisdiction, the parties' Contract required that they be arbitrated. (*Id.* at 42-44.) Accordingly, in an order entered March 19, 2007, the bankruptcy court dismissed the adversary proceeding against Snohomish without prejudice to permit Enron to pursue its termination-payment claim through arbitration, retaining jurisdiction over any proceedings to confirm an arbitration award. (March 19 Order at 3.)[15]

The bankruptcy court thus granted Snohomish the less favorable relief it had sought: dismissal of Enron's action without prejudice in favor of arbitration. It failed, however, to grant the more favorable relief to which Snohomish is entitled—dismissal of Enron's action with prejudice on the grounds that: (1) FERC has exclusive jurisdiction to decide the legality of the claimed termination payment; and (2) whether FERC's jurisdiction over that question is exclusive or concurrent, FERC has adjudicated it in an order that is binding and preclusive. The bankruptcy court's order also refused to grant Snohomish the alternative relief it sought of dismissal or stay of the adversary proceeding under the primary jurisdiction doctrine. Snohomish therefore appealed the March 19, 2007 order to this Court.[16]

---

[15] On March 30, 2007, Enron filed a notice of arbitration, and an arbitral panel has been selected. Snohomish moved the panel to stay the arbitration pending an initial decision by the ALJ in the Gaming and Partnership Proceeding and/or pending resolution of Snohomish's appeal of this Court's August 31, 2006 order, and the panel declined to do so, while noting that "developments may occur which require the Panel's reconsideration of the issue." Procedural Order No. 1, *Enron Power Mktg., Inc. v. Public Utility Dist. No. 1 of Snohomish County*, No. 75 198 Y 140 07 DEAR, at 1 (May 18, 2007). The panel accordingly set a briefing schedule for cross-motions for summary judgment and a hearing date of July 16, 2007 for those motions. *See id.* at 2.

[16] *See, e.g., Forney v. Apfel*, 524 U.S. 266, 271 (1998) (when a court gives a litigant "some, but not all, of the relief . . . requested," the litigant is entitled to appeal the order "insofar as it denies [the litigant] the relief . . . sought"); *Ashley v. Boehringer Ingelheim Pharms.*, 7 F.3d 20, 25 (2d Cir. 1993) (a "prevailing party" may appeal when it has been aggrieved by "some

## STANDARD OF REVIEW

A determination of the scope of the automatic stay is a question of law subject to *de novo* review.  *See, e.g.*, *In re Stockbridge Funding Corp.*, 158 B.R. 914, 919 n.9 (S.D.N.Y. 1993); *Reliant Energy Servs. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003).  Application of the doctrines of primary jurisdiction and issue preclusion is also reviewed *de novo*.  *See Ellis v. Tribune Television Co.*, 443 F.3d 71, 83 n.14 (2d Cir. 2006) (primary jurisdiction); *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 93 (2d Cir. 2005) (issue preclusion).

## ARGUMENT

**I.     FERC'S JUNE 28, 2006 ORDER DENYING ENRON'S TERMINATION-PAYMENT CLAIM DID NOT VIOLATE THE BANKRUPTCY CODE'S AUTOMATIC STAY AND THEREFORE IS NOT VOID AB INITIO.**

**A.     Snohomish Did Not Violate The Automatic Stay When It Sought To Defend Itself, In Response To Enron's Claim Against It, By Petitioning FERC To Declare The Termination Payment Unlawful.**

In its October 30, 2006 order, the bankruptcy court wrongly concluded that by asking FERC to hold that Enron could not collect a termination payment from it, Snohomish violated the automatic stay provisions of the Bankruptcy Code, and that FERC's June 28, 2006 order and any attempts to enforce that order were therefore void *ab initio*.  The bankruptcy court relied on Section 362(a)(3) of the Bankruptcy Code, which bars "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  The bankruptcy court failed to recognize, however, that Snohomish's petition seeking relief from FERC was an attempt to *defend itself against Enron's claim*, not an

---

aspect" of a judgment); *Disher v. Information Res., Inc.*, 873 F.2d 136, 138 (7th Cir. 1989) ("[A] party can appeal from a judgment not entirely in its favor and . . . a dismissal without prejudice, by subjecting the defendant to the risk . . . of further litigation, is not entirely in the defendant's favor").

attempt to obtain possession of, or exercise control over, any estate property.  Accordingly, neither Snohomish's petition nor FERC's order violated the automatic stay.

The "property of the estate" protected by the automatic stay includes "all legal or equitable interests of the debtor in property."  11 U.S.C. § 541(a)(1).  The automatic stay thus affords the debtor broad protection from its creditors.  At the same time, it serves the fundamental bankruptcy principle of equal treatment, by preventing individual creditors from seizing the debtor's property to satisfy their own claims and allowing the trustee or debtor-in-possession to marshal the estate's assets in an orderly fashion and distribute them equitably among all creditors.  *See Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989); *United States v. Inslaw*, 932 F.2d 1467, 1473 (D.C. Cir. 1991).

Because "property of the estate" includes a debtor's causes of action against third parties, Section 362(a)(3) stays acts to "obtain possession of" or "exercise control over" such causes of action.  Accordingly, the "automatic stay prevents individual creditors from suing to enforce a right of action belonging to a corporation when that corporation is in bankruptcy," because the creditor would be "exercis[ing] control over" the prosecution of a cause of action belonging to the bankruptcy estate, which only the estate may pursue.  *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1101 (2d Cir. 1990) (creditor violated automatic stay by suing third party on tort claim belonging to debtor's estate); *see also St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 702, 706 (2d Cir. 1989) (automatic stay would bar creditor from suing debtor's parent company on alter ego claim belonging to debtor's estate).

Section 362(a)(3) does not, however, stay actions taken to *defend* against causes of action brought by the debtor.  A defendant does not "possess" or "control" a debtor's cause of action merely by defending itself.  As the Seventh Circuit has explained:

> [There is] no policy of preventing persons whom the bankrupt has sued from
> protecting their legal rights.  True, the bankrupt's cause of action is an asset of the
> estate; but as the defendant in the bankrupt's suit is not, by opposing that suit,
> seeking to take possession of it, subsection [362](a)(3) is [not] applicable.

*Martin-Trigona*, 892 F.2d at 577 (Posner, J.).  If the defendant asserts defenses that defeat the

debtor's claim, it has taken no property from the debtor's estate, but merely established the

claim's invalidity (and consequent lack of value).  "[T]he meaning of 'possession' and 'control'

as used in § 362(a)(3) is one of dominion over the thing, not an effort to invalidate it. . . . While

it is true that a successful defense to a lawsuit eliminates its alleged value, this results in no loss

to the estate . . . . There can be no loss of what does not exist."  *In re Merrick*, 175 B.R. 333,

337-38 (B.A.P. 9th Cir. 1994).

     Thus, it has long been the law that a defendant does not violate the automatic stay when,

as here, it asserts defenses to a disputed claim brought against it by the debtor.  *See, e.g.*, *In re*

*Berry Estates, Inc.*, 812 F.2d 67, 71 (2d Cir. 1987) (Section 362 did not invalidate actions by

defendants to defend their conduct in suits brought by the debtor); *Martin-Trigona*, 892 F.2d at

577 (defendant's motion to dismiss debtor's state court lawsuit did not violate the stay);

*Checkers Drive-in Rests., Inc.*, 51 F.3d 1078, 1084-85 (D.C. Cir. 1995) (defendant would not

violate stay by filing federal service mark renewal in defense to debtor's suit to cancel

defendant's mark); *Inslaw*, 932 F.2d at 1473 ("[S]omeone defending a suit brought by the debtor

does *not* risk violation of § 362(a)(3) by filing a motion to dismiss the suit, though his resistance

may burden rights asserted by the bankrupt."); *In re Merrick*, 175 B.R. at 338 (defendant's

motion to dismiss debtor's suit did not violate Section 362(a)(3); "[t]he automatic stay should not

tie the hands of a defendant while the plaintiff debtor is given free rein to litigate"); *In re Fin.*

*News Network Inc.*, 158 B.R. 570, 571 n.1, 573 (S.D.N.Y. 1993) (defendant did not violate

Section 362(a)(3) by filing objection and defenses to contract claim asserted by debtor).

By filing a petition with FERC to declare the termination payment unlawful, Snohomish did not take any act to "possess" or "control" estate property in violation of Section 362(a)(3). Rather, Snohomish merely asserted defenses to liability for a disputed termination-payment claim that Enron had brought against it. Because, by asking FERC to declare that Enron could not collect a termination payment, Snohomish was only defending itself against Enron's claim, doing so did not violate the automatic stay.

The bankruptcy court acknowledged that "a party may defend against a claim brought against it without seeking relief from the automatic stay," but it nonetheless held that Snohomish violated Section 362(a)(3) because Snohomish raised its state-law defenses to Enron's termination payment before FERC, rather than the bankruptcy court. (Oct. 30 Order, Ex. A, at 4.) It opined that, "in order to avoid the application of the automatic stay, any defense, based upon state-contractual law, which [Snohomish] seeks to interpose . . . should be presented in the proceeding in this Court, not in a separate proceeding in another forum that is precluded by the automatic stay from proceeding with the claim itself." (*Id.*) But this reasoning is entirely circular. An action is not "precluded by the automatic stay" under Section 362(a)(3) if it is merely defending against the debtor's claim; thus, the fact that Snohomish initiated such defensive proceedings before FERC, rather than the bankruptcy court, cannot be grounds to hold that the FERC proceedings were precluded by the automatic stay.

Indeed, courts have repeatedly held that a defendant does not violate the automatic stay when it asserts a defense to the debtor's claim, even when it does so by initiating an action in another forum against the debtor for a declaratory judgment that the debtor's claim is invalid. For example, in a case involving a virtually identical procedural posture, *In re Transportation Systems International, Inc. v. Honeywell, Inc*., 110 B.R. 888 (D. Minn. 1990), *aff'd on other grounds*, 930 F.2d 625 (8th Cir. 1991), a bankrupt trucking company sued a shipper in

bankruptcy court to collect certain charges based on the debtor's tariff filed with the Interstate

Commerce Commission.  In response, the shipper filed a complaint with the ICC for a

declaratory order holding that the debtor could not collect the claimed charges—just as, in this

case, Snohomish sought an order from FERC that Enron could not collect the charges it seeks

under its FERC-regulated contract with Snohomish.  Reversing the bankruptcy court's contrary

conclusion, the district court in *Honeywell* held that the shipper's ICC complaint did not violate

the automatic stay, explaining:

> [The shipper] did not seek any property of the estate or the debtor.  Although [the debtor] is nominally a defendant, the [ICC] action is in fact an effort by [the shipper] to defend itself from claims asserted by [the debtor].  It is within neither the letter nor the spirit of the statute to regard the automatic stay as applying to such an action.

*Id*. at 893.  The court further expressly held that the shipper's "action before the ICC was neither

an effort to obtain possession of the debtor's property nor an effort to exercise control over the

debtor's estate" under Section 362(a)(3).  *Id.* at 895.

Other courts have reached the same conclusion.  For example, in *Corso v. Dewitt*, 180

B.R. 589 (C.D. Cal. 1994), the debtor possessed a wrongful death action against a shipowner;

after the debtor filed for bankruptcy, the shipowner filed an action against the debtor in a non-

bankruptcy forum under the Limitation of Shipowners' Liability Act, seeking to "limit the

recovery that the debtor and estate could receive from the debtor's wrongful death action."  *Id.* at

591.  The court rejected the debtor's argument that the shipowner thereby violated the automatic

stay, concluding that the "limitation action is defensive rather than offensive in nature," and that,

even though it could limit the debtor's recovery on his claim, it "is not an action that seeks 'to

exercise control over the property of the debtor's estate.'"  *Id.* at 592 (citation omitted).

Similarly, this Court has held that a claimant did not violate the automatic stay by

pursuing an interpleader action in a non-bankruptcy forum naming the debtor as a defendant.

25

*See Price & Pierce Int'l, Inc. v. Spicers Int'l Paper Sales, Inc.*, 50 B.R. 25, 26 (S.D.N.Y. 1985). As the court there explained, although the interpleader action was nominally against the defendant, "this is not an action to obtain possession of property held by [the debtor], as required for the invocation of § 362; rather, it is an action to determine whether the Fund, or some part thereof, rightfully belongs to [the claimant] or [the debtor]." *Id.*; *accord, e.g.*, *Holland America Ins. Co. v. Roy*, 777 F.2d 992, 996 (5th Cir. 1985).

The same principle applies here:  Snohomish's petition before FERC was merely "an effort . . . to defend itself from claims asserted by" Enron, not an attempt to possess or control any estate property.  *Honeywell*, 110 B.R. at 893.  Neither Snohomish's petition nor FERC's June 28 Order violated the automatic stay, and FERC's June 28 Order is thus not void *ab initio*.

> **B.      FERC'S June 28, 2006 Order Was Entered Pursuant To FERC's Police And Regulatory Power And Therefore Falls Within Section 362(b)(4)'s Exception To The Automatic Stay For Regulatory Proceedings.**

Even if the automatic stay of Section 362(a)(3) applied to the FERC proceedings—and, as demonstrated above, it does not—those proceedings would be exempt from the automatic stay under Section 362(b)(4).  Section 362(b) provides, in relevant part:

> (b) The filing of a [bankruptcy] petition . . . does not operate as a stay—

> (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . . to enforce such governmental unit's . . .  police and regulatory power, including the enforcement of a judgment other than a money judgment.

11 U.S.C. § 362(b).  Section 362(b)(4)'s exemption for proceedings by government agencies to enforce their police and regulatory powers ensures that when a governmental agency acts to "prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempt[s] to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay."  *Midlantic Nat'l Bank v. New Jersey*

*Dep't of Envtl. Prot.*, 474 U.S. 494, 504 (1986) (quoting legislative history); *accord SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000).

Section 362(b)(4) accordingly permits any proceeding in which an administrative agency is acting in its capacity as a *regulator*—as opposed to its capacity as, or on behalf of, a *creditor*—to go forward notwithstanding the regulated party's bankruptcy.  In accordance with that principle, the Supreme Court and the Second Circuit have applied Section 362(b)(4) to exempt from the automatic stay a broad array of government and administrative agency proceedings.  *See, e.g., Board of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 39-40 (1991) (Federal Reserve proceeding against debtor-bank holding company to restrain disposition of assets for violation of banking regulations); *In re FCC*, 217 F.3d 125, 131, 138 & n.8 (2d Cir. 2000) (FCC cancellation of debtor's spectrum license for default on timely payment of license).[17]

By contrast, the Second Circuit has held that government agency proceedings fell outside the Section 362(b)(4) exception in only one reported case.  In that case, the SEC sought to enforce a money judgment against property of the debtor's estate, in violation of Section 362(b)(4)'s express limitation of the exception to "enforcement of a judgment *other than a*

---

[17] *See also NLRB v. E.D.P. Med. Computer Sys.*, 6 F.3d 951, 955, 957 (2d Cir. 1993) (NLRB proceeding against debtor-employer seeking backpay remedy for violation of federal labor laws); *NLRB v. 15th Ave. Iron Works, Inc.*, 964 F.2d 1336, 1337 (2d Cir. 1992) (per curiam) (NLRB unfair labor practice proceedings against debtor seeking payments to unions); *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1024-25 (2d Cir. 1991) (municipality action against debtor for reimbursement of environmental clean-up costs at municipal landfill under CERCLA); *PBGC v. LTV Corp.*, 875 F.2d 1008, 1020 (2d Cir. 1989) (PBGC proceeding to require debtor to re-assume pension liabilities for previously terminated pension plan under ERISA), *rev'd on other grounds*, 496 U.S. 633 (1990); *Berry Estates*, 812 F.2d at 71 (proceedings by state and municipal authorities to require debtor-landlord to disgorge rents collected in excess of legal rate established under rent control laws); *CFTC v. Incomco, Inc.*, 649 F.2d 128, 133 (2d Cir. 1981) (CFTC action to obtain access to debtor's records in investigation of debtor's futures commodity trading activities).

*money judgment*." *See Brennan*, 230 F.3d at 71; *but cf. id.* (mere *entry* of judgment requiring debtor to disgorge profits from fraud on brokerage customers was within § 362(b)(4) exception). The court explained: "When the government seeks to impose financial liability on a party, it is plainly acting in its police or regulatory capacity . . . . However, once liability is fixed and a money judgment has been entered, the government necessarily acts only to vindicate its own interest [as a creditor] in collecting its judgment." *Id.* at 72-73.[18]

Courts in other circuits have similarly distinguished between proceedings in which a governmental unit acts in its regulatory capacity, which are exempt from the automatic stay, and those in which it acts as a creditor, which are not. Those courts have adopted two overlapping tests, known as the "pecuniary interest" and "public purpose" tests, to determine whether a governmental action falls within the regulatory exception under Section 362(b)(4). *See, e.g.*, *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1108-09 (9th Cir. 2005); *McMullen v. Sevigny* (*In re McMullen*), 386 F.3d 320, 325 (1st Cir. 2004); *Saftey-Kleen, Inc. v. Wyche*, 274 F.3d 846, 865 (4th Cir. 2001). Under the "pecuniary interest" test, the "court determines whether the [government] action relates primarily to the protection of the government's pecuniary interest in the debtors' property or to matters of public safety and health"; the "purpose of the 'pecuniary purpose' test is to prevent suits that would allow a governmental unit to obtain an advantage over creditors . . . in the bankruptcy proceeding." *Mirant*, 398 F.3d at 1108-09. Under the "public purpose" test, the "court determines whether the government seeks to 'effectuate public policy'" or merely to further "'private rights,'" *id.* at 1109, as where a governmental entity "attempt[s] to

---

[18] In another case, the Second Circuit found that an action by the FDIC, acting as receiver for five failed banks, in which it sought to collect loan debts owed by the debtor to the banks, was barred by the automatic stay. *See In re Colonial Realty Co.*, 980 F.2d 125, 132 (2d Cir. 1992). In that case, however, no party had contended that the Section 362(b)(4) exception was applicable. *See id.* at 135.

recover from property of the debtor estate . . . on the nongovernmental debts of private parties,"
*McMullen*, 386 F.3d at 325.  "A suit comes within the exception of § 362(b)(4) if it satisfies
either test."  *Mirant*, 398 F.3d at 1109.

Applying these tests, courts have held proceedings to be exempt under Section 362(b)(4)
when brought in the government's regulatory capacity pursuant to laws promoting the public
welfare, including, *inter alia*, "to protect the welfare of electricity consumers . . . from . . .
excessive charges."  *Id.* at 1109 (state suit under federal antitrust laws to require debtor to divest
three electric power plants); *see also, e.g., In re First Alliance Mortgage Co.*, 263 B.R. 99, 108,
113 (B.A.P. 9th Cir. 2001) (state action under consumer protection law seeking penalties and
restitution for customers defrauded by debtor).  On the other hand, these tests are not met where
the government acts in its capacity as a creditor, as when it seeks to recover on its claims under a
contract with the debtor.  *See, e.g.*,  *In re University Med. Ctr.*, 973 F.2d 1065, 1075 (3d Cir.
1992) (governmental unit's withholding of payments owed to debtor to recover on claim under
contract with debtor was outside the Section 362(b)(4) exception); *In re Corporacion de
Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440, 445-46 (1st Cir. 1986) (action by
governmental unit to enforce its rights arising from breach of contract was outside the Section
362(b)(4) exception).

Although the Second Circuit, in its most recent discussion of the government regulatory
exception, expressly declined to "pass on the validity" of the "pecuniary interest" and "public
purpose" tests, it found them to be satisfied where states brought damage actions to remedy
environmental pollution, which "relate primarily to matters of public health and welfare" and
which were not primarily designed to "inure . . . to the economic benefit of the states."  *In re*

29

*MTBE Prods. Liab. Litig.*, 2007 WL 1500338, at *20 (2d Cir. May 24, 2007).[19]  Thus, the

Second Circuit again made clear that regulatory agencies may proceed without interference from

the automatic stay when they act pursuant to their police powers, but not when they seek

primarily to protect the pecuniary interests of creditors in property of the estate.

Under Section 362(b)(4), the proceedings before FERC that resulted in its June 28 Order

were exempt from the automatic stay, because those proceedings were conducted pursuant to

FERC's "police and regulatory power."  In determining whether Enron may collect a termination

charge under its contract with Snohomish, FERC was acting in accordance with its long-standing

regulatory authority to ensure that wholesale electric power is sold only pursuant to rates,

charges, and contracts that are lawful.  *See* 16 U.S.C. §§ 824d(a), (c), (e); 824e(a); 18 C.F.R.

§ 35.1(e).  As discussed above, Congress invested FERC with comprehensive authority to

regulate the interstate sale of wholesale electricity, based on its findings that the sale of electric

energy "for ultimate distribution to the public is affected with a public interest, and that Federal

regulation of [such] matters . . . . is necessary in the public interest."  *See* 16 U.S.C. § 824(a).

Such regulation promotes the public welfare by "protect[ing] power consumers against excessive

prices."  *Pennsylvania Water & Power Co. v. FPC*, 343 U.S. 414, 418 (1952); *cf. Mirant*, 398

F.3d at 1109 (government acts within Section 362(b)(4) when it acts "to protect the welfare of

electricity consumers").  Accordingly, in determining that Enron may not lawfully collect a

termination payment under its contract with Snohomish, FERC was acting pursuant to its police

---

[19] The Second Circuit was applying a "virtually identical" regulatory exception to the
bankruptcy removal statute under 28 U.S.C. § 1452, which provides that a party may remove a
civil action "other than . . . a civil action by a governmental unit to enforce such governmental
unit's police or regulatory power."  Given the identity of language and purpose, the Second
Circuit "look[ed] to judicial interpretations of section 362 for guidance" in interpreting the
bankruptcy removal provision.  *MTBE*, 2007 WL 1500338, at *19.

and regulatory power to protect electricity rate-payers.  It was not, by contrast, seeking to protect

any pecuniary interest in property of the estate; it was neither seeking to assert any claim of its

own against Enron, nor acting on behalf of any private creditor seeking to obtain a pecuniary

advantage over Enron's other creditors.  Therefore, the FERC proceeding and the June 28 Order

were well within Section 362(b)(4)'s regulatory exception to the automatic stay.

The bankruptcy court reached the opposite conclusion because, in determining that the

termination payment was unlawful, FERC applied New York law; in the bankruptcy court's

view, the "determination of state-law contractual issues [is] not within FERC's regulatory police

power."  (Oct. 30 Order, Ex. A, at 3.)  But, as discussed above, that is simply wrong.  FERC has

long exercised jurisdiction under the FPA, concurrent with state and federal courts, to determine

questions of state contract law arising under wholesale energy contracts that it regulates.  *See,

e.g.*, *Town of Norwood v. FERC*, 217 F.3d 24, 27, 30 (1st Cir. 2000) (upholding FERC's

construction of terms of contract regarding extension of term of service); *supra* pp. 10-11 (citing

additional authorities in accord).  FERC has such concurrent jurisdiction precisely because the

determination of such state-law questions is integral to FERC's broader regulatory mission to

ensure that wholesale power rates, charges and contracts are just and reasonable and in the public

interest.  As this Court observed in its August 31, 2006 opinion, "the contract disputes at issue

here regarding termination payments in long-term power contracts are . . . 'inextricably

intertwined' with FERC's regulatory function."  Aug. 31 Op. at 35.[20]  And it is undoubtedly

within FERC's regulatory mandate to police fraud in the formation of FERC-regulated contracts

---

[20] Indeed, in addressing Snohomish's petition, FERC determined that it "must first" determine the state-law issues—*i.e.*, whether Enron's contract with Snohomish was "valid and binding"—"[b]efore" it could determine "whether the just and reasonable standard or the public interest standard should apply."  June 28 Order at 62,475-76, 62,477-78 & n.54.

to ensure that purchasers of wholesale power like Snohomish—and through it, the ultimate electricity-consuming public—are not fraudulently induced to purchase long-term power from insolvent sellers facing bankruptcy and liquidation, nor that they are required to pay termination charges for profits on power the bankrupt seller failed to deliver.[21]

Even more fundamentally, by opining that the "determination of state-law contractual issues [is] not within FERC's regulatory police power," the bankruptcy court wrongly sought to assess whether FERC's June 28 Order—which was plainly issued in its capacity as a regulator, rather than as a creditor of Enron's estate—was beyond the scope of FERC's "legitimate" regulatory power. In *MCorp,* the Supreme Court made clear that such an inquiry is beyond the bankruptcy court's authority. There, as here, the lower court determined that an administrative proceeding by the Federal Reserve against the debtor for violation of a banking regulation was not within Section 362(b)(4) because the regulation purportedly exceeded the bounds of the Federal Reserve's statutory authority, and thus was not within its "regulatory power." *See* 502 U.S. at 34-35 & n.1, 37, 40. The Supreme Court rejected this reasoning, explaining:

---

[21] To support its contrary ruling, the bankruptcy court pointed to FERC's observation in the June 28 Order that, under its *Arkla* test, it "would not typically" exercise jurisdiction over the state-law contract issues raised by Enron's termination payment claim because they "do not . . . require uniform interpretation with respect to the policies [FERC is] required to administer." (Oct. 30 Order, Ex. A, at 1, 3 (citing June 28 Order at 62,469).) But the fact that FERC might not choose to exercise jurisdiction over such state-law contract questions in all instances does not mean that, when it does, it is acting beyond the scope of its regulatory authority. FERC unquestionably has the power to decide such state-law issues, and its *Arkla* test, far from defining the limits of its regulatory power, simply identifies factors FERC considers when deciding how to exercise its "considerable discretion" to assert its primary jurisdiction over state-law questions within its concurrent jurisdiction. *See Public Serv. Co.*, 55 F.E.R.C. at 61,078. Indeed, FERC has chosen at times to assert its jurisdiction over state contract law issues even where it would not "normally" do so under the *Arkla* test. *See, e.g., Boston Edison Co. v. Town of Concord*, 49 F.E.R.C. ¶ 61,213, 61,755 (1989). Thus, whether or not it would "typically" do so, FERC's exercise of such jurisdiction in this case was well within its regulatory power.

> [The debtor's] broad reading of the stay provisions would require bankruptcy courts to scrutinize the validity of every administrative or enforcement action brought against a bankrupt entity. Such a reading is problematic, both because it conflicts with the broad discretion Congress has expressly granted many administrative entities and because it is inconsistent with the limited authority Congress has vested in bankruptcy courts. We therefore reject [the debtor's] reading of § 362(b)(4).

*Id.* at 40. Taking no view on the regulation's validity, the Court nonetheless concluded that the Federal Reserve proceedings "fall squarely within § 362(b)(4)." *Id.* at 34, 39-40.

Similarly, in *In re FCC*, 217 F.3d 125 (2d Cir. 2000), the bankruptcy court, as here, adopted a restricted view of the agency's regulatory power, concluding that the FCC's cancellation of the debtor's spectrum license when it failed to make timely payments for the license "lack[ed] any comprehensible regulatory objective." *Id.* at 132, 135, 138 (quoting bankruptcy court). As in *MCorp*, the Second Circuit rejected this approach: "The FCC need not defend its regulatory calculus *in the bankruptcy court*; whenever an FCC decision implicates its exclusive power to dictate the terms and conditions of licensure, the decision is regulatory." *Id.* at 135. The Second Circuit concluded that because "the timing of the payment obligation . . . was a subject of FCC regulation"—just as the collection of charges under wholesale electricity contracts is a subject of FERC regulation—"[u]ndoubtedly, the FCC is a governmental unit that is seeking 'to enforce' its 'regulatory power'" within Section 362(b)(4). *Id.* at 138 & n.8.

In opining that state-law contract questions are not within FERC's regulatory authority, the bankruptcy court improperly sought to delimit FERC's exercise of its regulatory power— something the Supreme Court and the Second Circuit have made clear the bankruptcy court had no authority to do, and that created precisely the kind of jurisdictional conflict Section 362(b)(4) was designed to prevent. Because FERC was acting pursuant to its police and regulatory power, FERC's June 28 Order did not violate the automatic stay, and therefore is not void *ab initio*.

## II.    FERC'S JUNE 28 ORDER DENYING ENRON'S TERMINATION-PAYMENT CLAIM MUST BE ACCORDED PRECLUSIVE EFFECT.

Because FERC's June 28 Order is not void, it is a valid and final determination of the central issue before the bankruptcy court—whether Enron had fraudulently induced Snohomish to enter the contract in question and thus was not entitled to collect a termination payment.  It is therefore preclusive on that issue.

Issue preclusion "bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding, if that party had a full and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits."  *Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir. 1992), *abrogated on other grounds as recognized in Yung v. Lee*, 432 F.3d 142, 147-48 (2d Cir. 2005); *see generally Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979); 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4416 (2002).  The Supreme Court has "long favored" application of res judicata and collateral estoppel to administrative determinations, in order to prevent losing litigants from enjoying a "rematch after a defeat fairly suffered," to protect those who have "already shouldered their burdens" from relitigating the same issue, and to prevent a needless drain on judicial resources.  *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107-08 (1991).  Issue preclusion thus applies to administrative determinations "[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate."  *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) (superseded by statute on other grounds); *see also Chauffeur's Training Sch., Inc. v. Spellings*,

478 F.3d 117, 132 (2d Cir. 2007); Restatement (Second) of Judgments § 83 (1982).[22]  FERC's

June 28 Order satisfies all the requirements for the application of issue preclusion.

> ### A.     FERC's June 28 Order Actually Decided The Same Issue Before The Bankruptcy Court, And The Decision Was Necessary To Its Judgment.

Before the bankruptcy court, Enron contended that it was entitled to a termination

payment under its Contract with Snohomish for the purchase of electrical power.  But FERC's

June 28 Order precludes any forum (other than the reviewing court of appeals) from concluding

that Enron can recover such a termination payment.

Applying New York law, FERC ruled that Enron had fraudulently induced Snohomish to

enter the Contract by misrepresenting its solvency.  FERC June 28 Order at 62,482.  After

carefully reviewing the parties' evidence and arguments, *id.* at 62,476-82, FERC made several

specific findings:  that Enron was insolvent at the time of the parties' negotiations, knew it was

insolvent, yet repeatedly made false representations regarding its solvency for the purpose of

inducing Snohomish to enter into the Contract; that Snohomish would not have negotiated and

---

[22] Courts have applied federal preclusion law to the determinations of federal agencies. *See, e.g.*, *Safir v. Gibson*, 432 F.2d 137, 143 (2d Cir. 1970); *Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F. Supp. 2d 192, 200 (D. Conn. 2006), *Borough of Lansdale v. PP & L, Inc.*, 426 F. Supp. 2d 264 (E.D. Pa. 2006), *reconsidered in part on other grounds*, 2007 WL 1461807 (E.D. Pa. May 16, 2007).  This accords with the Second Circuit's strong suggestion—repeatedly relied on by district courts in the circuit—that federal preclusion law applies to determine the preclusive effect of a prior federal judgment, whether the judgment was based on diversity or federal question jurisdiction.  *See Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 42 n.3 (2d Cir. 1986); *Anderson v. Bungee Int'l Mfg. Corp.*, 44 F. Supp. 2d 534, 538 n.3 (S.D.N.Y. 1999).  In any case, even if New York preclusion law applied, the New York standard is identical to the federal standard, with one additional requirement:  the issue previously decided must be "decisive" of the subsequent action.  *See Curry v. City of Syracuse*, 316 F.3d 324, 332 (2d Cir. 2003) (an issue is "decisive" if "it would prove or disprove, without more, an essential element of any of the claims set forth in the complaint").  FERC's order easily meets that additional requirement:  its holding that Enron fraudulently induced Snohomish to enter the Contract and that the Contract was thus voidable is decisive of the question whether Enron can recover a termination payment.

executed the Contract "had Enron disclosed its true financial status at the outset of the parties'

negotiations"; and that Enron's fraudulent misrepresentations proximately caused Snohomish's

decision to enter into the Contract and caused Snohomish's pecuniary and legal injury, *id.*

at 62,484-85.  Indeed, core factual issues involved in the fraudulent inducement claim were not

in dispute.  FERC pointed out that for "the most part, Enron does not contest Snohomish's

allegations" regarding its representations to Snohomish.  *Id.* at 62,483.  In fact, Enron could not

do so "given the sworn statements of its former executives and Enron's own position in

litigations filed [] against its former bankers and executives."  *Id.*

Furthermore, FERC's findings regarding Enron's fraudulent conduct were not incidental,

but necessary, to its June 28 Order.  FERC found that Snohomish had established the elements of

the fraud claim by "clear and convincing evidence," the same standard any court would apply in

determining fraudulent inducement under New York law.  *Id.* at 62,469; *see Schlaifer Nance &*

*Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (party must prove evidence of fraud

under "clear and convincing" standard); *Wickham Contracting Co. v. Bd. of Educ.*, 715 F.2d 21,

26-27 (2d Cir. 1983) (applying issue preclusion where legal and factual issues in the

administrative and judicial proceedings were, but for damages, identical).  In making these

findings, FERC definitively resolved the question whether Enron may collect a termination

payment under the Contract.

### B.    FERC Acted In A Judicial Capacity In Resolving The Termination-Payment Issue, Which Was Properly Before It, And The Parties Had A Full And Fair Opportunity To Litigate The Issue.

FERC acted in a judicial capacity when it determined that Enron's termination-payment

claim was foreclosed due to Enron's fraudulent inducement, deciding the issue through a

procedure possessing the essential elements of adjudication.  *See* Restatement (Second) of

Judgments § 83(2).  The parties had adequate notice of the FERC proceedings:  Snohomish's

initial petition was published in the *Federal Register* and the Commission extended the answer

date upon joint request of the parties.  FERC June 28 Order at 62,474.  Snohomish later amended

its petition, after the enactment of Section 1290, to add contract-law arguments, and FERC

granted Enron's motion to extend the response date again.  *Id.*  Both parties presented their

arguments and evidence in petitions, protests, motions, affidavits, and answers.  *Id.*  Noting that

it was relying on the parties' admissions—in particular, "Enron's admitted financial fraud"—and

the "detailed factual record" regarding the credit requirements set forth in Snohomish's request

for proposals, Enron's response to that request, and the parties' subsequent negotiations,

including Enron's written and oral representations addressing its purported solvency, FERC

carefully considered the arguments of each party.  *Id.* at 62,269, 62,477-83.  Furthermore, FERC

meticulously detailed Enron's conduct, the requirements of state law, its own findings, and the

reasons supporting its ultimate determination that Enron could not recover a termination payment

under the Contract.  *Id.* at 62,483-86.  *See Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F.

Supp. 2d 192, 200 (D. Conn. 2006) (according Bureau of Indian Affairs determination preclusive

effect and finding that Bureau acted in an adjudicative manner because its procedures provide for

notice, presentation of and opportunity to respond to evidence and arguments, the clear

application of criteria for federal tribal acknowledgment, and rules of finality, including

procedures for internal reconsideration and judicial review).

Moreover, the question whether Enron may collect a termination payment under a FERC-

regulated contract—including any state-law issue relevant to that question—was properly before

FERC.  Whether or not FERC has *exclusive* jurisdiction under Section 1290 to determine

whether the termination payment is permitted under the Contract, FERC clearly possesses

jurisdiction to decide the issue.  This Court has already recognized that "FERC had concurrent

jurisdiction over these disputes even prior to [Section 1290]."  Aug. 31 Op. at 35.  Enron itself

has acknowledged that FERC possesses concurrent jurisdiction over state-law contract matters relating to termination payments. *Id.* at 14, 35. Indeed, this Court has recognized that the "contract disputes at issue here regarding termination payments in long-term power contracts are . . . disputes that are 'inextricably intertwined' with FERC's regulatory function." *Id.* at 35. And, as demonstrated above, *see supra* Part I, the bankruptcy automatic stay did not bar FERC from reaching the termination-payment issues.

Finally, Enron had a full and fair opportunity to litigate the issue before FERC. As noted above, Enron had the opportunity to, and did, present evidence and argument in numerous filings before FERC. FERC carefully assessed the detailed factual record and arguments, and considered each requirement of New York law to establish a claim of fraudulent inducement. The Second Circuit has held that an ALJ proceeding on the papers, which permitted parties to submit briefs and documentary evidence, provided a full and fair opportunity to litigate the issues. *Chauffeur's*, 487 F.3d at 122, 132; *see id.* at 132 (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 483-84 (1982) (informal prior administrative proceeding given preclusive effect); *Hirschfeld v. Spanakos*, 104 F.3d 16, 19-20 (2d Cir. 1997) (prior proceeding without cross-examination given preclusive effect); *Wickham*, 715 F.2d at 27 (prior proceeding without prehearing discovery given preclusive effect)).

Courts have found FERC's determinations preclusive in very similar situations. For instance, in *Borough of Lansdale v. PP & L, Inc.*, 426 F. Supp. 2d 264 (E.D. Pa. 2006), a plaintiff asserted a state-law claim for breach of a FERC-regulated contract, alleging that the defendant had breached a contractual provision prohibiting it from requiring retail customers to pay a retail stranded cost charge. *Id.* at 298. In an earlier proceeding involving the same parties, FERC had clarified the scope of the contract at issue, finding that the contract applied only to wholesale stranded costs and did not limit the defendant's ability to recover retail stranded costs.

*Id.* at 300.  The district court accorded the FERC determination preclusive effect, holding that

FERC's finding defeated one of the elements of the plaintiff's contract claim.  *Id.* at 269, 300.

So too, here, FERC's adjudicative determination that Enron's fraudulent inducement barred

recovery on its termination-payment claim precludes further litigation of that issue.

### C.    The June 28 FERC Order Is Final For Purposes Of Issue Preclusion.

FERC's June 28 Order also satisfies the finality requirement of issue preclusion.

*Metromedia*, 983 F.2d at 365.  The Second Circuit has explained that even if a decision is not

final for purposes of appeal, it can be final for purposes of issue preclusion:

> [C]ollateral estoppel, unlike appealability . . . "does not require a judgment which
> ends the litigation . . . and leaves nothing for the court to do but execute the
> judgment."  Rather, the concept of finality for collateral estoppel purposes
> "includes many dispositions which, though not final in that sense, have
> nevertheless been fully litigated."  Whether a judgment that is not final [for appeal
> purposes] "ought nevertheless be considered 'final' in the sense of precluding
> further litigation of the same issue, turns upon such factors as the nature of the
> decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and
> the opportunity for review."

*Id.* at 366 (citing *Zdanok v. Glidden Co.*, 327 F.2d 944, 955 (2d Cir. 1964) (Friendly, J.) and

*Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (Friendly, J.));

*see also United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719 (2d Cir. 1993) ("We have

taken a broad view of the application of collateral estoppel to rulings made at an interim stage of

litigation.  Estoppel is applied when 'the litigation of a particular issue has reached such a stage

that a court sees no really good reason for permitting it to be litigated again.'").[23]

---

[23] *See also United States v. McGann*, 951 F. Supp. 372, 381 (E.D.N.Y. 1997) ("*Lummus*
has been consistently followed by every circuit which has had occasion to address the issue"); *In
re Bridgestone/Firestone, Inc., Tire Prods. Liability Litig.*, 333 F.3d 763, 767 (7th Cir. 2003) (for
issue preclusion purposes, a final judgment is "any prior adjudication of an issue in another
action that is determined to be sufficiently firm to be accorded conclusive effect"); *Wolstein v.
Docteroff*, 133 F.3d 210, 215-16 (3d Cir. 1997) (collateral estoppel does not require finality for
appeal purposes); *Christo v. Padgett*, 223 F.3d 1324, 1338-39 (11th Cir. 2000) (same).

FERC's June 28 decision easily satisfies the *Lummus* finality factors. FERC's careful consideration of the record and the arguments outlined in the parties' extensive briefs, as well as its reasoned order, satisfy the "adequacy of the hearing" factor, and FERC's June 28 Order is subject to judicial review, *see* 16 U.S.C. § 825*l*. Nor is there anything tentative about FERC's determination. To the contrary, FERC made definitive findings and conclusions and unequivocally ordered that "Snohomish's petition is hereby granted" to "deny Enron's termination payment in its entirety." June 28 Order at 62,469, 62,486.

Moreover, once FERC entered the Order, it was immediately enforceable. That is so notwithstanding Enron's and Snohomish's applications for rehearing. The FPA requires a party to file a rehearing application before it may seek review in the court of appeals, *see* 16 U.S.C. § 825*l*(a), but also specifically provides that neither an application for rehearing nor a petition for judicial review operates as a stay of FERC's orders, *see id.* § 825*l*(c). An order may thus be enforced even while a rehearing petition is pending, unless FERC specifically grants a stay. Here, no stay of FERC's June 28 Order has been sought or entered.

In similar circumstances, a federal district court rejected the argument that a FERC certificate authorizing construction of a natural gas pipeline was not "final" because FERC had before it pending applications for rehearing, noting that the Natural Gas Act—like the FPA—provides that an application for rehearing does not operate as a stay of a FERC order, and holding that it could enforce the FERC order. *Tennessee Gas Pipeline Co. v. 104 Acres of Land More or Less*, 749 F. Supp. 427, 431, 433 (D.R.I. 1990)[24]; *see also Panhandle E. Pipe Line Co.*

---

[24] The Supreme Court has explained that the relevant provisions of the FPA and the Natural Gas Act "are in all material respects substantially identical." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981) (citation omitted). The Supreme Court therefore

*v. Utilicorp United Inc.*, 928 F. Supp. 466, 470, 473 (D. Del. 1996) (enforcing FERC order

"notwithstanding the disposition of [pending] appellate proceedings," because "unstayed FERC

orders are entitled to administrative operation and effect"); *Sierra Club v. U.S. Nuclear*

*Regulatory Comm'n*, 862 F.2d 222, 225 (9th Cir. 1988) (a Nuclear Regulatory Commission

Appeal Board decision was immediately enforceable, despite being subject to *sua sponte* review

by the full Commission for at least forty days, because Commission regulations—like the

FPA—provide that a petition for review does not stay the Appeal Board decision, unless

otherwise ordered by the Commission).  The same applies here.  FERC's June 28 Order is

enforceable, final for purposes of issue preclusion, and must be given binding effect.[25]

## III.    IN THE ALTERNATIVE, THE DOCTRINE OF PRIMARY JURISDICTION REQUIRES DEFERRAL OF ENRON'S TERMINATION-PAYMENT SUIT UNTIL FERC DETERMINES WHETHER THE TERMINATION PAYMENT IS AN UNJUST PROFIT THAT CANNOT BE COLLECTED.

Under the doctrine of primary jurisdiction, when a "claim [that] is originally cognizable

in the courts . . . requires the resolution of issues which, under a regulatory scheme, have been

placed within the special competence of an administrative body," the "judicial process is

---

follows the "established practice of citing interchangeably decisions interpreting the pertinent
sections of the two statutes."  *Id.*

[25] That result accords with the settled principle that "a judgment otherwise final for . . .
res judicata [purposes] is not deprived of such finality by the fact that time still permits
commencement of proceedings in the trial court to set aside the judgment and grant a new trial or
the like; nor does the fact that a party has made such a motion render the judgment nonfinal."
Restatement (Second) of Judgments § 13 cmt. f.  The Second Circuit, along with several other
courts of appeals, has held that a court's ability to modify its judgment based on post-trial
motions does not deprive the judgment of finality for preclusion purposes, even if it renders the
judgment non-final for purposes of appeal.  *See EDP Med. Computer Sys., Inc. v. United States*,
480 F.3d 621, 626 (2d Cir. 2007) (availability of Rule 60(b) relief does not undermine finality
for res judicata purposes); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 309-10 n.4 (1st Cir. 2001)
("judgment may be regarded as final for res judicata purposes" despite pending post-judgment
motions); *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals*, *Inc.*, 170 F.3d 1373, 1381 (Fed.
Cir. 1999); *Tripati v. G.L. Henman*, 857 F.2d 1366, 1367 n.1 (9th Cir. 1988).

suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956); *accord Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006). Courts must defer to agency proceedings in such cases in order to secure "uniformity and consistency in the regulation of business entrusted to a particular agency," and to bring to bear the "expert and specialized knowledge of the agencies" regarding technical and policy matters "not within the conventional experience of judges" or that "requir[e] the exercise of administrative discretion." *Western Pac. R.R. Co.*, 352 U.S. at 64 (quoting *Far E. Conference v. United States*, 342 U.S. 570, 574-75 (1952)). Accordingly, when a dispute involves matters within the agency's regulatory authority, the doctrine "requires" the court to "stay[] further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).

In its adversary proceeding against Snohomish, Enron seeks to collect a termination payment under a FERC-regulated contract it entered into with Snohomish during the height of the Western power crisis. As described above, as a regulated seller of wholesale energy, Enron's right to collect such a charge is not purely a matter of state contract law, but rather is dependent on the comprehensive federal regulatory scheme administered by FERC. Under that scheme, Enron has no right to a rate or charge other than a "just" and "reasonable" charge made in accordance with its rate schedule filed with FERC. *See* 16 U.S.C. §§ 824d(a), (c), 824e(a); 18 C.F.R. § 35.1(e). Enron's market-based rate tariff permitted it to enter into contracts for the sale of power at market-based rates—such as its contract with Snohomish—but only on the conditions that, *inter alia*, it refrained from fraudulent conduct and that it lacked market power.[26]

---

[26] *See El Paso Elec. Co.*, 108 F.E.R.C. ¶ 61,071, 61,372, 61,374-75 (2004); *Enron Power Mktg., Inc.*, 103 F.E.R.C. ¶ 61,343, 62,301-02 (2003); *Enron Power Mktg., Inc.*, 65 F.E.R.C. ¶ 61,305 (1993).

In the wake of the Western power crisis, FERC commenced a wide-ranging investigation that has now established that, when Enron entered into its Contract with Snohomish, it was in violation of its filed rate schedule on both scores:  it engaged in widespread market manipulation that "undermine[d] the functioning of the wholesale power market" and resulted in "unjust and unreasonable rates," and it concealed from FERC changes in its market share resulting from its acquisition of control over its competitors' assets, thereby "imped[ing] [FERC's] ability to ensure that utilities do not acquire market power and that rates remain just and reasonable."[27]

FERC therefore revoked Enron's market-based rate authority and commenced proceedings against Enron to craft a remedy for its deception and misconduct.  Specifically, FERC ordered the ALJ in the Gaming and Partnership Proceedings to "determine the total amount of profits that Enron should be required to disgorge" for power sales made in violation of its market-based rate authority, warning that "Enron potentially could be required to disgorge profits for *all* of its wholesale power sales in the Western Interconnect for the period January 16, 1997 to June 25, 2003."[28]  FERC therefore ordered the ALJ to examine "terminated wholesale power contracts . . . pursuant to which Enron continues to demand termination payments," including its Contract with Snohomish, because "termination payments are based on profits Enron projected to receive under its long-term, wholesale power contracts executed during the period when Enron was in violation of conditions of its market-based rate authority," and hence are subject to forfeiture.[29]

---

[27] *El Paso Elec. Co.*, 108 F.E.R.C. at 61,371-72, 61,374-75; *Enron Power Mktg., Inc.*, 103 F.E.R.C. at 62,301-02.

[28] *El Paso Elec. Co.*, 108 F.E.R.C. at 61,369, 61,374-75 & n.50.

[29] *El Paso Elec. Co.*, 110 F.E.R.C. at 62,089-91 & n.4.  Similar issues within FERC's primary jurisdiction are also pending before FERC in Snohomish's petition for partial rehearing of FERC's June 28 Order, in which Snohomish seeks a ruling that Enron may not lawfully

Thus, FERC is presently determining in the Gaming and Partnership Proceedings whether the termination payment Enron seeks to collect from Snohomish in the adversary proceeding is an unjust profit made in violation of the FPA and Enron's market-based tariff, which it should not be permitted to collect. Accordingly, if FERC's June 28 Order is not accorded preclusive effect, the adversary proceeding must be stayed in deference to FERC's primary jurisdiction to determine the legality of the termination payment under the FPA.

All four factors the Second Circuit has articulated as the focus of the primary jurisdiction inquiry compel a stay here:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Ellis*, 443 F.3d at 82-83. The question here—whether the termination payment constitutes an unjust profit derived from Enron's market manipulation and concealed market power—is a

---

collect the termination payment under the FPA because Enron's market-based rate tariff has been revoked, and thus Enron has no tariff on file with FERC, as required in order to "collect or receive any rate" under a FERC-regulated contract. *See* Zimmerman Decl., Ex. 14 (Request for Limited Reh'g of Public Util. Dist. No. 1 of Snohomish County), Docket No. 91, at 5, 42-43; 16 U.S.C. § 824d(c); 18 C.F.R. § 35.1(e) ("No public utility shall . . . demand . . . collect or receive any rate, charge or compensation . . . which is different from that provided in a rate schedule required to be on file with this Commission . . . ."); *Enron Power Mktg., Inc.*, 103 F.E.R.C. at 62,305, 62,308 (revoking Enron's market-based rate authority and denying "wind-down" authority). In addition, Snohomish's petition notes that FERC has determined that Enron's manipulation of the Western energy markets "resulted in unjust and unreasonable rates," which renders Enron's contracts unlawful unless FERC acts to correct them. *Id.* at 62,302; *Enron Power Mktg., Inc.*, 106 F.E.R.C. ¶ 61,024, 61,094 (2004); 16 U.S.C. § 824d(a) ("[A]ny . . . rate or charge that is not just and reasonable is hereby declared to be unlawful."). These questions are at the core of FERC's power to regulate market-based rates, and the bankruptcy court erred by refusing to allow FERC to address these issues before pressing forward with Enron's termination-payment claim.

question involving technical and policy considerations within FERC's expertise (and exclusive jurisdiction) and requires administrative discretion in fashioning a remedy.  Moreover, "[c]ourts should be especially solicitous in deferring to agencies that are simultaneously contemplating the same issue," as FERC is doing here.  *See id.* at 87-88 (court erred by enforcing media-asset divestiture order without deferring to FCC decision on pending waiver request, leading to inconsistent rulings when FCC later granted waiver).  Finally, a "prior application to the agency" has plainly been made.[30]

Federal courts have regularly deferred to the primary jurisdiction of administrative agencies in these circumstances.  For example, in *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199 (5th Cir. 1988), a gas seller sued to collect payments under a "take or pay" contract for undelivered gas, much as Enron sued here to collect the termination payment for undelivered power.  Notwithstanding the gas seller's argument that the dispute was "purely contractual" and for the court to decide, the Fifth Circuit affirmed the district court's stay of the gas seller's contract suit under the doctrine of primary jurisdiction, so as to permit a referral to FERC to determine whether the contract payments demanded by the gas seller were unlawful and in excess of price ceilings under the Natural Gas Policy Act of 1978.  *See id.* at 201-03, 205; *Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1497-98 (10th Cir. 1996) (vacating judgment on pipeline's contract suit for indemnity and remanding for stay pending referral to FERC to decide whether indemnity provision was an "unreasonable" tariff practice under Interstate Commerce Act); *New York Elec. & Gas Corp. v. New York Indep. Sys. Operator, Inc.*, 168 F. Supp. 2d 23, 27-30 (N.D.N.Y. 2001) (staying electric power purchaser's contract suit to

---

[30]  The Gaming and Partnership Proceeding arose out of investigations FERC commenced in 2002, and has expressly encompassed the termination payment since 2005.  *See supra* pp. 14-15.

recover overcharges, pending completion of FERC proceedings to determine reasonableness of rate and seller's petition seeking recovery of overcharges from underlying power producers).[31]

Contrary to these well-established principles, the bankruptcy court asserted that "the doctrine of primary jurisdiction is not implicated here, as the state law claims are not within FERC's particular expertise." (March 9 Op. at 3, 27-28.) But that is the wrong question. By definition, the doctrine of primary jurisdiction applies "where a claim is originally cognizable in the courts," and thus necessarily applies to cases involving aspects the courts are competent to decide, such as the state-law claims here. *See Western Pac. R.R. Co.*, 352 U.S. at 64. But "'[t]he test is not whether some parts of the case are within the exclusive jurisdiction of the courts; the test is whether some parts of the case are within the exclusive jurisdiction of the agency.'" *Alberta Gas Chems. Ltd. v. Celanese Corp.*, 650 F.2d 9, 13 (2d Cir. 1981) (quoting 2 K. Davis, Administrative Law Treatise § 19.07, at 39 (1958)). Because Enron's right to collect the termination payment turns not only on questions of state law, but also on issues within FERC's exclusive jurisdiction and currently before FERC in the Gaming and Partnership Proceeding, the bankruptcy court should have deferred until FERC decided those issues, before proceeding to decide any remaining state-law issues not resolved thereby. *See Niagara Mohawk Power Corp. v. Megan Racine Assocs., Inc.*, 180 B.R. 375, 380-81 (Bankr. N.D.N.Y. 1995) (although "the courts are an appropriate forum" to determine buyer's contractual liability under electric power supply contract, contract suit had to be stayed under the doctrine of primary jurisdiction to allow FERC to determine whether seller had violated its regulatory authorization to sell power).

---

[31] *See also Western Pac. R.R. Co.*, 352 U.S. at 67-70 (reversing judgment awarding carriers higher rate under bomb-tariff for napalm shipments and remanding for referral to ICC to determine whether lower rate under gasoline-tariff applied); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 60 (2d Cir. 1994) (remanding for referral of land title dispute to Bureau of Indian Affairs to determine plaintiff's tribal status under Nonintercourse Act).

The bankruptcy court also refused to stay its hand until FERC had ruled in the relevant regulatory proceedings because, in the court's view, FERC had "upheld the enforcement of similar contracts" in *Nevada Power Co. v. Enron Power Mktg., Inc.*, 103 F.E.R.C. ¶ 61,353, *reh'g denied*, 105 F.E.R.C. ¶ 61,185 (2003), and had refused to modify those contracts despite Enron's misconduct.  (March 9 Op. at 23-24.)  But the Ninth Circuit has unequivocally rejected FERC's view of the limits of its regulatory authority in *Nevada Power*, holding that the standard FERC applied there to determine whether to reform long-term contracts entered into during the Western power crisis "cannot be squared with the [FPA's] statutory scheme" and "abdicate[d] [FERC's] statutory responsibility" to ensure just and reasonable rates.  *Snohomish*, 471 F.3d at 1084.[32]  Indeed, given that FERC has already determined that Enron's manipulation of the energy markets "resulted in unjust and unreasonable rates," *Enron Power Mktg., Inc.*, 103 F.E.R.C. at 62,302; 106 F.E.R.C. at 61,094, and is in the process of crafting a remedy for Enron's misconduct, it was wholly inappropriate for the bankruptcy court to conclude that Enron's existing contracts should nevertheless be enforced without awaiting FERC's action.  *See* 16 U.S.C. § 824d(a) (any rate that is not just and reasonable is "unlawful"); *Maislin Indus. U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 128-29 & n.10  (1990) ("The filed rate is not enforceable if the [agency] finds the rate to be unreasonable.").

The bankruptcy court reasoned that it "need not await a determination from FERC as to the validity of the contract rates, as the filed-rate doctrine requires that contracts be enforced in

---

[32] In any event, contrary to the bankruptcy court's reading, *Nevada Power* did not hold that Enron's contracts are necessarily enforceable.  It held only that certain long-term contracts in the Western market (not involving the Contract at issue here) could not be modified on the ground that they were contrary to the public interest—the ruling subsequently overturned by the Ninth Circuit in *Snohomish*.  FERC made clear that its order in *Nevada Power* was without prejudice to other remedies for Enron's misconduct that could be granted in subsequent proceedings.  *See* 103 F.E.R.C. at 62,400 (rejecting "Enron's contention that the Commission determination in this case should preclude further challenges to its contracts").

accordance with the contractual rates unless and until those rates are set aside." (March 9 Op. at 3, 28-29.) The bankruptcy court misapplied the filed-rate doctrine. That doctrine merely provides that when Congress regulates industry rates, the rate filed in a tariff approved by the governing regulatory agency as reasonable may not be modified by the courts through the application of common-law or other non-regulatory defenses, such as challenges brought under the federal antitrust laws or state law principles of estoppel, misrepresentation, and the like.[33] This rule promotes uniformity in rate regulation; prevents discriminatory application of rates among customers; and leaves the rate-making process to the expertise of administrative agencies. *See, e.g.*, *Wegoland Ltd. v. Nynex Corp.*, 27 F.3d 17, 19-21 (2d Cir. 1994).

But while the filed rate doctrine bars a court from *setting aside* a filed rate, it does not bar the court from merely *staying* proceedings when the rate is challenged before the agency. To the contrary, the purposes served by referral to the agency under the doctrine of primary jurisdiction—uniform regulation and expert agency decisionmaking—are the same purposes underlying the filed rate doctrine. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577-78 (1981) ("The considerations underlying the [filed rate] doctrine . . . are preservation of the agency's primary jurisdiction over reasonableness of rates . . . ."); *Nader v. Allegheny Airlines*, 426 U.S. 290, 304 (1976) ("The doctrine [of primary jurisdiction] has been applied . . . when an action otherwise within the jurisdiction of the court raises a question of the validity of a rate or practice included in a tariff filed with an agency."); *Maislin*, 497 U.S. at 128-29 & n.10 ("The

---

[33] *See, e.g.*, *Reiter v. Cooper*, 507 U.S. at 266; *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951) (court cannot vary filed rate under FPA "on the ground that, in its opinion, it is the . . . more reasonable one"); *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 162-63 (1922) (shipper could not bring antitrust challenge to railroad rates filed with Interstate Commerce Commission); *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915).

filed rate doctrine . . . contains an important caveat:  The filed rate is not enforceable if the ICC

finds the rate to be unreasonable.").

Thus, the filed rate doctrine does not bar application of the doctrine of primary

jurisdiction to refer to an agency a challenge to enforcement of the filed tariff.  As the Second

Circuit put it:  "[W]e do not view the filed rate doctrine as a road-block" that would require a

court blindly to proceed with an action to collect on a filed rate, rather than referring to the

agency the defendant's contentions that the rate is unreasonable under the governing statute.

*Delta Traffic Serv., Inc. v. Appco Paper & Plastics Corp.*, 893 F.2d 472, 474-75 (2d Cir.)

(holding that district court erred in denying the defendant shipper's motion for a stay of carrier's

action to collect filed-tariff rate pending referral of proceedings to the ICC to determine shipper's

defense that the tariff was unreasonable), *vacated on other grounds*, 498 U.S. 964 (1990).[34]

Thus, contrary to the bankruptcy court's view that the filed rate doctrine required it to

press forward with Enron's contract claims independently of FERC's concurrent enforcement

proceedings concerning the same contract, the law in fact required the bankruptcy court to do

just the opposite.  As the Second Circuit has instructed:

---

[34] *Accord Delta Traffic Serv. v. Transtop, Inc.*, 902 F.2d 101, 104-06 (1st Cir. 1990)
(Breyer, J.); *Advance United Expressways, Inc. v. Eastman Kodak Co.*, 965 F.2d 1347, 1352-53
(5th Cir. 1992), *modified on other grounds on reh'g*, 990 F.2d 184 (5th Cir. 1993); *Atlantis
Express, Inc. v. Standard Transport. Servs.*, 955 F.2d 529, 536-37 (8th Cir. 1992); *Milne Truck
Lines v. Makita U.S.A.*, 970 F.2d 564, 569-70 (9th Cir. 1992); *Southwestern Bell Tel. v. Allnet
Communications Servs.*, 789 F. Supp. 302, 305 (E.D. Mo. 1992) (filed rate doctrine did not bar
stay of tariff rate-collection suit to refer rate-reasonableness defense to FCC); *cf. Reiter v.
Cooper*, 507 U.S. at 266 (rejecting carrier argument that filed rate doctrine required court to
enforce filed contract rate regardless of shipper counterclaim challenging reasonableness of rate
under the ICA:  while "shipper cannot avoid payment of the tariff rate by invoking common-law
claims and defenses," the filed rate doctrine "assuredly does *not* preclude avoidance of the tariff
rate . . . through claims and defenses that are specifically accorded by the ICA itself").

A federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks toward the same end. Where a statute confers jurisdiction over a general subject matter to an agency and that matter is a significant component of a dispute properly before the court, it is desirable that the agency and the court go down the same track—although at different times—to attain the statute's ends by their coordinated action.

*Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994). Until FERC determines the legality of the termination payment Enron seeks in the proceedings pending before it, "the judicial process" must be "suspended." *Western Pac. R.R. Co.*, 352 U.S. at 64.[35]

## CONCLUSION

For the foregoing reasons, (1) the bankruptcy court's October 30, 2006 Order holding that the FERC June 28 Order was void *ab initio* in violation of the automatic stay and enjoining Snohomish from pursuing certain relief before FERC should be reversed; and (2) the bankruptcy court's March 19, 2007 Order dismissing the adversary proceeding without prejudice to permit arbitration should be vacated and remanded, with instructions to enter an order (a) dismissing the adversary proceeding with prejudice, in accordance with the preclusive effect of FERC's June 28 Order, or in the alternative, (b) dismissing or staying the adversary proceeding under the doctrine of primary jurisdiction pending FERC's resolution of the termination-payment claim in the Gaming and Partnership Proceeding.

---

[35] The bankruptcy court also opined that the adversary proceeding should proceed because, even if Snohomish were ordered to pay the termination payment, Enron could disgorge the payment if FERC later determines that Enron may not collect it. (March 9 Op. at 30.) Enron is bankrupt, however, and may be unable to disgorge the termination payment if it disburses the funds to its creditors before FERC rules. Thus, even if a stay were not required under the doctrine of primary jurisdiction, any judgment on Enron's claim should await a decision in the Gaming and Partnership Proceeding, in order to preserve the effectiveness of any remedy FERC may order. *See Reiter*, 507 U.S. at 270 (equities weigh against granting bankrupt carrier judgment on tariff-rate "undercharges" claim before ICC decides shipper's unreasonable-rate counterclaim); *Delta Traffic Serv. v. Georgia-Pacific Corp.*, 936 F.2d 64, 66 (2d Cir. 1991) (judgment for bankrupt carrier held in escrow pending ICC decision on shipper's unreasonable-rate reparations claim).

Dated:  June 11, 2007                    Respectfully submitted,


/s/ Douglas F. Curtis
Douglas F. Curtis (DC 2076)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

Craig Goldblatt
Joel Millar
Danielle Spinelli
D. Hien Tran
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

Lisa Lynch
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Alan E. Gamza (AG 2014)
Philippe Zimmerman (PZ 7744)
Alan Kolod (AK 3108)
MOSES & SINGER LLP
405 Lexington Avenue
New York, NY  10174
(212) 554-7800

Michael A. Goldfarb
LAW OFFICES OF
  MICHAEL A. GOLDFARB
1150 Market Place Tower
2025 First Avenue
Seattle, WA  98121
(206) 374-7090

Michael J. Gianunzio
  General Counsel
Eric L. Christensen
  Assistant General Counsel
PUBLIC UTILITY DISTRICT NO. 1
  OF SNOHOMISH COUNTY
2320 California Street
Everett, WA  98206
(425) 783-8649

Counsel for Appellant Public Utility District
  *No. 1 of Snohomish County*

## CERTIFICATE OF SERVICE

I, Danielle Spinelli, hereby certify that on this 11th day of June, 2007, I served the foregoing BRIEF FOR APPELLANT PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, with attachments, by electronic mail and overnight courier on the parties to this action at the addresses listed below:

Israel Dahan
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY  10281
(212) 504-6629
israel.dahan@cwt.com

Jonathan D. Polkes
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
jonathan.polkes@weil.com

*Counsel for Appellee Enron Power
  Marketing, Inc.*

/s/ Danielle Spinelli
Danielle Spinelli