# EXHIBIT 4

115 FERC ¶ 61,375
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Joseph T. Kelliher, Chairman;
Nora Mead Brownell, and Suedeen G. Kelly.

| | |
|---|---|
| Public Utility District No. 1 of Snohomish County, Washington | Docket No. EL05-139-000 |

ORDER GRANTING, IN PART, AND DENYING, IN PART,
PETITION FOR RELIEF FROM A CONTRACT
TERMINATION PAYMENT CLAIM

(Issued June 28, 2006)

1.    On August 5, 2005, as amended on December 7, 2005, Public Utility District No. 1 of Snohomish County, Washington (Snohomish) submitted a petition pursuant to section 1290 of the Energy Policy Act of 2005 (EPAct 2005),[1] requesting that the Commission exercise its exclusive jurisdiction to review a claim for a $116.8 million termination payment, plus interest, as sought by Enron Power Marketing, Inc. (Enron) in a bankruptcy complaint proceeding.[2]  Enron's claim is based on Snohomish's election to terminate a long-term power sales agreement entered into by the parties on January 26, 2001 (Agreement), due to events related to Enron's financial collapse and bankruptcy.[3]

2.    The Commission would not typically rule on the contract issues raised by Enron's termination payment claim, or by Snohomish's petition, in which affirmative defenses relating to this claim are raised by Snohomish (including Snohomish's assertion that it was fraudulently induced to enter into the Agreement).  These claims and defenses

---

[1] Pub. L. No. 109-58, 119 Stat. 594, 984 (2005).

[2] *See* Enron Power Marketing, Inc.'s Complaint for Declaratory Relief Pursuant to the Bankruptcy Code and Rules and for Damages*, Enron Power Marketing, Inc. v. Public Utility District No. 1 of Snohomish County*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. filed Jan. 31, 2003) (*Snohomish Adversary Proceeding*).

[3] The Agreement was modeled on a standard form purchase and sale agreement, Version 2.1, as prepared by the Edison Electric Institute.

20060628-4003 Issued by FERC OSEC 06/28/2006 in Docket#: EL05-139-000

require, for their resolution, the application of state law and do not otherwise require uniform interpretation with respect to the policies we are required to administer.[4] However, Snohomish's petition presents the Commission with a unique matter of first impression – the invocation of our exclusive jurisdiction, under section 1290 of EPAct 2005, to determine whether a requirement to make a termination payment for power not delivered is not permitted under a rate schedule (or contract under such a rate schedule) or is otherwise unlawful on the grounds that the contract is unjust and unreasonable or contrary to the public interest.  The Commission finds that, in this instance, where it has been granted exclusive jurisdiction under section 1290 with respect to a termination payment claim, it is both necessary and appropriate to consider the parties' respective state law claims and defenses on the merits.[5]

3.     For the reasons discussed below, we will grant, in part, and deny, in part, Snohomish's petition.  Specifically, we will grant Snohomish's request that we deny Enron's termination payment claim in its entirety (both the principal amount and interest, as claimed by Enron), based on our finding, below, that the Agreement was fraudulently induced by Enron.  This finding is based on the assumed applicability of New York law, the substantive law selected by the parties in the choice of law provision included in the Agreement.  We find that, under New York law, and under the unique facts presented by this case, clear and convincing evidence exists that Enron fraudulently induced Snohomish to enter into the Agreement.  In making this finding, we rely on the admissions of the parties (*i.e.*, on Enron's admitted financial fraud) and the detailed factual record, summarized below, concerning among other things:  (i) the credit requirements set forth by Snohomish in its request for proposals (RFP); (ii) Enron's response to that RFP; and (iii) the parties' subsequent negotiations (including Enron's written representations, and verbal communications) addressing, among other things, Enron's professed solvency.

---

[4] *See Arkansas Louisiana Gas Co. v. Hall*, 7 FERC ¶ 61,175 at 61,323 ("We consider the need for uniformity in light of the policies Congress has charged this Commission to administer"), *reh'g denied*, 8 FERC ¶ 61,031 (1979) (*Arkla*).

[5] Other entities have also filed petitions pursuant to section 1290.  *See City of Vernon, California*, Docket No. EL06-3-000 (complaint filed October 15, 2005); *Luzenac America, Inc.*, Docket No. EL06-8-000 (complaint filed October 20, 2005); and *Ash Grove Cement Co.*, Docket No. EL06-63 (complaint filed March 21, 2006).  The Commission is acting on each of these petitions in orders issued contemporaneous with this order. Only in this case, however, do we determine that the underlying contract is eligible for review under section 1290.

Docket No. EL05-139-000                                                    3

4.      However, we will deny Snohomish's request that we adjust the charges paid by
Snohomish for the period January 26, 2001 through November 28, 2001. While section
1290 gives the Commission exclusive jurisdiction related to termination payments,
Snohomish's claim, in this respect, is not related to Enron's termination payment claim
and is thus beyond the scope of section 1290.

5.      We also distinguish this case from the very different set of circumstances reviewed
by the Commission in a series of orders issued pursuant to our public interest standard
(collectively, the *Forward Contracts Proceedings*).[6]  The *Forward Contracts
Proceedings* addressed certain forward contracts entered into in the Western energy
markets among numerous buyers and sellers, including parties to certain sleeve
transactions and third-party brokered transactions (including transactions in which the
buyers were unaware of the counter party's identity or engaged in little, if any,
bargaining).[7]  In those cases, the Commission found, based on the records developed in
each proceeding, that the *Mobile-Sierra*[8] public interest standard of review properly
applied to the Commission's review of the contracts at issue.  As the Commission noted
in each case, however, there was no evidence of "unfairness, bad faith, or duress in the
original negotiations" of the contracts at issue.[9]

---

[6] *See Nevada Power Co. v. Enron Power Marketing, Inc.*, 103 FERC ¶ 61,353 at
P 110 (*Nevada Power*), *order denying reh'g*, 105 FERC ¶ 61,185 (2003); *Public Utilities
Commission of the State of California v. Sellers of Long Term Contracts to the California
Department of Water Resources*, 103 FERC ¶ 61, 61,353 at P 62 (*Water Resources*),
*order denying reh'g*, 105 FERC ¶ 61,182 (2003); and *PacifiCorp v. Reliant Energy
Services, Inc.*, 103 FERC ¶ 61,355 at P 73 (*PacifiCorp*), *order denying reh'g*, 105 FERC
¶ 61,184 (2003).  In the *Forward Contracts Proceedings*, the complainants sought to
modify their forward contracts under the Commission's just and reasonable standard,
based on the dysfunctions of the Western spot markets during the period November 1,
2000 to June 20, 2001.  For additional background regarding these market dysfunctions,
*see* note 12, *infra*.

[7] *See, e.g., Nevada Power*, 103 FERC ¶ 61,353 at P 48.

[8] *See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956)
(*Mobile*); *FPC v. Sierra Pacific Power*, 350 U.S. 348 (1956) (*Sierra*).

[9] *See Nevada Power*, 103 FERC ¶ 61,353 at P 110; *Water Resources,* 103 FERC
¶ 61,353 at P 62; and *PacifiCorp*, 103 FERC ¶ 61,355 at P 73.  The only agreements
addressed in the *Forward Contracts Proceedings* that involved Enron were those
agreements to which the Nevada Power Co. and Sierra Pacific Power Co. (the Nevada
Companies) were parties.  However, to the extent Enron was involved in these

(continued)

Docket No. EL05-139-000                                                              4

6.      Finally, Enron challenges the constitutionality of section 1290 and requests that
the Commission defer its rulings, herein, until these matters can be addressed by the U.S.
district court in a matter that is currently pending.  As discussed below, we decline to
defer our ruling on Snohomish's petition.

**Background**

### Enron Corp.'s Financial Fraud and Bankruptcy

7.      Snohomish states that at the time the parties negotiated the Agreement, Enron and
its corporate parent, Enron Corp., were engaged in a widespread, multi-billion dollar
fraud that, once disclosed, quickly led to Enron's financial collapse and bankruptcy.
Snohomish notes that in the months that followed, additional allegations relating to these
events began to surface, including charges of securities fraud, accounting irregularities,
money laundering, breach of fiduciary duties, misleading financial information, ERISA
violations, insider trading, excessive compensation, wrongdoing by certain of Enron
Corp.'s bankers, and energy spot market price manipulation.[10]  While the background
underlying these events need not be reviewed here, in detail, they are nonetheless

---

proceedings, it has since settled its disputes.  *See Nevada Power Co.,* Docket No. EL02-
28-000, *et al,* Notice of Withdrawal of Testimony and Exhibits Relating to Enron, as
submitted by the Nevada Companies (filed February 6, 2006).

[10] *See* Final Report of Neal Batson, Court-Appointed Examiner, *In re Enron
Corp.,* No. 01-16034 (AJG) (Bankr. S.D.N.Y. filed Nov. 4, 2003) (Examiner's Report).
*See also* Snohomish amended petition at attachments G and I (attaching the Court-
Appointed Examiner's Second and Third Reports).  Snohomish notes that criminal
investigations concerning many of these activities have since led to numerous convictions
or guilty pleas on the part of Enron's former executives and employees, including guilty
pleas entered by:  (i) Andrew S. Fastow, Enron Corp.'s former Chief Financial Officer,
on January 14, 2004; (ii) Ben F. Glisan, Jr., Enron Corp.'s former Treasurer, in
September 2003; (iii) Richard A. Causey, Enron Corp.'s former Chief Accounting
Officer, on December 28, 2005; (iv) Timothy A. Despain, Enron Corp.'s Deputy
Treasurer, on October 7, 2004; and (v) Mark E. Koenig, Enron Corp.'s former Director of
Investor Relations and Executive Vice President, on August 25, 2004.  In addition, in a
jury trial held before the U.S. District Court for the Southern District of Texas, former
Enron Corp. Chief Executive Officer, Jeffrey K. Skilling, was found guilty, on May 25,
2006, on 19 counts of conspiracy, fraud, false statements and insider trading, and Enron
Corp. founder and former Chairman, Kenneth L. Lay was found guilty on 6 counts of
conspiracy and fraud.

Docket No. EL05-139-000                                                          5

relevant as they relate to Snohomish's claim that the Agreement was *also* procured by fraud (*i.e.*, by Snohomish's claim that Enron knowingly misrepresented that it was solvent at the time the Agreement was executed).

8.      The Examiner's Report states that by the fall of 2001 and before any of the above-noted allegations were made public, Enron Corp. was the seventh largest corporation in the world, as measured by its annual revenues.  The Examiner's Report goes on to describe that, beginning in October of 2001, Enron Corp. was required to make a series of disclosures and financial restatements revealing for the first time the extent to which it had relied on special purpose entities (SPEs) and other aggressive accounting techniques to conceal the true amount of its corporate debt.  Specifically, while Enron Corp.'s 2001 third quarter Form 10-Q balance sheet reflected debt of only $12.978 billion, Enron Corp. disclosed, on November 19, 2001, that its actual debt when including "off-balance sheet" debt (including $14 billion in debt attributable to Enron Corp.'s SPEs) and other balance sheet adjustments, was not $12.978 billion, as reported in its Form 10-Q, but rather $38.094 billion – an understated total debt in excess of $25 billion.[11]  Following these disclosures, on November 27, 2001, market analysts lowered Enron Corp.'s credit rating to below investment grade.  On December 2, 2001, as noted above, Enron Corp. and Enron filed for bankruptcy protection.

### Enron's Market Manipulation, the Revocation of Enron's Market-Based Rate Authority, And Related Remedial Actions

9.      In the wake of Enron Corp.'s financial collapse, allegations also began to surface that Enron Corp., through its affiliates, had used its market position to manipulate prices in the electric and natural gas markets during the course of the Western energy crisis.[12]

---

[11] Examiner's Report at 16-17.

[12] The scope and origin of the Western energy crisis has been analyzed and reviewed in numerous Commission orders issued in response to these events.  *See, e.g., San Diego Gas & Elec. Co.,* 92 FERC ¶ 61,172 (2000); *San Diego Gas & Elec. Co.,* 95 FERC ¶ 61,115, *order on reh'g,* 95 FERC ¶ 61,418 (2001).  Briefly, the Western energy crisis was triggered in the early summer of 2000 when day-ahead and real-time prices in the markets operated by the California Power Exchange Corp. (Cal PX) and the California Independent System Operator, Inc. (Cal ISO) reached levels that exceeded, by three or four times, those seen at comparable demand conditions in prior years.  These price spikes occurred as a result of both supply shortfalls (as caused, principally, by a lag in generation and transmission expansion; a higher than normal rate of forced outages in existing gas and oil-fired generation; and a drop in net scheduled imports) and record high demand (as caused by economic growth and unseasonably hot weather).  These

(continued)

Docket No. EL05-139-000                                                      6

Evidence relating to Enron's role in (and responsibility for) these events began to surface following Enron Corp.'s bankruptcy filing.  In response, the Commission issued an order, on February 13, 2002, instituting a Staff investigation of whether any entity, including Enron (through any of its affiliates or subsidiaries), had manipulated spot market prices or had otherwise exercised undue influence over wholesale electricity prices in the West since January 1, 2000.[13]

10.     In its Initial Report, issued August 2002, Staff found, among other things, that Enron, through certain unfiled partnership agreements with other public utilities, including its affiliates, had gained control of these entities' jurisdictional assets and appeared to have then used these assets for a number of unauthorized purposes, including gaming activities.  In response to these interim findings, the Commission issued a series of orders, on August 13, 2002, establishing hearing procedures, pursuant to section 206 of the Federal Power Act (FPA),[14] to determine whether the alleged misconduct, as documented by Staff, had occurred and, if so, to determine the appropriate remedies, including refunds and/or revocation of Enron's market-based rate authority.[15]  In addition, the Commission issued an order on November 20, 2002, allowing the parties to a complaint proceeding, filed by San Diego Gas & Electric Co. (*California Refund Proceeding*), to conduct additional discovery regarding these and related market manipulation issues.[16]

11.     In Staff's Final Report, issued March 26, 2003, Staff further found that Enron and its affiliate, Enron Energy Services, Inc. (EESI), appeared to have violated FPA section 205(a)[17] by engaging in certain gaming activities, as first outlined by Staff in its Initial Report.[18]  In response, the Commission issued an order, also on March 26, 2003,

---

supply and demand conditions were exacerbated, in turn, by the imperfect design and operation of the California wholesale energy markets -- an environment that became ripe for market manipulation.

[13] *See Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices,* 98 FERC ¶ 61,165 (2002).

[14] 16 U.S.C. § 824e (2000).

[15] *See Portland General Elec. Co.,* 100 FERC ¶ 61,186 (2002); *Avista Corp.,* 100 FERC ¶ 61,187 (2002); *El Paso Elec. Co.,* 100 FERC ¶ 61,188 (2002).

[16] *See San Diego Gas & Elec. Co.,* 101 FERC ¶ 61,186 (2002).

[17] 16 U.S.C. § 824d (2000).

[18] These gaming activities included:  (i) a load shifting strategy involving the submission of an artificial load schedule in order to receive inter-zonal congestion

(continued)

20060628-4003 Issued by FERC OSEC 06/28/2006 in Docket#: EL05-139-000

directing Enron and EESI, to show cause why their authority to sell power at market-based rates should not be revoked by the Commission *(MBR Revocation Proceeding)*.[19] In addition, the Commission issued an order, in Docket No. EL03-180-000, *et al*., on June 25, 2003, directing Enron, EESI and certain other entities to show cause why their behavior, as documented by Staff (including these entities' work in concert through partnerships, alliances or other arrangements), did not constitute gaming and/or anomalous market behavior as defined in the Cal ISO and Cal PX tariffs.[20]  In these proceedings, i.e., in Docket Nos. EL03-180-000 and EL03-154-000 (collectively, the *Partnership/Gaming Proceedings*), the Commission authorized the administrative law judge to consider all appropriate remedies, including the monetary remedy of disgorgement of unjust profits and any other additional, appropriate non-monetary remedies.

12.     In an order issued by the Commission on June 25, 2003, in the *MBR Revocation Proceeding*, the Commission revoked Enron's and EESI's market-based rate authority.[21] In doing so, the Commission found that Enron and EESI had disrupted the Western energy markets during the course of the Western energy crisis by inventing numerous market manipulation schemes and using various Enron companies to execute these schemes.  The Commission noted that the exposure of these schemes had also led to criminal prosecutions and to the submission of guilty pleas by two of the three

---

payments (*i.e.*, the deliberate creation of congestion on a transmission line in order to increase the value of Enron's transmission rights); (ii) a megawatt laundering strategy (also known as ricochet), involving the purchase of energy in the Cal PX day-ahead market by one entity, the exportation of that energy to a second entity, and the subsequent resale of that energy back to the Cal ISO in the real-time market (or by way of an out-of-market sale); and (iii) various trading strategies premised on the submission of false information schedules.

[19] *See Enron Power Marketing, Inc.,* 102 FERC ¶ 61,316 (2003).

[20] *See Enron Power Marketing, Inc.,* 103 FERC ¶ 61,346 (2003).  In a companion order issued by the Commission, in Docket No. EL03-137-000, *et al.*, the Commission also directed Enron and EESI and certain other entities to show cause why their behavior, as documented by Staff (including certain gaming practices) did not constitute gaming and/or anomalous market behavior as defined in the Cal ISO and Cal PX tariffs.  *See* American *Elec. Power Service Corp.,* 103 FERC ¶ 61,345 (2003).

[21] *See Enron Revocation Order,* 103 FERC ¶ 61,343.

individuals who headed Enron's western power trading desk in Portland, Oregon.[22]  The Commission further found that Enron had routinely disregarded the corporate separation among its affiliates and trading partners in order to facilitate its misconduct and had failed to report the nature of these inter-corporate and intra-corporate relationships to the Commission, as it was required to do so under its market-base rate authorizations.[23]  The Commission found that the totality of these actions had resulted in unjust and unreasonable rates warranting immediate remedial action without the need for further evidentiary procedures.[24]

13.     In addition, the Commission has accepted offers of settlement addressing Enron's misconduct, as set for hearing by the Commission in the *California Refund Proceeding,* the *Enron Partnership/Gaming Proceedings*, and related proceedings.[25]  In the *Enron-California Parties/OMOI Settlement*, for example, the Commission accepted the parties' agreement requiring Enron:  (i) to assign to the California Parties[26] $25 million in

---

[22] *Id.* at P 55, *citing Unites States v. Timothy N. Belden*, Plea Agreement, N.D. Cal. Case No. CR02-0313-MJJ (filed Oct. 17, 2002); *United States v. Jeffrey S. Richter*, Plea Agreement N.D. Case No. CR-03-0026-MJJ (filed Feb. 4, 2003).   A guilty plea covering the third individual involved in this activity, John M. Forney, was entered on August 5, 2004.  *See Unites States v. John M. Forney*, Plea Agreement, N.D. Cal. Case No. CR03-0178-MJJ (filed Aug. 5, 2004).

[23] *Id.* at P 16 and P 51.

[24] *Id.* at P 50 and P 56.

[25] *See San Diego Gas & Elec. Co.,* 113 FERC ¶ 61,171 (2005) (*Enron-California Parties/OMOI Settlement*), *order on reh'g,* 115 FERC ¶ 61,032 (2006); *see also San Diego Gas & Elec. Co.,* 114 FERC ¶ 61,067 (2006) (*Enron-Nevada Companies Settlement*); *San Diego Gas & Elec. Co.,* 113 FERC ¶ 61,226 (*Enron-SRP Parties Settlement*), *corrected,* 113 FERC ¶ 61,244 (2005), *order on reh'g,* 115 FERC ¶ 61,032 (2006).  On March 10, 2006, Enron was also a party to three additional proposed settlements, submitted in Docket No. EL03-180-000, *et al.* (*Enron-Valley Electric Settlement*; *Enron-Santa Clara Settlement*; and *Enron-Trial Staff Settlement)*, proposing to resolve additional remaining issues in the *Enron Partnership/Gaming Proceedings* and related proceedings.  In addition, on April 25, 2006, a settlement agreement was submitted in these proceedings by Enron and the Metropolitan Water District of Southern California (*Enron-Water District Settlement*).

[26] The California Parties are Pacific Gas and Elec. Co., Southern California Edison Co., San Diego Gas & Elec. Co., the State of California Attorney General, the California

(continued)

receivables claimed by Enron to be due from Cal ISO and Cal PX; (ii) to assign to market participants $22.4 million held by the Cal ISO as collateral related to certain meter reading claims; (iii) to allow, in favor of the California Parties and certain additional claimants, an unsecured claim of $875 million in Enron's bankruptcy proceeding; and (iv) to pay a civil penalty of $600 million in the form of a subordinated bankruptcy claim.

### The Execution of the Agreement

14.    Snohomish states that on December 22, 2000 (*i.e.*, prior to the disclosure of Enron Corp.'s financial fraud and Enron's spot market gaming practices), Snohomish issued its RFP, seeking offers for a long-term power supply.  Snohomish states that it did so in order to protect its customers from the rising, highly volatile prices then prevailing in the Western spot markets.[27]  Snohomish states, however, that market conditions in the forward markets were also unfavorable at this time.  Specifically, Snohomish states that there were few sellers willing to respond to Snohomish's need for firm, around-the-clock power and that those few sellers who did respond (including Enron) were unwilling to offer prices anywhere near what could be considered reasonable in a functioning, competitive market.[28]  Snohomish states that, as such, Enron possessed vastly disproportionate bargaining power over Snohomish when it came to negotiating the terms and conditions of the Agreement.  Snohomish further states that Enron fully and intentionally exploited this unfair bargaining status during the course of the parties' negotiations, given Enron's systematic efforts to improperly bid prices up in the spot market.  Snohomish argues that Enron did so, among other reasons, for the express purpose of inducing customers, like Snohomish, into long-term contracts – a decision that Snohomish claims that it made only begrudgingly and under duress.

15.    Snohomish states that its RFP included, among other things, a creditworthiness requirement, stating that "[t]o be eligible for consideration, bidders shall have a long-term credit rating no less than BBB by Standard & Poors, or B by Moody's."  Snohomish argues that had Enron properly disclosed the true state of its financial affairs, Enron

---

Department of Water Resources, the California Electricity Oversight Board, and the California Public Utilities Commission.

[27] *See* Snohomish initial petition at 6 (noting that by May 2000, spot prices in the Western markets had begun spiraling out of control and that, by December 2000, had reached a peak of as high as $3,300 per MWh).

[28] Snohomish ultimately agreed with Enron under the Agreement to a price term of $109 per MWh for 25 MWs of firm power, and a contract term of nearly nine years' duration.

would not have been eligible to submit a bid pursuant to the RFP because its credit rating would not have met the requirements specified in that RFP. Snohomish states that, as such, the Agreement would never have been negotiated, much less executed.

16.     Snohomish adds that during the course of the parties' negotiations, Enron's fraud against Snohomish was further compounded. Specifically, Snohomish argues that Enron repeatedly and fraudulently represented to Snohomish, in both verbal communications and written representations, that it was solvent and thus able to perform its obligations under the Agreement. Snohomish argues that the Agreement was further tainted by fraud in the form of the financial guarantee that was made a part of the Agreement. Snohomish argues that with this guarantee, Enron Corp. gave its assurance to Snohomish that Enron would be capable of performing its obligations under the Agreement. Snohomish argues that, in fact, Mr. Despain, who signed the guarantee on behalf of Enron Corp., had direct knowledge that Enron Corp. had artificially inflated its credit rating by way of its misstated financial reports. Snohomish notes that Mr. Despain was personally involved in these fraudulent activities and has since pled guilty to these charges.[29]

17.     Snohomish states that on November 27, 2001, following the parties' execution of the Agreement (on January 26, 2001) and following Enron Corp.'s October 2001 financial restatements, market analysts reduced Enron Corp.'s credit rating to below investment-grade. Snohomish states that under the Agreement, this occurrence constituted a defined "Event of Default."[30] Snohomish states that accordingly, on November 28, 2001, in a written notice to Enron, it invoked its right, under section 5.2 of the Agreement, to terminate the Agreement, effective November 29, 2001.[31] Snohomish

---

[29] *See supra* note 10.

[30] Snohomish states that it relied, in particular, on section 5.1 of the Agreement which defines "[a]n 'Event of Default' [to] mean, with respect to a Party (a 'Defaulting Party'), the occurrence of any of the following: . . . (d) such Party becomes Bankrupt; (e) the failure of such Party to satisfy the creditworthiness/collateral requirements agreed to pursuant to Article Eight hereof; . . . (g) . . . the occurrence and continuation of . . . a default . . .; [and] (h) with respect to such Party's Guarantor . . . (iii) a Guarantor becomes Bankrupt." Snohomish adds that the term "Bankrupt," under section 1.3 of the Agreement, is broadly defined to include not only Enron's formal bankruptcy filing but also the point at which Enron became "bankrupt or insolvent (however evidenced)."

[31] Section 5.2 of the Agreement states, among other things, that in the Event of Default, the Non-Defaulting Party shall have the right to designate an Early Termination Date and "to accelerate all amounts owing between the Parties and to liquidate and terminate all, but not less than all, Transactions (each referred to as a 'Terminated

(continued)

Docket No. EL05-139-000                                                    11

states that, in addition, its notice of termination also acknowledged its obligation under section 5.2 of the Agreement to calculate a "settlement amount" in connection with the Agreement's termination. Snohomish's notice to Enron stated, however, that "[g]iven the severe market perturbations that are likely to result from Enron's imminent bankruptcy filing, it is impossible at this time to reasonably determine a Settlement Amount under section 5.2."

18.    Thereafter, on December 2, 2001, Enron (and Enron Corp.) filed for bankruptcy protection under chapter 11 of the Bankruptcy Code. Thereafter, on December 21, 2001, Snohomish, in a second written communication to Enron addressing Snohomish's section 5.2 obligations (and its related obligation, under section 5.3 of the Agreement, to net out the settlement amount into a single liquidated amount payable in the form a termination payment), asserted that it was not required, in this case, to make a termination payment to Enron in any amount. Snohomish asserted, first, that it had been fraudulently induced to enter into the Agreement and that, consequently, the Agreement was null and void from the outset. Snohomish also asserted that Enron Corp.'s bankruptcy rendered Enron's continuing performance under the Agreement impossible. In addition, Snohomish argued

---

Transaction') between the Parties." Section 5.2 further provides that the Non-Defaulting Party shall calculate a "Settlement Amount" for each such Terminated Transaction "in a commercially reasonable manner," while section 5.4 requires the Non-Defaulting Party to give notice, "as soon as practicable after a liquidation," of the amount of the Termination Payment "and whether the Termination Payment is due to or due from the Non-Defaulting Party." The Settlement Amount, a defined term under the Agreement, means, "with respect to a Transaction and the Non-Defaulting Party, the Losses or Gains, and Costs, expressed in U.S. Dollars, which such party incurs as a result of the liquidation of a Terminated Transaction pursuant to section 5.2." Finally, section 5.3 requires that the Settlement Amounts be netted out to a single liquidated amount, payable by one Party to the other in the form a Termination Payment:

> The Non-Defaulting Party shall aggregate all Settlement Amounts into a single amount by: netting out (a) all Settlement Amounts that are due to the Defaulting Party, plus, at the option of the Non-Defaulting Party, any cash or other form of security then available to the Non-Defaulting Party pursuant to Article Eight, plus any or all other amounts due to the Defaulting Party under this Agreement against (b) all Settlement Amounts that are due to the Non-Defaulting Party, plus any or all other amounts due to the Non-Defaulting Party under this Agreement, so that all such amounts shall be netted out to a single liquidated amount (the "Termination Payment") payable by one Party to the other. The Termination Payment shall be due to or due from the Non-Defaulting Party as appropriate.

Docket No. EL05-139-000                                                                    12

that when the contract price under the Agreement is corrected to a just and reasonable rate, no termination payment would be owed in any event.

19.    Snohomish states that on January 31, 2003, in the *Snohomish Adversary Proceeding*, Enron staked out its opposing position on the matter, seeking to recover, from Snohomish, a $116.9 million termination payment, plus interest, pursuant to its alleged rights under sections 5.2 and 5.3 of the Agreement.  Snohomish requests that this termination payment claim be denied.

### <u>Snohomish's Request for Relief Pursuant to EPAct 2005, Section 1290</u>

20.    Snohomish asserts that EPAct 2005, section 1290 grants exclusive jurisdiction over this matter to the Commission.  Section 1290 provides as follows:

(a)   Application – This section applies to any contract entered into in the Western Interconnection prior to June 20, 2001, with a seller of wholesale electricity that the Commission has --

(1)   found to have manipulated the electricity market resulting in unjust and unreasonable rates; and

(2)   revoked the seller's authority to sell any electricity at market-based rates.

(b)   Relief – Notwithstanding section 222 of the Federal Power Act (as added by section 1262 [sic]), any provision of title 11, United States Code, or any other provision of law, in the case of a contract described in subsection (a), the Commission shall have exclusive jurisdiction under the [FPA] (16 U.S.C. 791a, *et seq*.) to determine whether a requirement to make termination payments for power not delivered by the seller, or any successor in interest of the seller, is not permitted under a rate schedule (or contract under such a schedule) or is otherwise unlawful on the grounds that the contract is unjust and unreasonable or contrary to the public interest.

(c)   Applicability – This section applies to any proceeding pending on the date of enactment of this section involving a seller described in subsection (a) in which there is not a final, nonappealable order by the Commission or any other jurisdiction determining the respective rights of the seller.

Docket No. EL05-139-000                                                                13

21.    Snohomish argues that the Agreement satisfies the requirements for consideration by the Commission for relief under section 1290.[32]  Snohomish further argues that it is entitled to relief under section 1290(b), because, among other things, the Agreement was procured by fraud and because Enron lacked authority to enter into the Agreement.

**Notice Of Filing And Responsive Pleadings**

22.    Notice of Snohomish's initial (August 5, 2005) petition was published in the *Federal Register* with interventions, protests and comments due on or before September 6, 2005.[33]  This answer date was subsequently extended by the Commission, upon the joint request of Snohomish and Enron, for the stated purpose of fostering settlement discussions in the above-noted proceedings, concerning Enron's transactions and trading practices in the Western energy markets during the course of the Western energy crisis.[34]  These settlement discussions failed to produce settlements addressing Enron's termination payment claim against Snohomish.  On September 6, 2005, a motion to intervene was timely filed by Western Power Trading Forum.

23.    On December 7, 2005, Snohomish filed an amended petition, stating that it was doing so because the bankruptcy court, in an order issued November 16, 2005 in Enron's bankruptcy proceeding, had cleared the way for Snohomish and others to raise, before the Commission, all issues related to Enron's termination payment claims, including contract issues, without the risk of Enron seeking a bankruptcy court injunction or sanctions against a party requesting that the Commission assert its jurisdiction relating to these matters.[35]  On December 13, 2005, Enron filed an uncontested motion seeking to extend

---

[32] EPAct 2005, sections 1290(a) and (c).  Specifically, Snohomish notes that: (i) the Agreement was entered into prior to June 20, 2001; (ii) the Commission has found that Enron manipulated the electricity market resulting in unjust and unreasonable rates; (iii) the Commission has revoked Enron's authority to sell electricity at market-based rates; and (iv) proceedings involving Enron have been and will be pending on the date of enactment in which there is no final, nonappealable order by the Commission or any other jurisdiction determining the rights of Enron to collect a termination payment from Snohomish.

[33] 70 Fed. Reg. 61,278 (2005).

[34] *See supra* note 25.

[35] *See* Snohomish amended petition at 2, *citing Enron Power Marketing, Inc. v. Luzenac America, Inc.*, Order Denying Enron's Motion for an Order Enforcing the Automatic Stay, Enjoining Prosecution of Luzenac's FERC Petition and for Civil Contempt Sanctions, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Nov. 16, 2005).

the response date through January 17, 2006.  A notice granting the requested extension was issued by the Commission on December 16, 2005.  Motions to intervene were timely filed by Enron, the City of Santa Clara, California, the Metropolitan Water District of Southern California, and Valley Electric Association, Inc.  A protest was filed by Enron. On February 6, 2006, March 7, 2006, and March 31, 2006, supplemental pleadings were submitted by Snohomish consisting of an answer, a motion for partial summary disposition,[36] and a motion to lodge.[37]  On January 18, 2006, February 21, 2006, and April 17, 2006, supplemental pleadings consisting of an affidavit and answers were filed by Enron.  We will treat of these supplemental pleadings as answers.  Finally, on June 2, 2006, Snohomish filed a second motion to lodge, consisting of the verdicts reached in the trial of Enron executives Kenneth Lay and Jeffrey Skilling (*see supra* note 10).  On June 19, 2006, Enron submitted an answer to Snohomish's motion and on June 27, 2006, Snohomish submitted an answer to Enron's answer.

---

[36] Snohomish's motion seeks summary disposition on two grounds.  First, Snohomish argues that Enron committed fraud specific to the Agreement and violated the requirements of its market-based rate authority when it concealed its true financial status from Snohomish during the parties' negotiations of the Agreement.  Second, Snohomish asserts that a termination payment cannot be collected in this case because Enron failed to provide notice, as required by section 5.5. of the Agreement, regarding its asserted challenge to Snohomish's determination that no payment was due.  Because the relief sought with respect to these claims was previously requested by Snohomish in its initial and amended petition, Snohomish's motion is in the nature of an answer and will be treated as such here.

[37] Snohomish's motion to lodge concerns an opinion of the U.S. Court of Appeals for the Ninth Circuit in *SEC v. JT Wallenbrock & Associates,* Case No. 04-55100 (issued March 10, 2006) (*JT Wallenbrock*).  Snohomish asserts that *JT Wallenbrock* is consistent with the Commission's repeated findings that harm to individual consumers need not be shown in order for the Commission to take remedial action against an entity found to have violated the Commission's rules.  Because Snohomish's motion addresses arguments previously raised by Snohomish in its initial and amended petition, Snohomish's motion is in the nature of an answer and will be treated as such here.

Docket No. EL05-139-000                                                        15

**Discussion**

####    A.    **Procedural Matters**

24.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure,[38] the notices of intervention and timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.  Rule 213(a)(2) of the Commission's Rules of Practice and Procedure[39] prohibits an answer to a protest, or an answer to an answer, unless otherwise permitted by the decisional authority.  We will accept each of the above-noted answers (but not the answers submitted in response to Snohomish's second motion to lodge) because they have provided information that assisted us in our decision-making process.  Finally, we will reject Snohomish's second motion to lodge as redundant (*see supra* note 10) and thus unnecessary.

####    B.    **Enron's Constitutional Claims before the District Court and Request to Defer Action in this Case**

25.    Enron characterizes Snohomish's argument that the Agreement was fraudulently induced (*see* section D, below) as a state law claim over which the Commission may not be granted, by Congress, exclusive jurisdiction, depriving a state court (or, in this instance, an article III court) of its concurrent jurisdiction.  Specifically, Enron argues that any interpretation of section 1290 that would give to the Commission exclusive jurisdiction over these state law claims would violate the Constitution, including the Bankruptcy Clause, the separation of powers doctrine, the Fifth Amendment's guarantees of due process and equal protection, and the Seventh Amendment's guarantee of a right to a jury trial.

26.    Enron also notes that the constitutionality of section 1290 is now pending before the U.S. District Court for the Southern District of New York.  Enron submits that under these circumstances, the Commission should avoid the risk of an inconsistent decision with an article III court and should thus defer deciding the merits of this case until the district court has decided the matter.  Enron adds that should section 1290 be found unconstitutional, Snohomish's remaining jurisdictional claim, as arising under the FPA

---

[38] 18 C.F.R. § 385.214 (2005).

[39] *Id.* at § 385.213(a)(2).

and the Commission's concurrent jurisdiction, would violate the automatic stay provisions of the bankruptcy code.[40]

27.     We agree with Enron that we need not address, here, the constitutionality of section 1290, given the pending status of this issue before the district court. However, we reject Enron's argument that a merits decision regarding Snohomish's argument that the Agreement was procured by fraud, should be (or must be) deferred in this case. The district court will decide, in due course, the constitutionality of section 1290, but we decline to defer our decision on the merits here.

### C.     Application of Section 1290

28.     The parties in this case do not dispute that the Agreement satisfies the jurisdictional requirements giving rise to our authority to review the Agreement's termination payment provisions, under sections 1290(a) and (c).[41] We agree that section 1290 applies under the circumstances presented in this case. While the parties therefore agree that the merits of this case must be decided in accordance with the standards of relief set forth in section 1290(b), the parties are not in agreement regarding the standard of review applicable under this provision.

### 1.     Snohomish's Position

29.     Snohomish argues that when evidence exists of fraud, duress, or bad faith at the contract formation stage, the contract can be declared unlawful under the FPA using either the just and reasonable standard or a public interest standard.[42] Snohomish asserts, however, that the use of the just and reasonable standard is appropriate in this case for two reasons:  first, because the FPA mandates that all rates and charges demanded by a

---

[40] 11 U.S.C. § 362(b) (2000).

[41] Specifically, the parties do not dispute that the Agreement was entered into in the Western Interconnection prior to June 21, 2001 with a seller of wholesale electricity (Enron), or that Enron has been found by the Commission to have manipulated the electricity market resulting in unjust and unreasonable rates; or that Enron's authority to sell electricity at market-based rates has been revoked. There is also no dispute that there was a proceeding pending on the date of enactment of section 1290, as required by section 1290(c).

[42] See Snohomish initial petition at 2-3 and 17, and Snohomish amended petition at 31, citing Nevada Power, 103 FERC ¶ 61,353 at P 110; Water Resources, 103 FERC ¶ 61,353 at P 62; and PacifiCorp, 103 FERC ¶ 61,355 at P 73.

public utility be just and reasonable; and second, because there is no *Mobile-Sierra* clause in the Agreement.  Snohomish adds that there is extrinsic evidence in this case demonstrating that when Snohomish attempted to include language restricting applications by the parties for a change in rates (out of fear that prices might rise again), Enron rejected Snohomish's contract language and, instead, insisted on the use of a contract form containing no *Mobile-Sierra* clause.

30.     Snohomish argues, in the alternative, that its fraud in the inducement claim may be analyzed under New York law, the law made applicable to the Agreement at Enron's insistence.  Snohomish adds that under black-letter contract law, as applied in New York, fraud in the inducement is a complete defense, preventing the defrauding party from enforcing any contract induced by fraud against the defrauded party.[43]  Snohomish further adds that under New York law, a contracting party who has been fraudulently induced to enter into an agreement may plead such fraudulent inducement as an affirmative defense, in addition to seeking other remedies such as rescission of the contract or tort damages for fraud.[44]

## 2.     Enron's Position

31.     Enron asserts that section 1290(b), as applied here, requires the Commission to review the Agreement under the public interest standard of review because this standard of review is consistent with the terms of the Agreement (which are silent on the matter).[45]  Enron further notes that to grant Snohomish's requested relief, the Commission would be required to retroactively modify the Agreement.  Enron argues, however, that under FPA section 206, any price relief granted in this case by the Commission can be prospective

---

[43] *See* Snohomish February 6, 2006 answer at 4 and 51, *citing National Union Fire Ins. Co. of Pittsburgh, PA v. Turtur*, 892 F.2d 199, 203 (2nd Cir. 1994) ("It is clear that under New York law, a party may not compel performance of any agreement which that party has induced by fraud"); *Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 410 (D.C. Cir. 2000) (recognizing that it is unreasonable for the Commission to enforce a contract, even if the contract contains *Mobile-Sierra* language limiting a party's ability to change the contract, where evidence of bad faith exists in the original contract negotiations).

[44] *Id.* at 51-52 and 60, *citing Merry Realty Co., Inc. v. Shamokin & Hollis Real Estate Co.,* 230 N.Y. 316, 323 (1921).

[45] Enron protest at 88 and 90, *citing Standard of Review for Modification of Jurisdictional Agreements,* 113 FERC ¶ 61,317 at P 9 (2005) (*Standard of Review Order).*

only, thus preventing Snohomish from avoiding a termination payment claim that vested on the day the Agreement was terminated. Enron notes, in this regard, that in the *Enron Revocation Order,* the Commission revoked Enron's market-based rate authorizations on a prospective basis but did not then invalidate, and has not since invalidated, any of Enron's long-term contracts.[46] Finally, Enron notes that under New York law, Snohomish's fraud claim (if it is to be considered here at all) must demonstrate that Enron: (i) made an omission, misrepresentation, or false statement of material fact; (ii) with knowledge of its falsity; (iii) with the intent to defraud; (iv) upon which Snohomish reasonably relied; and (v) which caused damage to Snohomish due to Snohomish's reliance thereon.[47]

### 3.     **Commission Finding**

32.     Before we can determine what standard of review should be applied to a claim for a termination payment under the Agreement, we must first determine whether the Agreement is a valid and binding contract. Snohomish argues that the Agreement was fraudulently induced by Enron's financial misrepresentations. If the Agreement is not valid and binding, the Commission need not consider whether the just and reasonable standard or the public interest standard should apply. In addition, we find that since section 1290 mandates that the Commission has exclusive jurisdiction to review the termination payment claims under the Agreement and since the only way the Commission can complete such review is to first determine the validity of the Agreement, it is both necessary and appropriate to consider the validity of the Agreement.[48] Indeed, in the unique circumstances presented here, the Commission would be unable to exercise its exclusive jurisdiction to make a determination with respect to the termination payment under the Agreement if it did not first determine whether the Agreement is valid. Accordingly, in the following section we consider the merits of Snohomish's fraudulent inducement claim.

---

[46] *See, e.g., Nevada Power,* 103 FERC ¶ 61,353.

[47] Enron protest at 54, *citing Lomaglio Assoc. Inc. v. LBK Mktg. Corp.,* 892 F. Supp. 89, 94 (S.D.N.Y. 1995) (*Lomaglio*). Snohomish, in its February 6, 2006 answer, argues to the contrary, that when a party alleges fraud in the inducement as a contract defense rather than as a tort claim, that party need not demonstrate damages. Snohomish argues that at most, under New York law, it need only show that it did not get what it bargained for when it entered into the Agreement. *See also* Snohomish March 7, 2006 answer at 32-36.

[48] Regardless of our *Arkla* precedent, we will consider Snohomish's claim here, given the Commission's exclusive mandate under section 1290.

Docket No. EL05-139-000                                                                19

### D.     Whether the Agreement is Voidable

### 1.     Snohomish's Position

33.     Snohomish argues that the Agreement should be regarded as *void ab initio* on several grounds.  First, Snohomish argues that the Agreement was fraudulently procured by Enron due to both Enron's financial fraud and its market fraud.  Snohomish argues that Enron's massive financial fraud, as summarized above, was intended to create the false appearance that Enron was an investment grade counterparty at the time that the parties negotiated the Agreement and thus was specifically tied to Enron's activities as a power marketer.  Specifically, Snohomish asserts that Enron's scheme was aimed in large measure at artificially inflating Enron's credit ratings so that it could continue to actively trade in these markets.  Snohomish asserts that Enron has not disputed the existence of this fraud, or the findings of the Examiners' Report detailing these activities.[49]  Snohomish adds that, in fact, Enron has expressly embraced these findings in complaints filed against its former officers.

34.     Snohomish argues, moreover, that Enron's financial fraud went to the very heart of the parties' negotiations and formation of the Agreement.  Specifically, Snohomish asserts that if Enron had properly disclosed the true state of its financial affairs, rather than deliberately concealing the fact that it was engaging in widespread financial fraud, Enron would not have been rated as an investment-grade company and it therefore would not have been eligible to submit a bid under the terms of Snohomish's RFP.  Snohomish notes that its RFP specifically stated that "[t]o be eligible for consideration, bidders shall have a long-term credit rating no less than BBB by Standard & Poors, or B by Moody's."

35.     Snohomish further asserts that Enron continued to misrepresent its solvency during the course of the parties' negotiations.  Snohomish notes, for example, that Enron's taped phone conversations reveal that the Enron officer responsible for negotiating the Agreement instructed Enron's in-house attorney to lie to Snohomish and that Enron director for middle-market operations in the West admitted that Enron committed fraud by claiming an investment-grade credit rating.  In addition, Snohomish states that Enron, in both the draft and final contract documents, provided false written representations regarding the financial status of both Enron and Enron Corp., including

---

[49] *See* Snohomish amended petition at 11, *citing* Reorganized Debtors' Fourth Amended Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims, *Enron Corp. v. Citigroup, Inc.,* Adv. Proceeding No. 03-09266 (AJG) at P 7 (filed Jan. 10, 2005).

Docket No. EL05-139-000                                                    20

the fraudulent and knowingly false statement that, as of the date the Agreement was
signed and on the date of every transaction thereafter, neither Enron, the primary obligor
under the Agreement, or Enron Corp., the guarantor, were "bankrupt" and that Enron
Corp. had the capacity or ability to make delivery of all products it agreed to provide to
Snohomish.

36.      Snohomish argues that this financial fraud was then further enshrined in the
Agreement in the form of a financial guarantee, i.e., the requested guarantee sought by
Snohomish of Enron's performance by its parent, Enron Corp., as provided by Timothy
Despain, Enron Corp.'s Deputy Treasurer.  Snohomish notes that Mr. Despain is one of
many Enron Corp. executives who has now pled guilty to financial fraud and that Mr.
Despain's guilty plea reveals that, at the very time he signed the guarantee and for two
years prior thereto, he was actively engaged in a conspiracy to artificially inflate Enron
Corp.'s credit ratings by misstating its financial results.

37.      Snohomish argues that, in addition to Enron's financial fraud, Enron also engaged
in market fraud directly tied to the Agreement.  Snohomish asserts that this is so given
Enron's implicit representations that the price term it offered was a fair, competitive price
untainted by fraud and market manipulation.  Snohomish argues that, in fact, Enron itself
was engaged in fraud and market manipulation and that this unlawful conduct permeated
all of its transactions in the market.[50]

38.      Snohomish also asserts that Enron acted in bad faith during the course of the
parties' negotiations.  Specifically, Snohomish asserts that Enron's recorded phone calls
(in particular, a call made by Enron's in-house lawyer, Shari Stack, to Greg Wolfe, the
Enron officer negotiating the Agreement with Snohomish) demonstrate that Enron used
its credit rating as a selling point in its transactions with customers.

39.      Snohomish also asserts that it was under duress during the course of the parties'
negotiations due to, among other things, the market power that Enron possessed over
Snohomish in the negotiations.  Snohomish asserts that this market power was evidenced
by the illiquidity of the market and the fact that only three sellers responded to
Snohomish's RFP, with each seller ultimately committing to provide only 25 MW of
power, even though Snohomish solicited bids for up to 100 MW.  Snohomish argues that
this low level of response to an RFP for power supplies is a clear warning flag of market

---

[50] *See* Snohomish amended petition at 20, *citing El Paso Elec. Co.,* 108 FERC
¶ 61,071 at P 24 (2004) (a violation of market-based rate authority is a continuing
violation which would permeate all transactions in the market).

power.[51]  Snohomish adds that it only considered the contract term specified in the Agreement (almost nine years) due to the disruption of the spot market, as brought about in large measure by Enron.  Snohomish argues that, in fact, the Commission itself recommended this course of action prior to its knowledge of Enron's market fraud.[52]

40.     Snohomish states that Enron's market power over Snohomish is also evidenced in Enron's taped phone conversations, which demonstrate that Enron knew that Snohomish was "cornered" and that Snohomish didn't have many options.  Snohomish adds that the phone conversations also show that Enron knew customers were "desperate" to enter into forward contracts as a result of the chaos in the Western energy markets.  Snohomish further adds that Enron's principal negotiator even told his colleague that Karin Bulova, the person handling the RFP for Snohomish, was "probably going to faint when I tell her [the deal] just got three years longer" for the same price offered just the day before.

41.     Snohomish further argues that the Agreement was tainted in its formation because Enron failed to adhere to the conditions of its market-base rate authority (a filed rate schedule).  Snohomish relies on the *Enron Revocation Order,*[53] where the Commission found that "implicit in Commission orders granting market-based rates is a presumption that a company's behavior will not involve fraud, deception, or misrepresentation."  Snohomish further relies on the Commission's findings in the *Enron Revocation Order* that Enron:  (i) engaged in fraud, deception, and misrepresentation in its transactions in the Western markets; (ii) that these violations of its market-based rate authority permeated all of its transactions in these markets; (iii) that Enron's behavior undermined the functioning of these markets and the Commission's reliance on these markets to ensure that rates are just and reasonable; and (iv) that Enron's market manipulations resulted in unjust and unreasonable rates.[54]

---

[51] *See* Snohomish initial petition at 19, *citing TECO Power Service Corp.,* 53 FERC ¶ 61,202 at 61,810 (1990).

[52] *Id.* at 20, *citing San Diego Gas & Elec. Co.,* 93 FERC ¶ 61,294 at 61,993-94 (2000).

[53] 106 FERC ¶ 61,024 at P 20.

[54] Snohomish argues that even if the Commission had not already made findings, the Commission would still be warranted in declaring the Agreement unlawful, here, because the contract price ($109 per MWh for a term of almost nine years) is plainly unjust and unreasonable.  Snohomish argues that in a properly functioning competitive market, a rate for a contract of this length should have been in the range of the long-run

(continued)

42.    Finally, Snohomish argues that when the Commission issued its order accepting Enron's market-based rate schedule for filing, in 1993, the Commission stated that if Enron was unwilling to abide by the conditions imposed on that rate schedule, it would be considered void as of the date of the Commission's order.[55]  Snohomish argues that because Enron did not abide by these conditions (as found by the Commission in the *Enron Revocation Order*), its market-based rate authority was void, there was no filed tariff in place at the time the Agreement was executed, Enron lacked valid authority to enter into the Agreement, and consequently, a termination payment cannot be collected by Enron.  Snohomish argues that a contract entered into by a seller lacking required license or permit authority is void or voidable and the seller has no legal authority to enforce the contract.[56]

## 2.    **Enron's Position**

43.    Enron argues that the Agreement was legitimately executed and thus binding on the parties.  First, Enron argues that Snohomish has failed to demonstrate that the Agreement was procured by fraud.  Enron argues that to prevail on this claim, Snohomish is required to demonstrate, among other things, that Snohomish was injured by Enron' fraudulent acts.[57]  Enron adds that Snohomish is also required to show two types of causation:  transaction causation and loss causation.[58]

---

marginal cost of new generation, which in the Pacific Northwest should have been around $34 per MW.

[55] *See Enron Market-Based Rate Authorization Order,* 65 FERC ¶ 61,305 at 62,407.

[56] *See* Snohomish amended petition at 29, *citing Municipal Elec. Util. Assoc. of the State of New York v. Power Authority of the State of New York*, 23 FERC ¶ 61,031 (1983); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 387 (1970).

[57] Enron protest at 54, *citing Lomaglio,* 892 F. Supp. at 94.

[58] *Id.* at 55-56, *citing First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir. 1993) (*First Nationwide)* ("[I]n addition to showing that but for the defendant's misrepresentations the transaction would not have come about, the defendant must also show that the misstatements were the reason the transaction turned out to be a losing one"); *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1986) ("The misrepresentation of a material fact must have proximately caused the injury"); *Bastian v. Petren Resources Corp.,*  892 F.2d 680, 685 (7th Cir. 1990) (*Bastian*) (defendant's concealment of shortcomings of its business were not the cause of loss because plaintiffs
(continued)

Docket No. EL05-139-000                                                     23

44.     Enron argues that this fraud standard has not been met here for a number of reasons.  First, with respect to Snohomish's claim that the Agreement was procured as a result of financial fraud, Enron argues that Snohomish has failed to demonstrate that Enron's statements regarding its solvency are the proximate cause of Snohomish's decision to enter into the Agreement.  Enron, for example, questions the importance of Snohomish's claimed insistence, in the RFP, that Enron be a credit-worthy counterparty. Enron argues that not until February 2002 did Snohomish adopt a risk management policy with respect to long-term term contracts.  Enron adds that the form of contract proposed by Snohomish and attached to its RFP contained no representations of the counterparty's solvency, no right to request the counterparty's financial documents, no collateral thresholds, no right to request performance assurances, and no termination rights.

45.     Enron also argues that Snohomish was determined to buy power under a long-term contract rather than pursue any other resource alternative and that having made that decision, was subject to the market price of long-term power even if Enron had not responded to the RFP.  Enron concludes that it was the movement of the market, not Enron, that caused Snohomish's asserted "loss" in this case and that Enron's credit standing was thus irrelevant.  Enron also asserts that the Guarantee it provided, under the Agreement, secured payments it was required to make to Snohomish, but did not guarantee the delivery of power.

46.     Enron further argues that Snohomish's fraud claim fails because Snohomish is unable to demonstrate that it received something other than what it bargained for.  Enron argues that, in fact, the parties agreed up-front that in the event of default, the "out-of-the-money" party would make a termination payment.  Enron further argues that when Snohomish decided to procure 75-100 MW of supplies at a blended price of $125 per MWh, it set itself on the path to being out-of-money, under the Agreement, in late 2001. Enron argues that, as such, it was the movement of the market, not Enron, that caused Snohomish's loss.

47.     Enron also disputes Snohomish's market fraud claim.  Enron argues that, in fact, there is no evidence in this case of market manipulation specific to the Agreement or to the parties' negotiation of the Agreement.  Enron argues, for example, that no finding has been made that Enron manipulated the forward markets in the Pacific Northwest.  Enron

---

would have invested in other oil and gas partnerships and would have suffered losses due to industry-wide conditions).

Docket No. EL05-139-000                                                    24

argues that, in fact, the Commission has upheld a finding by Judge Cintron that increased rates in the Pacific Northwest were caused by other factors.[59]

48.    Enron also points out that the Commission's findings in the *Enron Revocation Order,* as relied upon by the Commission in revoking Enron's market-based rate authority, related only to the California spot markets, not the forward markets.  Enron adds that while Staff's Final Report, in Docket No. PA02-2-000, did find a correlation between these markets, that correlation did not extend beyond forward contracts of four years in length (and by that point found that the correlation was weak).  Enron also argues that Staff found no correlation between the spot market and nine-year contracts (such as the Agreement) and points out that the Commission (following its release of the *Enron Revocation Order*) expressly upheld the validity of Enron's pre-existing long-term contracts with Nevada Power Co. and Sierra Pacific Power Co.[60]

49.    Enron next argues that even assuming that Snohomish could prove either of its fraud claims, Snohomish cannot prevail on either claim because Snohomish ratified the Agreement by continuing performance after it had knowledge of Enron's financial situation, by terminating the Agreement in accordance with its terms, and by attempting to enforce the Agreement in its favor.[61]  Enron points out, for example, that Snohomish had notice, as early as October 16, 2001, that Enron's financial statements were erroneous, that Enron Corp.'s credit rating had been reduced on that same date by Moody's, and that the Securities and Exchange Commission, on October 22, 2001, had launched an investigation into Enron Corp's financial practices -- well in advance of Snohomish's first attempt to terminate the Agreement on November 29, 2001.  Enron concludes that by ratifying the Agreement, Snohomish waived its claims for rescission due to fraudulent inducement.

50.    Enron also disputes Snohomish's argument that Enron acted in bad faith in negotiating the Agreement.  First, Enron disputes Snohomish's characterization of the recorded phone calls relied upon by Snohomish.  Enron argues, for example, that the phone call that occurred between Enron's in-house lawyer and Mr. Wolfe, the lead Enron negotiator with respect to the Agreement, is misinterpreted by Snohomish.  Enron argues that in the conversation at issue, Mr. Wolfe instructed the in-house counsel to inform Snohomish that "one of those things we wanted to shore up is if we are gonna be . . . on some sort of short list – make it sound like we're in a competitive process . . . or . . . just

---

[59] *Id*. at 82, *citing Puget Sound Energy, Inc.,* 103 FERC ¶ 61,348 (2003).

[60] *Id*. at 83, *citing Nevada Power,* 103 FERC ¶ 61,353.

[61] *Id.* at 61, *citing Kurrus v. Kurrus*, 136 N.Y.S.2d 395, 397 (N.Y. Sup. Ct. 1954).

Docket No. EL05-139-000                                                                25

. . . who have others been talking to, or some [thing] like that, you know? . . . called lies, it all how well you can weave these lies together, Shari . . ." Enron argues that all Mr. Wolfe wanted the in-house lawyer to do was to ask a question in an effort to gather some intelligence and to suggest that Enron believed it was in a competitive process. Enron argues that, regardless, at the time the Agreement was being negotiating, Enron intended to honor its obligations and therefore could not have been negotiating in bad faith.

51.     Enron also disputes Snohomish's assertion that the Agreement was entered into by Snohomish under duress, *i.e.*, given Enron's alleged market power and/or an illiquid market. First, Enron argues that Snohomish's duress claim is legally incompatible with its claim that the Agreement was fraudulently induced, because if, as alleged, Snohomish had no choice but to enter into the Agreement, the asserted misrepresentation that support Snohomish's fraud claim would be irrelevant. In addition, Enron argues that if only fraud could have induced Snohomish to enter into the Agreement, then it must have had the option of refusing the deal, thus undermining Snohomish's duress claim.[62]

52.     Enron also argues that Snohomish has failed to make out the elements necessary to support its duress claim. Specifically, Enron argues that Snohomish has failed to demonstrate that: (i) Snohomish involuntarily accepted the terms of the Agreement; (ii) circumstances presented no other alternative; and (iii) these circumstances were the result of coercive acts on the part of Enron.[63] Enron notes, for example, that Snohomish's claim that entered into the Agreement "begrudgingly" is the same claim made by Snohomish and rejected by the presiding judge in the *Nevada Power* proceeding. Enron argues that in that case, the presiding judge found Snohomish, shortly after it had entered into the contract at issue, "touted to its customers that the Morgan Stanley [contract, *i.e.*, the contract at issue] and other long term contracts 'give us a lot of security against the uncertainty of market fluctuations, and that the contracts insulate the ratepayers from market volatility.'"[64]

---

[62] *Id.* at 44, *citing Zeilinger v. SOHIO Ak. Petro Co.,* 823 P.2d 653, 656 (Alaska 1992) (claims of economic duress entitles defendant to judgment as a matter of law on claims of fraud).

[63] *Id.* at 45, *citing Benincasa v. Flight Sys. Auto. Group,* 242 F. Supp 2d 529, 538 (N.D. Oh. 2002); *Jamestown Farmers Elevator, Inc. v. General Mills, Inc.*, 552 F.2d 1285, 1290 (8th Cir. 1977).

[64] *See Nevada Power Co. v. Enron Power Marketing, Inc.,* 101 FERC ¶ 63,031 at P143 (2002).

Docket No. EL05-139-000                                                          26

53.     Enron argues that even if Snohomish did enter into the Agreement with reluctance or even dissatisfaction with its terms, due to economic necessity, there is no evidence in this case that Snohomish did so as a result of unlawful or unconscionable pressure, as exerted by Enron.[65]  Enron argues to the contrary that the relatively small number of bidders (three) responding to Snohomish's request for proposal, was attributable to the fact that Snohomish required these bidders (including Enron) to bid prices far below the then-prevailing spot market price.  Enron argues that in a similar circumstance, the Commission has declined to find that this level of market response was inadequate.[66]

54.     Finally, Enron disputes, as unproven, Snohomish's assertion that Enron created and used volatility and uncertainty over prices to induce Snohomish and others into executing contracts with Enron that were unjust and unreasonable.  In addition, Enron argues that Snohomish's reliance on *TECO* is misplaced because in that case, the Commission explained that it did not intend to apply a rigid numerical sparseness test in determining whether a bidding program was sufficiently subscribed to allay concerns about market dominance in generation.

55.     Enron also disputes Snohomish's assertion that the Enron officer negotiating the deal, Greg Wolfe, told colleagues he believed Snohomish was "cornered" when the Agreement price of $109 was fixed.  Enron argues that, in fact, all negotiations inherently involve a certain amount of pressure and coercion.  In any event, Enron argues that Snohomish agreed to virtually the same deal with Morgan Stanley and that the Commission has determined, in *Nevada Power*, that the Morgan Stanley agreement was the result of Snohomish's voluntary choice.[67]  Enron asserts that Snohomish was buying power to resell in the open market, just like any other power marketer, that it could have rejected Enron's bid and terminated negotiations, but that it voluntarily chose to negotiate a price that was below market in the early years.

56.     Enron also argues that Snohomish's duress claim is untimely, because under New York law, one who would repudiate a contract procured by duress must act promptly, or that entity will be deemed to have elected to affirm it.[68]  Enron argues that even if

---

[65] Enron protest at 46, *citing Int'l Paper Co. v. Whilden,* 469 So.2d 560, 563 (Ala. 1986).

[66] *Id.* at 39, *citing Nevada Power,* 103 FERC ¶ 61,353 at P 107.

[67] 103 FERC ¶ 61,353 at P 110.

[68] Enron protest at 46, *citing Bethlehem Steel Corp. v. Solow,* 405 N.Y.S. 2d 80, 82 (N.Y. App. Div. 1978; *Smith v. Jones,* 351 N.Y.S.2d 802, 807 (N.Y. Civ. Ct. 1973 (ratification results is a party who executed a contract under duress accepts the benefits

(continued)

Docket No. EL05-139-000                                                      27

Snohomish executed the Agreement under duress, it did not repudiate the contract when prices fell in the second half of 2001, and it continued to do nothing until November 2001 when it terminated the Agreement by its terms. Enron concludes that this delay belies any claim that Snohomish sought to extricate itself from the Agreement because of duress.

57.    Enron also disputes Snohomish's claim that the revocation of Enron's market-based rate authorizations and Enron's violations of its market-based rate authority render the Agreement *void ab initio.* Enron argues that the revocation of its market-based rate authorizations was prospective only, taking effect no earlier than June 25, 2003. Enron adds that, in *El Paso Elec. Co.,*[69] the Commission held that the revocation of a seller's market-based rate authorizations, or a disgorgement remedy ordered in connection with transactions undertaken pursuant to those authorizations, does not, *ipso facto,* void the seller's market-based rate contracts. Enron asserts that, as such, neither the revocation of its market-based rate tariff, nor the findings of market fraud on which it was based, render the Agreement itself unlawful.

### 3.    Snohomish's February 6, 2006 Answer

58.    Snohomish, in its February 6, 2006 answer, responds to Enron's assertion that the form contract attached by Snohomish to its RFP did not require representations as to the solvency of potential suppliers. Snohomish argues that the form contract attached to the RFP incorporated the Western System Power Pool Agreement (WSPP Agreement), which contains express representations, at section 37, regarding the solvency of suppliers.[70] In addition, Snohomish argues that the WSPP Agreement contains specific provisions, at section 27, to protect purchases should the creditworthiness of a supplier come into question. Snohomish argues that it was legally entitled to rely on the truthfulness of these representations and warranties in entering into the Agreement.[71]

---

flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or void the contract).

[69] 108 FERC ¶ 61,071 at P 7, n.10 (2004).

[70] The WSPP Agreement is a standardized agreement that is on file with the Commission.

[71] Snohomish answer at 54, *citing Ainger v. Michigan General Corp.,* 476 F. Supp. 1209, 1220 (S.D.N.Y. 1979), *aff'd,* 632 F.2d 1025 (2d Cir. 1980).

59.    Snohomish also disputes Enron's assertions that Snohomish is required to demonstrate harm in connection with its fraud claims and that Snohomish has failed to do so.  Snohomish counters that because the Commission's responsibility, in this regard, is to protect markets, not individual competitors, Enron's fraud on the market provides a sufficient basis to invalidate the Agreement.  Snohomish argues that in *El Paso*, for example, the Commission determined that Enron's market fraud, by itself, was sufficient to vitiate any claim to termination payments, without the need to show that Enron's market fraud harmed any given customers.[72]  Snohomish asserts that, similarly, under New York law, when a victim of fraud in the inducement asserts that claim as a contract defense, rather than as a tort claim, that party need not prove that it was damaged as a result of the fraud.[73]  Snohomish argues that, at most, under New York law, a defrauded party must only show that it did not get what it bargained for when it entered into the contract.

60.    Regardless, Snohomish asserts that it was harmed as a result of Enron's fraud.  Specifically, Snohomish asserts that Enron's market fraud played a significant role in changing the price and terms Snohomish was forced to agree to in the Agreement.  Snohomish adds that because, as the Commission has also found, "maintaining an accurately priced spot market is the single most important element for disciplining longer term transactions,"[74]  and "the operation of the California electricity markets can affect prices throughout the entire Western Interconnection,"[75] Enron's market fraud affected the price paid by parties throughout the Western Interconnection, including Snohomish and millions of other electric consumers across the Western Interconnection who bore the brunt of Enron's misdeeds.

---

[72] 110 FERC ¶ 61,280 at PP 10-11.  Snohomish adds that the Commission has also rejected the requirement that consumer harm be shown in imposing a remedy intended to ensure that a regulated utility complies with its statutory and regulatory filing requirements.  Snohomish February 6, 2006 answer at 55, *citing Southern California Water Co.,* 106 FERC ¶ 61,305 at P 16, *reh'g denied*, 108 FERC ¶ 61,168,  *order on clarification,* 109 FERC ¶ 61,121 (2004), *remanded on other grounds*, D.C. Cir. No. 04-1324 (issued Dec. 30, 2005).

[73] Snohomish February 6, 2006 answer at 60, *citing Stuart v. Lester,* 1 N.Y.S. 699, 700-701 (N.Y. Gen Term 1888) (*Stuart*); *Franklin Enterprises Corp. v. Moore, Franklin Sales Corp.,* 34 Misc. 2d 594, 596, 226 N.Y.S. 2d 527, 530 (N.Y. Sup. Ct. Nassau Co. 1962) (*Franklin Enterprises*).

[74] *AEP Power Marketing, Inc.,* 97 FERC ¶ 61,219 at 61,972 (2001), *order on reh'g*, 107 FERC ¶ 61, 018 (2004).

[75] *San Diego Gas & Elec. Co,* 95 FERC ¶ 61,418 at 62,556 (2001).

20060628-4003 Issued by FERC OSEC 06/28/2006 in Docket#: EL05-139-000

Case 1:07-cv-03078-LAP    Document 7-5    Filed 06/11/2007    Page 30 of 45

61.     Snohomish adds that Enron, in its protest (at pp. 16, 82, and 60), concedes that near-term wholesale prices, which were directly affected by the spot market dysfunctions, played a critical role in the Agreement, as evidenced by the taped telephone conversation between Enron's principal negotiator, Mr. Wolfe, and Snohomish's negotiator. Snohomish asserts that in this conversation, Enron acknowledged that short-term price increases for contracts "April through 2002" had left Snohomish with a Hobson's choice of either a significantly longer contract term or a significantly increased contract price. Snohomish asserts that, accordingly, Enron concedes that its market fraud in the spot and short-term markets had a direct and material impact on the grossly inflated price and term of the Agreement and that the only "benefit" Snohomish received from the Agreement was protection from the market meltdown to which Enron substantially contributed.

62.     Snohomish also responds to Enron's argument that Snohomish is estopped from litigating its fraud claim because it ratified the Agreement (by failing to terminate it quickly enough).  Snohomish responds that it terminated the Agreement within hours of Enron's credit rating being downgraded to junk bond status on November 28, 2001, which was the first defined event of default under the Agreement and the first clear evidence that Enron's financial restatements indicated something more serious than a minor restatement of earnings for an otherwise healthy company.  Snohomish further points out that Enron's ratification argument implausibly assumes that Snohomish somehow had, or should have had, greater knowledge of Enron's fraud than the credit rating agencies themselves.

#### 4.      Enron's February 21, 2006 Answer

63.     Enron, in its February 21, 2006 answer, responds to Snohomish's argument that Snohomish should not be required to show injury in support of its fraud claim because Snohomish relies on fraud only as a defense.  Enron responds that under New York law, an action or defense of fraud must allege injury.[76]  Enron also disputes Snohomish's reliance on *Stuart* in support of Snohomish's claim that when a party pleads fraud as a defense to a contract enforcement action, it is not necessary that it show loss attributable to the misrepresentation because a "[s]howing that the representation was a material one . . . is proof that damages in some degree have been sustained by the defrauded party."

---

[76] *Id.* at 38, *citing Falk v. Goodman,* 178 N.Y.S.2d 471, 473 (N.Y. Sup. Ct. 1958) (*Falk*), *aff'd without opinion,* 185 N.Y.S.2d 231 (N.Y. App. Div. 1959), *judgment rev'd on other grounds*, 195 N.Y.S.2d 645 (N.Y. 1959) ("[I]t is elementary that to sustain an action or defense of fraud one must allege representation, falsity, scienter, deception and injury").

Docket No. EL05-139-000                                                            30

Enron argues that this precedent, in fact, requires proof of injury even if it does allow the injury to inferred from the materiality of the misrepresentation.  Enron adds that the materiality of the misrepresentation must be determined, in turn, by the extent of damaged caused to the defrauded party.

64.    Enron also disputes Snohomish reliance on *Franklin Enterprises*.  Enron argues that in that case, the court only held that the "actual amount" of the injury need not shown.  Enron also disputes Snohomish's assertion that it need not prove injury in support of its fraud claims where, as here, an agency is exercising its regulatory powers.  Enron argues that while an agency, acting on its motion, is not required to prove injury, a private plaintiff, such as Snohomish, may not avoid this obligation.[77]

65.    Enron also disputes Snohomish's alternative argument that even assuming injury must be shown in support of Snohomish's fraud claims, Snohomish did not get what it bargained for under the Agreement.  Enron argues that, in fact, what Snohomish wanted was a combination of contracts that would allow it to purchase power at rates below the spot market during the early portion of those contracts.  Enron asserts that so long as Snohomish could obtain power at a blended price of $125 per MWh, the other contracts obligations that it agreed to undertake were largely irrelevant.  Enron notes that Snohomish received exactly what it wanted from Enron while the market price was above the blended price of $125 per MWh, but that when spot prices fell and Snohomish could no longer resell the power at a profit, Snohomish looked for a way out of its contracts, including the Agreement.

66.    Enron adds that Enron Corp.'s credit downgrade and financial fraud actually benefited Snohomish by permitting it to terminate a contract it no longer wanted because it had become uneconomic.  Enron notes that this termination option freed Snohomish of the need of filing a Commission action to modify the terms of the agreement, pursuant to the Commission's complaint procedures.  Enron adds that if Snohomish had accurately predicted Enron's future bankruptcy at the start, and refused to deal with Enron, it would have done exactly the same deal with a different seller, terminated that seller's contract or sued to shorten it, and wound up in exactly the same economic position it is in now.

---

[77] *Id.* at 46, *citing SEC v. McCaskey,* 2001 U.S. Dist. LEXIS 13571 (S.D.N.Y. 2001), *order on reh'g*, 2002 U.S. Dist. LEXIS (S.D.N.Y. Mar. 26, 2002) ("Unlike private plaintiffs, . . .  the SEC is not required to prove reliance or injury in order to enjoin violations of the securities laws").

Docket No. EL05-139-000                                                                31

67.     Enron further disputes Snohomish's assertion that it did not get a supplier that was capable of delivering power throughout the course of the Agreement and was therefore injured in this sense. Enron argues that, in fact, it reliably supplied Snohomish until Snohomish voluntarily elected to terminate the Agreement and was capable of delivering (and did deliver) substantial quantities of power to counterparties even after it filed for bankruptcy. Enron argues that Enron Corp.'s financial fraud never injured Snohomish, because even after Enron's bankruptcy, Snohomish could have continued receiving power from Enron under the Agreement.

### 4.    **Snohomish's March 7, 2006 Answer**

68.     Snohomish, in its March 7, 2006 answer, responds to Enron's assertion that the Commission is without authority to grant Snohomish relief in this case because it can act on a prospective basis only. Snohomish argues that, in fact, the Commission has repeatedly held, as have the courts, that the Commission is authorized to address violations of Commission rules and filed tariffs on a retrospective basis.[78] Snohomish asserts that, in any event, precluding Enron from collecting future profits under an invalid and now revoked tariff is not an act of retroactive ratemaking.

### 5.    **Commission Finding**

69.     We address Snohomish's fraudulent inducement claim pursuant to the assumed applicability of New York law, as agreed to by the parties to the Agreement and for the reasons discussed more fully below. Applying New York law, we find that the evidence presented here demonstrates clearly and convincingly that Enron engaged in financial fraud contemporaneous with its execution of the Agreement, *i.e.*, that it represented to Snohomish that it was solvent when, in fact, it was insolvent. We also find that these misrepresentations were the proximate cause of Snohomish's decision to enter into the Agreement and caused injury to Snohomish. As such, we find that Snohomish was fraudulently induced by Enron to enter into the Agreement. We also find that Snohomish acted on a timely basis to void the Agreement.

---

[78] *Id.* at 35, *citing American Elec. Power Service Corp.,* 103 FERC ¶ 61,345 at P 12 (2003) (finding that the Commission may "take action to address earlier periods if, during those earlier periods, a seller did not charge the filed rate or violated tariffs"); *State of California ex rel. Lockyer v. FERC,* 383 F.3d 1006, 1015-16 (9th Cir. 2004), *reh'd pending*; *Williston Basin Interstate Pipeline Co. v. FERC,* 215 F.3d 875, 879 (8th Cir. 2000); *Malta Irrigation Dist. v. FERC*, 955 F.2d 59 (D.C. Cir. 1992); *Southern Natural Gas Co. v. FERC,* 813 F.2d 364, 367 (11th Cir. 1987).

70.    We begin our analysis with the recognition that there is no federal common law of contracts.[79]  As such, our findings below, regarding Snohomish's fraud allegations, must be based on the application of state substantive law.  Here, the parties do not dispute that the Agreement should be governed by New York law.[80]  Accordingly, we will assume the applicability of New York law for the purpose of determining whether the Agreement is valid and enforceable.  Under New York law, a contract induced by fraud is not void, but rather voidable, at the option of the defrauded party.[81]  Proof of the claim thus requires an affirmative action on the part of the defrauded party to relieve itself of its obligation under the contract at issue, *i.e.*, New York law recognizes fraud in the inducement as an affirmative defense to a contract enforcement action.[82]  As the opponent of the contract, however, Snohomish is required to meet its burden of proving, by clear and convincing evidence, that Enron fraudulently induced it to enter into the Agreement.[83]

71.    While the parties, as noted above, agree that New York law applies, the parties differ in their views regarding the necessary elements that must be shown, under New York law, to support a fraudulent inducement claim.  Snohomish argues that it need only show that Enron: (i) made representations to Snohomish that were false when made; (ii) knew its representations to be false; (iii) made the misrepresentations with the intent to defraud; and (iv) induced Snohomish to enter into the Agreement.[84]  As such,

---

[79] *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that state law applies, except in matters governed by the Constitution or by an act of Congress).

[80] *See* Snohomish amended petition at 31 ("Under New York law, which applies to the [Agreement] at Enron's insistence [cit.], Enron's fraud in inducing Snohomish to enter into the [Agreement] vitiates Enron's ability to enforce the contract and Snohomish is entitled to have the contract declared *void ab initio* as a result of Enron's fraud in the inducement [cit.]."); Enron protest at 54.

[81] *Ettlinger v. National Surety Co.*, 221 N.Y. 467, 469-470 (1917); *accord Mix v. Neff*, 473 N.Y.S.2d 31, 33 (N.Y. App. Div. 1984) (*Mix*), *cited with approval in Dalessio v. Kressler*, 773 N.Y.S.2d 434, 437 ( N.Y. App. Div. 2004).

[82] *See United States Fidelity & Guarantee Co. v. Delmar Development Partners, LLC*, 803 N.Y.S.2d 254, 257-58 (N.Y. App. Div. 2005).

[83] *See Mix*, 473 N.Y.S.2d at 33.

[84] Snohomish February 6, 2006 answer at 52.

Snohomish argues that it is not required to demonstrate injury.[85]  Enron disagrees, arguing that a five-prong fraud test should be applied in this case, including a requirement that Snohomish prove injury.  Enron argues that under New York law, an action *or* defense of fraud in the inducement must allege injury and that even under *Stuart*, the materiality of the misrepresentation (if it is to serve as a proxy for injury) must be determined by the extent of damage caused to the defrauded party.[86]  In addition, Enron asserts that to prevail on a claim of fraudulent inducement, Snohomish is required to show two types of causation: both transaction causation and loss causation.[87]

72.       Where fraud is asserted as an affirmative defense to a contract claim, we agree that New York law generally requires proof that the defrauded party incurred damages as a result of the fraud.[88]  However, there is a difference of opinion as to what must be shown in order to prove that the defrauded party was "damaged" as a result of the fraud at issue. Some courts have held, in articulating the minority view under New York law, that in

---

[85] Snohomish March 7, 2006 answer at 36, *citing* N.Y. Pattern Jury Instr. – Civil 3:20, Comment at 148 (2005).  Snohomish also relies on *Stuart*, 1 N.Y.S. 699 at 700-01 for the proposition that injury may be inferred from the materiality of the misrepresentation.

[86] *See* Enron February 21, 2006 answer at 38, *citing Falk,* 178 N.Y.S.2d 471 at 473.

[87] *Id.* at 55-56, *citing First Nationwide,* 27 F.3d 763 at 769 ("[I]n addition to showing that but for the defendant's misrepresentations the transaction would not have come about, the defendant must also show that the misstatements were the reason the transaction turned out to be a losing one"); *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1986) ("The misrepresentation of a material fact must have proximately caused the injury"); *Bastian,* 892 F.2d 680 at 685 (defendant's concealment of shortcomings of its business were not the cause of loss because plaintiffs would have invested in other oil and gas partnerships and would have suffered losses due to industry-wide conditions).

[88] *See Falk*, 178 N.Y.S.2d 471 ("[It] is elementary that to sustain an action or defense of fraud one must allege representation, falsity, scienter, deception, and injury"). *But see Downey v. Mallison,* 247 N.Y.S.2d 705 (N.Y. App. Div. 1931) (holding that in an action for contract rescission, injury or damage need not be alleged, *citing Stuart,* 1 N.Y.S. 609.

Docket No. EL05-139-000                                                      34

order to demonstrate damages, actual pecuniary injury must be shown.[89]  The majority view, however, suggests that where a party is seeking only to avoid the enforcement of a fraudulently induced contract, and is not seeking money damages in tort, legal injury (*i.e.*, damages) may be inferred from the fraudulent misstatements themselves.[90]  While New York law appears to be split on this issue, we need not decide, here, which of these two competing standards should be applied with respect to our consideration of Snohomish's claims, given our finding, below, that Snohomish has satisfied its burden of proof under *either* standard.

73.     We begin our review of New York's five-prong fraud test by examining the misrepresentations attributed to Enron by Snohomish.  First, Snohomish asserts that Enron, during the course of the parties' negotiations, was insolvent, *i.e.*, that its total, actual debt exceeded its publicly-reported debt by tens of billions of dollars.[91] Snohomish further asserts that Enron's insolvency, at the time the Agreement was being negotiated, is undisputed by Enron and is otherwise conclusively established, here, by: (i) the guilty pleas, entered by Enron Corp's executives,[92] and (ii) Enron's own assertions concerning these matters in judicial pleadings filed by Enron Corp. against its former executives and bankers.[93]  Second, Snohomish asserts that despite Enron's insolvency

---

[89] *See Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421-22 (1996), *citing with approval Reno v. Bull*, 226 N.Y. 546 (1919) (*Reno*) (setting forth New York's "out-of-pocket" rule for fraud damages).

[90] *See Maybee v. Sullivan*, 156 N.Y.S. 865 (N.Y. App. Div. 1916) (holding that where defendants sought to resist the enforcement of a note due to plaintiff's fraud, "it is not necessary . . . to show . . . pecuniary loss in any particular sum by reason of [plaintiff's] false representations"); *Accord Krinsky v. Title Guarantee & Trust Co.*, 298 N.Y.S. 31, 37 (N.Y. App. Div. 1937); *Commercial Credit Corp. v. Third & La Fayette Sts. Garage, Inc.*, 234 N.Y.S. 463 (N.Y. App. Div. 1929); *see also Hotaling v. A. B. Leach & Co.*, 247 N.Y. 84, 88 (1928) ("[v]arying circumstances logically require variation in the application of [the out-of-pocket] measure of damages [set forth in *Reno*]").

[91] *See supra* PP 7-8.

[92] *See supra* note 10.

[93] *See* Snohomish February 6, 2006 answer at 33-34, *citing* Reorganized Debtor's Fourth Amended Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims, *Enron Corp. v. Citigroup, Inc.*, Adv.

(continued)

and the financial fraud to which it was a party, Enron represented to Snohomish, during the course of the parties' negotiations, that it was not only solvent, but that, in fact, it had (and warranted) a favorable credit rating.

74.     Snohomish notes that these misrepresentations were made by Enron, in both the draft and final contract documents exchanged by the parties, *i.e.*, in the form of proposed contract provisions included by Enron in the draft documents it tendered to Snohomish and in the form of executed commitments and affirmations included in the Agreement itself.  Snohomish notes that Enron, by submitting these documents to Snohomish, provided false written representations regarding the financial status of both Enron and Enron Corp., including the fraudulent and knowingly false statement that, as of the date the contract was signed and as of every transaction entered into thereafter, neither Enron, the primary obligor under the Agreement, nor Enron Corp., the guarantor, were 'Bankrupt' (a term broadly defined, under section 1.3 of the Agreement, to encompass insolvency, "however evidenced").[94]  Snohomish asserts that Enron further represented that it had the capacity, or ability, to make delivery of all products it agreed to provide to Snohomish under the Agreement.[95]

75.     In addition to these misrepresentations, Snohomish states that Enron's responses to the RFP constituted yet another series of misrepresentations, given the express requirement set forth in the RFP that any entity seeking to do business with Snohomish "have a long-term credit rating no less than BBB by Standard & Poors, or B by Moody's."  Snohomish states, for example, that on the evening of January 19, 2001, Enron submitted a response to the RFP stating that it was a credit-worthy counterparty

---

Proc. No. 03-09266 (AJG) (Bankr. S.D.N.Y. filed Jan. 10, 2005) at ¶ 703 ("[A]t least as early as 1999, Enron was insolvent"); Complaint to Avoid Certain Pre-Petition Loan and Annuity Transactions as Fraudulent Transfers, *The Official Committee of Unsecured Creditors of Enron Corp. v. Lay,* Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. filed Jan. 31, 2003).

[94] Snohomish asserts that this contractual warranty was set forth in section 10.2(v), addressing "Representations and Warranties" as follows:

> On the Effective Date and the date of entering into each Transaction, each Party represents and warrants to the other Party: . . . (v) it is not Bankrupt and there are no proceedings pending or being contemplated by it  or, to its knowledge, threatened against it which would result in it being or becoming Bankrupt.

[95] Snohomish relies on section 5.1(h)(iii) of the Agreement, which states that an "Event of Default" shall occur if, among other things, "a Guarantor becomes Bankrupt."

(listing a specific credit rating in support of that claim) and then did so again in a revised offer made to Snohomish on Monday morning, January 22, 2001. Snohomish asserts that this same identical false statement was made by Enron on January 23, 2001 and then twice on January 24, 2001. Snohomish asserts that but for these material misrepresentations, Snohomish would not have agreed to enter into a contract with Enron.

76.     Snohomish also asserts that Enron made material misrepresentations to Snohomish in the form of a corporate guarantee, provided by Enron Corp.'s Deputy Treasurer, Timothy A. Despain. Specifically, Snohomish states that Mr. Despain, in the guarantee sought by Snohomish, directly and expressly represented to Snohomish that Enron Corp. was a solvent entity capable of performing its financial obligations under the Agreement. Snohomish notes, however, that Mr. Despain's guilty plea, entered on October 7, 2004, confirms that at the time that this guarantee was provided, Mr. Despain was both aware of, and personally involved in, Enron's Corp. financial fraud schemes.[96]

77.     Based on the totality of this evidence, we agree that Snohomish has carried its burden of proof with respect to the first three prongs of the fraud test enumerated above, *i.e.*, we agree that Enron: (i) made representations to Snohomish that were false when made; (ii) knew its representations to be false; and (iii) made the misrepresentations with the intent to defraud Snohomish, *i.e.,* with the intent to induce Snohomish to enter into the Agreement. The evidence presented here is clear and convincing that Enron was insolvent at the time of the parties' negotiations, knew it was insolvent, yet nonetheless made numerous representations to Snohomish as to its solvency. For the most part,

---

[96] *See supra* note 10. Finally, Snohomish relies on certain statements regarding Enron's practices and policies, as made by Enron's director of middle market operations in the West, Stewart Rosman, following the parties' execution of the Agreement. Snohomish states that in a recorded phone record, Mr. Rosman stated that in the case of long-term transactions, Enron typically cited its good (pre-bankruptcy) credit rating as a criterion (*i.e.*, a selling point) to persuade buyers to select Enron as their supplier. Enron, in its protest, replies that Mr. Rosman was not directly involved in the Snohomish negotiations. *See* Enron protest at 52. However, we find that the general applicability of Mr. Rosman's admission may be considered, here, as circumstantial evidence. *See, e.g., Halloran v. Virginia Chemicals, Inc.*, 41 N.Y.2d 386 (1977) ("Because one who has demonstrated a consistent response under given circumstances is more likely to repeat that response when the circumstances arise again, evidence of habit has, since the days of the common-law reports, generally been admissible to prove the conformity on specified occasions.").

Enron does not contest Snohomish's allegations on these points.  Nor could it, given the sworn statements of its former executives and Enron's own position in litigations filed its against its former bankers and executives.  Nor can Enron credibly dispute that it made these misrepresentations for the purpose and intent of inducing Snohomish to enter into the Agreement.

78.     We also find that Snohomish has carried its burden of proof on the remaining prongs supporting its fraudulent procurement claim, i.e., we agree that Enron's fraudulent misstatements were the proximate cause of both Snohomish's decision to enter into the Agreement and the cause of Snohomish's legal injury.  Snohomish argues, and we here find, that the Agreement would not have been negotiated by the parties and would not have been executed by Snohomish had Enron disclosed its true financial status at the outset of the parties' negotiations.  In fact, the RFP process established by Snohomish required this disclosure. We find that Snohomish's intent, in specifying this condition, was to exclude from consideration as a potential counterparty, entities such as Enron. We also note that Snohomish's practice, in this regard, was not unusual.  In fact, it is standard for a party to a prospective long-term contract to insist that its counterparty be creditworthy.

79.     We reject Enron's argument, to the contrary, that Enron's insolvency and financial fraud were not the proximate cause of Snohomish's determination to enter into the Agreement because, as Enron asserts, Snohomish was simply indifferent to Enron's insolvency.  In support of its argument, Enron notes that, in January 2001, Snohomish had no risk management policy regarding the creditworthiness of its counterparties under long-term purchase contracts.  Enron alleges that the only risk policy effective, as of that date, governed short-term transactions and addressed only the credit of Snohomish's purchasers (i.e., the entities from whom Snohomish would need to collect payment as a seller).[97]  Enron further argues that the form of contract proposed by Snohomish and attached to its RFP contained no representations of the counterparty's solvency, no right to request the counterparty's financial documents, no collateral thresholds, no right to request performance assurances, and no termination rights.

80.     We reject Enron's conclusions regarding Snohomish's needs and intent in entering into the Agreement.  First, Enron's assertion that Snohomish was somehow unconcerned,

---

[97] Enron adds that under this policy, Snohomish was permitted to purchase from, but not sell to, a D-rated counterparty, one which had no D&B rating, a non-investment grade bond rating, a net worth of less than $50 million and a "poor payment history with the district."  Enron argues that not until February 2002 did Snohomish adopt a risk management policy with respect to long-term contracts.

or otherwise indifferent to Enron's insolvency, or to Enron's concealment of its
insolvency, is belied by both fact and logic.  Snohomish's RFP suggests clearly that
Snohomish wanted and intended to negotiate only with an entity meeting its credit
requirements.  Moreover, the draft contract attached to the RFP, as Snohomish points out,
incorporated by reference the WSPP Agreement, which does, in fact, contain
representations regarding the solvency of the supplier, at sections 27 and 37 of that
agreement.[98]

81.     This intent, moreover, was further manifested in the provisions of the Agreement
itself, including sections 10.2(v) and 5.1(h)(iii), and in the corporate guarantee sought and
obtained by Snohomish.  Nor can we give credence to Enron's claims regarding
Snohomish's risk management policies.  As Snohomish points out in its February 6, 2006
answer, Snohomish's board of commissioners specifically directed that the contract
entered into by Snohomish, pursuant to the RFP, be "consistent" with Snohomish's risk
management policies, *i.e.*, that the creditworthiness requirements applicable to
Snohomish's purchasers under its then-existing risk management policy be made
applicable to Enron.  In any event, we agree with Snohomish that these risk management
policies are irrelevant here, given the superseding, express requirements of the RFP and
the Agreement itself.

82.     Finally, as to the remaining prong of the fraud test applicable in this case, we find
that Snohomish has made a clear and convincing showing of both actual pecuniary injury
and inferred legal injury attributable to Enron's fraudulent misrepresentations.  First, we
find that Snohomish's liability for a $116 million termination payment is an actual
pecuniary injury.  In fact, this payment is a liability that Snohomish would not have
faced, even in the form of a claim, but for Enron's fraudulent misrepresentations inducing
Snohomish to enter into the Agreement.  As such, Enron's claim constitutes a pecuniary
injury.  In addition, it is well-settled under New York law that an entity may not profit
from its own wrong.[99]  To allow Enron to collect a termination payment, in this instance,

---

[98] *See supra* P 63.

[99] *Riggs v. Palmer*, 115 N.Y. 506, 511-12 (1889) ("[A]ll laws as well as all
contracts may be controlled in their operation and effect by general, fundamental maxims
of the common law.  No one shall be permitted to profit by his own fraud, or to take
advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire
property by his own crime.") *cited with approval in Goldner v. New York Property Ins.
Underwriting Association*, 455 N.Y.S.2d 204, 205 (N.Y. Sup. Ct. 1982) (applying *Riggs*
to a contract dispute).

20060628-4003 Issued by FERC OSEC 06/28/2006 in Docket#: EL05-139-000

Docket No. EL05-139-000                                                                    39

would be contrary to the expressed policies of the State of New York and would, in turn, result in certain pecuniary, "out-of-pocket" losses to Snohomish.[100]

83.    We also find that Snohomish has shown legal injury.  Under New York law, "[t]he rule is that fundamental misrepresentations which transmute indecision into a damaging decision connote damages."[101]  In this case, as noted above, Enron's "fundamental

---

[100] Even assuming that the pecuniary damages, identified above, were insufficient to support Snohomish's fraud claim, here, we note that because Snohomish was not aware of Enron's true financial position, it was precluded from negotiating terms in the Agreement that would have protected it, or otherwise compensated it, for its increased risk or, alternatively, was precluded from simply ending its negotiations with Enron. Accordingly, to the extent Snohomish was unable to factor knowledge of Enron's true financial situation and the risks related thereto into appropriate protective mechanisms in the Agreement, Snohomish can also be said to have been damaged by Enron's fraud. Specifically, the termination payment obligation, under the Agreement, was intended to operate as a *mutual* hedging mechanism, *i.e.*, to insulate *both* parties from market volatility in the case of either party's default.  Enron's insolvency, at the time the Agreement was executed, however, rendered this risk management function both meaningless and valueless for Snohomish, given Enron's financial inability to compensate Snohomish for its losses had power prices increased above the contract price prior to a default-triggered early termination.

Similarly, because Enron's bankruptcy (an event of default under the Agreement) was, or should have been, a foreseeable event for a party, such as Enron, that was knowingly insolvent at the time the Agreement was executed, Enron's misrepresentations concerning this issue increased the inevitability that the termination provisions of the agreement would be entirely one sided – protecting only Enron but *never* Snohomish.  If Enron had filed for bankruptcy when market prices exceeded the contract price, i.e., a situation in which Enron would have owed Snohomish a termination payment, Enron would have been unable to fully compensate Snohomish because of its insolvency, thus rendering the termination payment provisions a meaningless protection for Snohomish. Yet, if market prices had fallen below contract prices (as in fact occurred), Enron would have been able to demand a termination payment, as it has, from its creditworthy counterparty, Snohomish.  No rational purchaser would have entered into such a one-sided bargain.

[101] *State Street Trust Co. v. Ernst*, 264 N.Y.S. 555 (N.Y. Sup Ct. 1933), *aff'd without opinion*, 266 N.Y.S. 968 (N.Y. App. Div. 1933) (holding that "[w]hile there is no

(continued)

Docket No. EL05-139-000                                                    40

misrepresentations" concerning its solvency and the fact that these misrepresentations were made by Enron contemporaneous with the parties' negotiation and execution of the Agreement are not in dispute. Snohomish was, by definition, in a state of indecision when it solicited proposals pursuant to its RFP. By fraudulently and fundamentally misrepresenting its financial condition, Enron caused Snohomish to accept its proposal, transmuting Snohomish's indecision into a damaging decision resulting in legal injury. For all these reasons, we conclude that the Agreement is voidable.

84.    We reject Enron's argument that Snohomish's fraud claim fails because Snohomish ratified the Agreement. The facts in this case demonstrate clearly that Snohomish voided the Agreement shortly after the public announcement, on November 28, 2001, that Enron Corp.'s credit rating had been lowered to below investment grade. Snohomish, in this instance, should not have been expected to have had greater knowledge of Enron's financial fraud than the credit rating agencies themselves.

85.    We also reject Enron's argument that Snohomish's fraud claim must be decided and rejected on the basis of the Commission's rulings in the *Forward Contracts Proceedings.*[102] Unlike in the *Forward Contract Proceedings,* in this case we do not rest our decision on any findings regarding market conditions prevailing at that time or on modifying the Agreement under any particular standard.. Rather, we have determined, above, under New York law, that contract-specific evidence concerning Enron's fraudulent assertion of solvency, in its negotiations with Snohomish, render the Agreement voidable.

86.    Based on these findings, we need not consider, here, Snohomish's remaining arguments in support of its position that the Agreement is void, *i.e.*, we need not consider Snohomish's claims that: (i) Enron's market fraud also rendered the Agreement void; (ii) Enron, in entering into the Agreement, engaged in bad faith; (iii) Enron's market power induced Snohomish to enter into the Agreement under duress; and (iv) Enron lacked authority to enter into the Agreement, given its failure to adhere to the conditions of its market-based rate authority. In addition, we need not consider Snohomish's alternative arguments supporting its request for relief, as arising under the Agreement.[103]

---

presumption of damage arising from a representation proved to be false, the nature of the representation may be such that injury from acting upon it may be inferred").

[102] *See supra* note 6.

[103] Snohomish argues, among other things, that even assuming that the Agreement was lawfully entered into and thus became binding on the parties, Enron's termination payment claim fails, given Enron's failure to timely respond to Snohomish's

(continued)

Docket No. EL05-139-000                                                    41

### E.    Snohomish's Request that the Price Term under the Agreement Be Reduced to a Competitive Level

87.    In the absence of a valid contract governing the parties' performance in this case, Snohomish asserts that the price term charged by Enron, under the presumed authority of the Agreement, must be reduced to a competitive level. Snohomish asserts that in a properly functioning competitive market, a rate for a contract with a nine-year term would have been in the range of the long-run marginal cost of new generation, which in the Western energy market should have been around $34 per MW.[104]  Snohomish adds that while there can be differences of opinion among experts regarding the exact level of the long-run marginal cost, there can be no dispute that the cost would be well below the $109 per MW price term under the Agreement.

88.    Snohomish also asserts that the Commission is authorized, in this case, to reduce the price term under the Agreement to the appropriate level. Snohomish argues that when the Commission granted Enron its market-based rate authorizations and thus authorized Enron to enter into the Agreement, the Commission did so subject to the condition, imposed upon Enron, that its acts and transactions would not be the product of fraud, deception or misrepresentation. Snohomish argues that when this conduct is found to have occurred, the Commission is authorized to order Enron to disgorge any unjust profits attributable to its violations.

89.    We find that the remedy sought by Snohomish would not be appropriate here, covering the parties' initial performance under the Agreement. In fact, Snohomish's request for relief addresses a pending issue raised by Snohomish in the *Enron Gaming Proceeding*. Regardless, Snohomish's request for relief does not arise under section 1290, which addresses termination payments for power not delivered.

---

December 21, 2001 notice that no termination payment was due. Snohomish asserts that under section 5.5 of the Agreement, "[i]f [Enron] disputes [Snohomish's] calculation of the Termination Payment, in whole or in part, [Enron] shall, within two (2) Business Days of receipt of [Snohomish's] calculation of the termination payment, provide to [Snohomish] a detailed written explanation of the basis for such dispute." Snohomish also argues that Enron's termination payment claim fails because it is claim for lost profits that cannot be proved in this case with sufficient particularity. *See* Snohomish amended petition at 34, *citing Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 2005 WL 1863853 (S.D.N.Y. Aug. 8, 2005), *on reconsideration*, 2006 WL 147586 (S.D.N.Y.    Jan. 20, 2006).

[104] Snohomish petition at Attachment A (affidavit of John P. White).

Docket No. EL05-139-000                                                42

<u>The Commission orders</u>:

     Snohomish's petition is hereby granted, in part, and denied, in part, as discussed in the body of this order.

By the Commission.  Commissioner Brownell voted present; see attached statement.

( S E A L )


                                    Magalie R. Salas,
                                      Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Public Utility District No. 1 of                          Docket No. EL05-139-000
Snohomish County, Washington

(Issued June 28, 2006)

BROWNELL, Commissioner, <u>voting present</u>:

The Commission is an independent agency with quasi-legislative and quasi-judicial authority to make and enforce its rules. The quasi-legislative function manifests itself in rulemakings and policy statements. External influences can call into question the "independence" of the agency. The quasi-judicial function is the formal and paper hearings that provide individual parties the opportunity to litigate their interests based on the particular facts. External influences in the judicial function are more troublesome because they tend to undermine the rights of individual parties to due process (i.e., a fair hearing and impartial decision-making).

The subject proceeding involving Snohomish presents a matter of first impression. As the majority points out, the Commission does not typically rule on the type of contract issues raised by Enron's termination payment claim, or by the affirmative defenses asserted by Snohomish. These issues involve the application of state law and do not otherwise require uniform interpretations with respect to the policies we are required to administer. This proceeding is before us solely because section 1290 of EPAct 2005 gives the Commission exclusive jurisdiction to decide this specific dispute.

The adjudicatory proceedings that Snohomish has pending before the Commission have been the subject of continuous statements, letters and press releases from non-parties regarding what is the appropriate outcome, questioning the competency and fairness of the decision-makers, and criticizing the rules of procedure that govern every adjudicatory proceeding. The Commission's order on the Enron-Trial Staff Settlement itself, issued concurrently, recognizes that the external influence on the decisional processes of the Commission remains unabated.[105] I am concerned whether we can truly discount what has been said.

The inordinate amount of intrusion and the direct focus on a particular outcome in this matter have now reached the point where I believe the most appropriate course of action for me is to simply vote "present."

---

[105] See, e.g., Enron Power Marketing, Inc.,115 FERC ¶ 61,376 at P32 and n.52 (2006).

Docket No. EL05-139-000                                      2

    For these reasons, I respectfully vote present.


                                                  _____

                                                  Nora Mead Brownell
                                                  Commissioner